**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| NAYLOR GARDENS COOPERATIVE HOUSING ASSOCIATION | : | |
| Plaintiff, | : | |
| | : | Case No. 1:26-cv-00244-SLS |
| v. | : | |
| JEFFREY CHARLES & ASSOCIATES, INC. | : | |
| Defendant. | : | |

**COUNTERCLAIM OF JEFFREY CHARLES & ASSOCIATES, INC.**

**Exhibit 1**

# MANAGEMENT AGREEMENT

**BETWEEN:**

**NAYLOR GARDENS COOPERATIVE HOUSING ASSOCIATION**

**AND:**

**AGENT**

**JEFFREY CHARLES & ASSOCIATES, INC.**

**BEGINNING: JUNE 1ST, 2023**

**ENDING: MAY 31ST, 2026**

# MANAGEMENT AGREEMENT

This Management Agreement ("Agreement") is made June 1st, 2023, between ***Naylor Gardens Cooperative Housing Association*** ("Cooperative") and ***Jeffrey Charles and Associates, Inc.*** ("Agent").

1. **Appointment and Acceptance.** The Board of Directors ("Board") of the Cooperative appoints the Agent as exclusive agent for the management of the property described in Paragraph 2 of this Agreement, and the Agent accepts the appointment, subject to the terms and conditions set forth in this Agreement and the Supplemental Management Plan.

2. **Description of Project.** The property ("Project") to be managed by the Agent under this Agreement is a housing development consisting of land, buildings, and other improvements which make up:

**Naylor Gardens Cooperative Housing Association**

Location: 2725 30th Street, SE
City: Washington State: District of Columbia, 20020
No. of dwelling units: 796

I. **Definitions.** As used in this Agreement and the Management Plan:

a. "Agent" shall be Jeffrey Charles & Associates, Inc.
b. "Agreement" shall be the Management Agreement between the Cooperative and the Agent.
c. "Board" shall be the board of directors of the Cooperative.
d. "Naylor Gardens Cooperative Housing Association Membership Trust/Security Deposit Account." Shall be the interest-bearing account for the benefit of the Cooperative in which the Membership Fees will be deposited.
e. "Carrying Charge" shall be the monthly assessment paid to the Cooperative by each Member of the Cooperative for us in meeting the Cooperative's financial needs and obligations.
f. "Certificate of Incorporation" shall be the Cooperative Articles of Incorporation, filed with the District of Columbia, as may be amended from time to time by the Membership of the Cooperative.
g. "Cooperative" shall be the Naylor Gardens Cooperative Housing Association.
h. "General Operating Reserves" shall be the interest-bearing account for the benefit of the Cooperative that shall hold the amount to be saved as an operating reserve.
i. "Governing Documents" shall be the Articles of Incorporation, By-Laws, House Rules and Regulations of the Cooperative, and Member's ownership documents including Proprietary Leases and Stock Certificates. In the event of any conflict between the provisions of this Agreement and any provision of the Governing Documents, the provisions of this Governing Documents shall control.
j. "Management Plan" shall be the supplemental document to this Agreement and is a comprehensive and detailed description of the policies and procedures to be followed in the management of the Project.
k. "Member/Membership" shall be any person, trust or other legal entity, or any combination thereof who holds a Stock Certificate or certificate of stock and proprietary lease evidencing ownership in the Cooperative.

l. "Membership Fee" shall be the security deposit, or any other fees funds collected by the Agent not including Carrying Charges.
m. "Operating Account" shall be the account holding all Carrying Charges, including any late fees and other amounts receivable on the Owner's account in connection with the management and operation of the Project. The account shall be named "Naylor Gardens Cooperative Housing Association Operation Account."
n. "Owner" shall be the Members and Residents of the Cooperative who are governed by the Board of Directors.
o. "Principal Parties" means the Owner and the Agent.
p. "Project" shall be the property of Naylor Gardens Cooperative Housing Association.
q. "Property Manager" shall be the Agent's employee assigned to manage the Property.
r. "Proprietary Lease" shall refer to the contract between the Cooperative and the Member signed at the time the Stock Certificate is issued. The Occupancy Agreement, along with the Bylaws and the House Rules, list the rights and responsibilities of Members of the Cooperative as well as the obligations of the Cooperative to the Members.
s. "Residents" shall be any person who is either a Member or who holds a legal lease.
t. "Stock Certificate" shall be the document memorializing the sale of a proportionate share of the Cooperative to an individual. Each Stock Certificate shall list the proportionate share of the Cooperative it represents and shall correspond to a single dwelling unit in the Cooperative.

II. **Management Plan.** The Management plan is attached which provides a comprehensive and detailed description of the policies and procedures to be followed in the management of the Project. In many of its provisions, this Agreement will briefly define the nature of the Agent's obligations, with the intention that reference be made to the Management Plan for more detailed policies and procedures.

a. Accordingly, the Owner and the Agent will comply with all applicable provisions of the Management Plan, unless certain provisions are waived with the prior written consent of the Board, regardless of whether specific reference is made thereto in any particular provision of this Agreement. The Management Plan will be incorporated as a part of this Agreement, and copies will be provided to the parties hereto.

III. **Basic Information.** As soon as possible, the Owner will furnish the Agent with a complete set of plans and specifications with copies of all guaranties and warranties pertinent to construction, fixtures, and equipment. With the aid of this information and through inspection by competent personnel, the Agent will thoroughly familiarize itself with the character, location, construction, layout, plan, and operation of the Project, and especially the electrical, heating, plumbing, air-conditioning and ventilation systems, the elevators, and all other mechanical equipment.

IV. **Marketing.** The Agent will carry out the marketing activities prescribed in the Management Plan. Subject to the Owner's prior approval, advertising expenses will be paid out of the Project Operating Account as Project Expenses.

V. **Membership.** The Agent will offer for sale and will sell memberships in the Cooperative, which was established as a market rate cooperative and not as a limited equity cooperative. Incidental thereto, the following provisions will apply:

a. The Agent will follow the Membership selection policy described in the Management Plan and the Governing Documents of the Cooperative.
b. The Agent will show the premises to prospective residents.
c. The Agent will take and process applications for membership, including the administration of a background check. Applications will be subject to Board acceptance or denial. If an application is rejected, the applicant will be told the reason for rejection, and the rejected application, with reason for rejection, will

be kept on file for three (3) years. A current list of prospective Members will be maintained.

d. The Agent will complete all the provided Proprietary Leases and will execute the same in the Cooperative's name, identified thereon as agent for the Owner upon receipt of consent to do so by the Board. The terms of all agreements will comply with the pertinent provisions of the Governing Documents of the Cooperative, and any government agency regulations. Proprietary Leases will be in a form approved by the Owner, but Occupancy Agreements need not to be submitted for the approval of the Owner.

e. The Owner will furnish the Agent with schedules of Carrying Charges as from time to time approved by the Board, showing Carrying Charges for dwelling units and other charges for facilities and services. In no event will such Carrying Charges and other charges be exceeded.

f. The Agent will counsel all prospective Members regarding eligibility for dwelling units that are less than fair market Carrying Charges and will prepare and verify eligibility certifications and recertification in accordance with the Cooperative's Governing Documents.

g. The Agent will collect, deposit, and disburse Membership Fees, if required, in accordance with the terms of each Member's Proprietary Lease and the Governing Documents. Membership Fees and other funds collected by the Agent will be deposited by the Agent in an interest-bearing account for the benefit of the Cooperative separate from all other accounts and funds, with a bank or other financial institution whose deposits are insured by an agency of the United States Government. This account will be carried the Corporation's name and designated of record as "Naylor Gardens Cooperative Housing Association Membership Trust/Security Deposit Account." All instruments should be made payable to "Naylor Gardens Cooperative Housing Association."

h. The Agent acknowledges that there are three categories of units within the Cooperative. The first category includes units occupied by the members named in the Proprietary Lease. The second category includes units which are subleased to third parties by the members named in the Proprietary Lease. The third category includes units which are owned by the Owner and subleased to third parties. The Agent shall be responsible for all leasing operations related to the second and third categories, as more thoroughly described in the Management Plan.

VI. **Collection of Carrying Charges and Other Receipts.** The Agent will collect when due all Carrying Charges, including any late fees and other amounts receivable on the Owner's account in connection with the management and operation of the Project. Such receipts (except for Members' Membership fees/security deposits, which will be handled as specified in Paragraph 8(9) above) will be deposited in an account, separate from all other accounts and funds, with a bank whose deposits are insured by the Federal Deposit Insurance Corporation. This account will be carried in the Owner's name and designated or record as "Naylor Gardens Cooperative Housing Association Operating Account."

VII. **Enforcement of Governing Documents.** The Agent will secure full compliance by each Member with the terms of his or her Proprietary Lease and all other Governing Documents. Voluntary compliance will be emphasized, and the Agent, utilizing the services of the Property Manager will counsel Members and make referrals as appropriate to the community agencies in cases of financial hardship or under other circumstances deemed appropriate by the Agent and the Owner, to the end that involuntary termination of tenancies may be avoided to the maximum extent consistent with sound management of the Project. Nevertheless, and subject to the pertinent procedures prescribed in the Management Plan, the Agent may lawfully terminate any occupancy when, in the Board's judgement and the Board's request, sufficient cause (including but not

limited to nonpayment of Carrying Charges) for such termination occurs under the terms of the Members' Proprietary Lease. For this purpose, the Agent is authorized to consult with legal counsel to be designated by the Owner, to bring actions for eviction and to execute notices to vacate and judicial pleading incident to such actions; provided, however, the Agent keeps the Owner informed of such actions and follows such instructions as the Owner may prescribe for the conduct of any such action. Subject to the Owner's approval, attorney fees and other necessary costs incurred in connection with such actions will be paid out of the Project's Operating Account as Project expenses.

VIII. **Maintenance and Repair.** The Agent will maintain the Project in good repair in accordance with the Management Plan and local codes, and in a condition at all times acceptable to the Owner, including but not limited to cleaning, painting, decorating, plumbing, carpentry, grounds care, and such other maintenance and repair work as may be necessary.

Incidental thereto, the following provisions will apply:

a. Special attention will be given to preventative maintenance and, to the greatest extent feasible, the services of regular maintenance employees will be used.
b. Subject to the Owner's prior written approval, the Agent will contract with qualified independent contractors for the maintenance and repair of heating systems and for ordinary repairs beyond the capability of regular maintenance employees.
c. The Agent will systematically and promptly receive and investigate all service requests from Members, take such action thereon as may be justified, and will keep records of same. Emergency requests will be received and serviced on a twenty-four (24) hour basis. Complaints of a serious nature will be reported to the Owner after investigation.
d. The Agent is authorized to purchase all materials, equipment, tools, appliances, supplies, and services necessary for proper maintenance and repair. This expenditure shall be limited to the amount specified in the annual budget.
e. Notwithstanding any of the foregoing provisions, the prior approval of the Owner will be required for any expenditure which exceeds Five Thousand Dollars ($5,000) in any one instance for labor, materials or otherwise in connection with the maintenance and repair of the Project, except for recurring expenses within the limits of the operating budget or emergency repairs involving manifest danger to persons or property or required to avoid suspension of any necessary service to the Project. In the latter event, the Agent will inform the Owner of the facts as promptly as possible. In the event the Agent makes an expenditure exceeding such amount to perform an emergency repair, the Agent shall provide the Owner with a written explanation of the emergency, the repairs made, and the total cost, within twenty-found (24) hours of making this expenditure.

IX. **Utilities and Services.** In accordance with the Management Plan and the operating budget, the Agent will make arrangements for water, electricity, gas, fuel oil, sewage and trash disposal, vermin extermination, decorating, laundry facilities, and telephone services. Subject to the Owner's prior approval, the Agent will make such contracts as necessary to secure such utilities and services.

X. **Employees.** The Management Plan prescribes the number, qualifications, and duties of the personnel to be regularly employed in the management of the Project, including a Property Manager, maintenance, bookkeeping, clerical, and other managerial employees. All such personnel will be employees of the Agent, and will be hired, paid, supervised, and discharged by the Agent with the approval of the Board, subject to the following conditions:

a. As more particularly described in the Management Plan, the On-Site Property Manager will have duties of the type usually associated with that position. He/She will be directly responsible for the Agent's Property Manager for the coordination of activities in the interest of good overall management.

b. The compensation (including fringe benefits) of the On-Site Property Manager and the maintenance employees will be as approved by the Board of Directors.
c. The Owner will pay for compensation (including fringe benefits) payable to the on-site management and maintenance employees, as prescribed in the Management Plan, and for all local, state, and Federal taxes and assessments (including but not limited to Social Security taxes, unemployment insurance and workman's compensation insurance) incident to the employment of such personnel. Such compensation will be paid out of the Project Operating Account and will be treated as Project Expenses.
d. Compensation (including fringe benefits) payable to the on-site staff, such as the Property Manager, and all bookkeeping, clerical, and other managerial personnel, plus all local, state, and Federal taxes and assessments incident to the employment of such personnel will be borne solely by the Project and will not be paid out of the Agent's fee.
e. The Agent will establish and follow an employment policy that affords Residents maximum opportunities for employment in the management and operation of the Project and, to the extent consistent with that consideration, employment opportunities to lower-income persons in the area.
f. The Agent is an independent contractor. In no event shall the Agent (or its employees) be considered employees of the Owner. However, with regard to any type of communication with the Owner's legal counsel or the Board of Directors, officers, committee members, employees and agents, the Agent and its employees shall be deemed the functional equivalent of officers and employees of the Owner for purposes of the attorney/client privilege and any and all other legal protections afforded to the Owner.

XI. **Disbursements From Owner's Operating Account.**

a. From the funds collected and deposited by the Agent in the Owner's Operating Account pursuant to Paragraph 9 above, the Agent will make the following disbursements promptly when payable:
   1. Compensation payable to the employees specified in Paragraph 13(C) above, and for the taxes and assessments payable to local, state, and Federal governments in connection with the employment of such personnel.
   2. All sums otherwise due and payable by the Owner as expenses of the Project authorized to be incurred by the Agent under the terms of this Agreement, including compensation payable to the Agent, pursuant to Paragraph 25 below, for its service hereunder.
   3. All recurring or budgeted items.

b. In the event the balance in the Owner's Operating Account is at any time insufficient to pay disbursements due and payable under Paragraph 14(a) above, the Agent will promptly inform the Owner of that fact and the Owner will then remit to the Agent sufficient funds to cover the deficiency. The Agent will make all earliest and best efforts to advise the Owner of a reasonably foreseeable risk of Owner's Operating Account holding insufficient funds to pay said disbursements. In no event will the Agent be required to use its own funds to pay such disbursements.

XII. **Budgets.** Annual operating budgets for the Project will be as approved by the Owner. Except as permitted under Paragraph 11(e) above, annual disbursements for each type of operating expense itemized in the budget will not exceed the amount authorized by the approved budget. The Agent will prepare and submit recommended operating budgets for approval for each fiscal year beginning during the term of this Agreement, to the Owner at least one hundred-twenty (120) days before the beginning of the fiscal year so that the budget may be approved sixty (60) days before the beginning of the fiscal year. The Owner will promptly inform the Agent of any changes

incorporated in the approved budget, and the Agent will keep the Owner informed of any anticipated deviation from the receipts or disbursements stated in the approved budget.

XIII. **Records and Reports.** In addition to any requirements specified in the Management Plan or in other provisions of this Agreement, the Agent will have the following responsibilities with respect to records and reports:

a. The Agent will establish and maintain a comprehensive system of records, books, and accounts in a manner conforming to the directives of the Board. All records, books, and accounts will be subject to examination at reasonable hours by any Member of the Board and any other authorized representative of the Owner. All such records will remain the property of the Owner and shall be returned to the Owner within twenty (20) days of termination of this Agreement.

b. With respect to each fiscal year ending during the term of this agreement, the Agent will have an annual financial report prepared by a certified public accountant or other person acceptable to the Owner, based upon the preparer's examination of the books and records of the Owner and the Agent, provided that the Board has given prior written consent. The report will be prepared in accordance with the directives of the Owner, and will be certified by the preparer, and will be submitted to the Board withing thirty (30) days after the end of the fiscal year. Compensation for the preparer's services will be paid out of the Owner's Operating Account as an expense of the Project.

c. The Agent will prepare a monthly report comparing actual and budgeted figures for receipts and disbursements and will submit each such report to the Owner by the fifteenth (15th) of the following month.

d. The Agent will furnish such information (including but not limited to occupancy reports, Resident information, government licenses, balance sheet, income statement, general ledger, aging income report, and trial balance) as may be requested by the Owner from time to time with respect to the financial, physical, or operational condition of the Project.

e. The Agent will prepare and submit in a timely fashion, reports as required by any other institution or auditor.

f. By the fifteenth (15th) day of each month, the Agent will furnish the Owner with an itemized list of all delinquent accounts, as of the eleventh (11th) day of the same month.

g. By the tenth (10th) day of each month, and no later than the fifteenth (15th) day of each month, the Agent will furnish to the Owner with a statement of receipts and disbursements during the previous month, and with a schedule of accounts receivable and payable, copies of contractor and vendor receipts, and reconciled bank statements for the Owner's Operating Account as of the end of the previous month.

h. Upon reasonable advance written notice to the Agent, the Agent will grant access to the Owner or its representatives (including but not limited to its legal representation, consultants, and accountants) to enter any part of the Project to inspect the Project, extract information from all books and records, and/or any other purpose the Owner deems necessary, provided the request is for a reasonable time.

i. The Agent shall respond substantively to any inquiry by the Owner with respect to any report described herein within two (2) business days of receipt.

XIV. **Fidelity Bond.** The Agent will furnish, at its own expense, a fidelity bond in an amount which is at least equal to the gross potential income for three months and is conditioned to protect the Owner and the Consenting Parties against misappropriation of Project funds by the Agent and its employees. The fidelity bond will designate the Owner as a named insured. The other terms and conditions of the bond, and the surety thereon, will be subject to the approval of the Owner and the Consenting Parties. In the event that any employee, principal owner, director, officer and/or

agent of the Agent is adjudged to having embezzled or otherwise converted funds or other property of the Owner, then Agent agrees to assign to the Owner that portion of the proceeds received by the Agent from its fidelity bond provider as a result of said embezzlement.

XV. **Bids, Discounts, Rebates, etc.** The Agent will obtain contracts, materials, supplies, utilities, and services on the most advantageous terms to the Project, and is authorized to solicit bids, either formal or informal, for items that can be obtained from more than one source. The Agent will secure and credit to the Owner all discounts, rebates, or commissions obtainable with respect to purchases, service contracts, and all other transactions on the Owner's behalf. The Owner and Agent agree that all goods and services purchased from individuals or companies having an identity-of-interest with the Agent or Owner shall be purchased at costs not in excess of those that would be incurred in making arms-length purchases on the open market.

The Board and/or its representatives and the Agent shall solicit written cost estimates (i.e., bids) from at least three (3) contractors or suppliers for any work item which the Owner or the Agent estimates will cost $5,000 or more and for any contract or ongoing supply or service agreement arrangement which is estimated to exceed $5,000 per year. Each person or entity from which a bid is solicited must be properly licensed by the United States, and the District of Columbia, to the extent that the statutes, ordinances, or regulations of any governmental unit or agency require licensure of persons or entities engaging in the business of providing services or supplying the goods that are the subject of the bid. The Agent shall be responsible for obtaining proof of such licensure, which it shall submit to the Owner upon reasonable demand. The Agent agrees to accept the bid which represents the lowest price taking into consideration the bidder's reputation for quality of workmanship or materials and timely performance, and the time frame within which the service of goods are needed. For any contract or ongoing supply or service arrangement obtainable from more than one source and estimated to cost less than $5,000, the Agent shall solicit verbal or written cost estimates, as necessary to assure that the Owner is obtaining services, supplies, and purchases at the lowest possible cost. The Agent must make a written record of any verbal estimate obtained. Copies of all required bids and documentation of all verbal cost comparisons made by the Agent shall be made part of the Owner's records and shall be retained for three (3) years from the date the work was completed. This documentation shall be subject to inspection by the Secretary or his/her designee, and the Owner. The Agent agrees to submit such documentation upon request. The Agent further agrees to disclose to the Owner any financial interest that the Agent may have related to the proposed contractor at the time of the bid submission.

The Agent further agrees that bids will be obtained from, or contracts entered into with suppliers who agree to furnish a reasonable warranty, in writing, of the goods supplied. As to bids or contracts for the provision of services in excess of $5,000, the contractor from whom the bid is sought must give, in writing, a written warranty as to the materials and workmanship for a period of time deemed reasonable by the Board. Furthermore, the contractor must provide evidence of sufficient worker's compensation and liability insurance, and acknowledge in writing that acceptance of the bid is contingent upon the contractor obtaining a performance bond for the completion of the Project, a payment bond ensuring payment of all subcontractors, and that periodic payments under the contract are conditioned upon obtaining from all contractors and subcontractors, and any other party with mechanics lien or materialman's lien rights, executed waivers of those rights. These conditions may only be waived by a vote of the Board of Directors, or in the event of the necessity of emergency repairs as described in Paragraph 11(e) of this contract.

XVI. **Meetings.** The Agent will attend at least eleven (11) Board meetings and one (1) Membership meeting during each year that this agreement is in effect. The Board may request the Agent to attend additional meetings.

XVII. **Social Services Program.** If the Board determines it is applicable, the Agent will be responsible to the Owner for carrying out the social services program described in the Management Plan.

XVIII. **Member-Management Relations.** If the Board determines it is applicable, the Agent will encourage and assist residents of the Project in forming and maintaining representative organizations to promote their common interests and will maintain good-faith communication with such organizations to the end that problems affecting the Project and its residents may be avoided or solved on the basis of mutual self-interest.

XIX. **On-Site Management Facilities.** Subject to the further agreement of the Owner and Agent as to more specific terms and prior written consent of the Board, the Agent will be allowed to maintain a management office within the Project, to be shared with the Board, and the Owner will make no rental charge for the same.

XX. **Insurance.** Owner agrees to procure and maintain, or at the request and expense of the Owner, Agent will procure and maintain, at all times during the term hereof such fire, extended coverage, public liability, workers' compensation, umbrella liability, business interruption and other policies in amounts as are commercially reasonable for like facilities, insuring both Owner and Agent as primary insured for tort liability and insuring Owner as primary insured for property liability. The owner agrees to provide Agent with, where appropriate, copies of certificates of insurance naming the Agent as an additional insured. Owner further agrees that the Agent may terminate this Agreement if, at any time during the term of this Agreement, Owner cancels or refuses to renew or obtain insurance for the Project in the amounts and with the types of coverage as set forth herein, and replacement insurance is not obtained by the Owner within fifteen (15) days after the written request of the Agent.

XXI. **Other Insurance.** Agent represents that it currently maintains and shall maintain, with financially sound and reputable companies, insurance on all of its properties in at least such amounts and against at least such risks as are usually and reasonably insured against by entities of similar size engaged in the same or similar business. Such insurance shall include the following coverage: 1) Commercial General Liability, 2) Workers Compensation, 3) Commercial Automobile Liability, 4) Commercial Umbrella Liability, and 5) Errors and Omissions Liability. Agent agrees that it will not unreasonably reduce the amounts or coverage of such insurance from the amounts or coverage currently in place and that it will increase such amounts and provides additional insurance against such risks such that its insurance in place, from time to time, shall be consistent with the foregoing representation.

XXII. **Compliance with Governmental Orders.** The Agent will take such actions as may be necessary to comply promptly with any and all governmental orders or other requirements affecting the Project, whether imposed by Federal, State, County, or Municipal authority, subject, however, to the limitation stated in Paragraph 11(e) with respect to repairs. Nevertheless, the Agent shall take no such action so long as the Owner is contesting, or the Owner in writing of all notices of such orders or other requirements, within seventy-two (72) hours from the time of their receipt. Agent's responsibilities under this Paragraph will include, but not be limited to:

a. Applying for, obtaining, and maintaining all licensees and permits required of the Owner or Agent in connection with the operation and management of the Project. The Owner will cooperate with the Agent to execute and deliver all applications and any other documents necessary to maintain compliance.
b. Make all best efforts necessary to comply with all governmental requirements and to discharge any lien, encumbrance, or charge on or with respect to the Property. Comply with the homestead deduction requirements of OTR and the requirements of OPM Compliance.
c. Notify Owner of the need to retain legal counsel for the Property for the purpose of instituting any and all legal actions or proceedings reasonably necessary to collect charges, insurance proceeds, condemnation awards, rent or other income to the Project, to

abate or reduce any taxes upon the property, or to dispossess guests, tenants, or other persons, or to cancel or terminate any lease or license for default.

XXIII. **Nondiscrimination.** In the performance of its obligations under this Agreement, the Agent will comply with the provisions of any Federal, state, or local law prohibiting discrimination in housing on the grounds of race, color, sex, creed or national origin, handicap, or familial status including Title VI of the Civil Rights Act of 1964 (Public Law 88-352, 78 Stat. 241), all requirements imposed by or pursuant to the Regulations of the Secretary (24 CFR, Subtitle A, Part 1) issued pursuant to that title; regulations issued pursuant to Executive Order 11063, and Title VIII of the 1968 Civil Rights Act and any subsequent amendment to any of the above stated statutes, ordinances, and regulations.

XXIV. **Agent's Compensation.** The Agent will be compensated for its services under this Agreement by monthly fees, to be paid out of the Project Operating Account and treated as Project expenses. Such fees will be payable on the first (1st) day of each month, in advance, for the term of this Agreement or any renewal term thereof. Each such monthly fee will be in an amount equal to 3.5% of gross receipts of previous month, per month as of same date of this Agreement, which shall include any subleasing fee paid by members. No further charge shall be made by the Agent for the services provided in this Agreement without the consent of the Board. The Agent will propose and get advanced written approval from the Board for any project management fees for contracts over $200,000. Said project management fees shall be determined based on the size, cost, and complexity of the project but shall not exceed [to be determined]. Contracts under $200,000 shall not be subject to any additional project management fees.

XXV. **Term of Agreement.** This Agreement shall be in effect for a period of three (3) years, beginning on **June 1st, 2023,** and ending on **May 31st, 2026,** under the following conditions:

a. This Agreement may be terminated by the Owner or the Agent with or without cause at any time, provided at least ninety (90) days advance notice thereof is given, this Agreement will automatically renew itself for successive one-month terms unless either party notifies the other to the contrary in writing thirty (30) days prior to the expiration date or any renewal term thereof.

b. In the event of a material default by either the Owner or the Agent under this Agreement, the Agreement is terminated as of the date the termination notice is received.

c. Upon termination, the Agent will transfer all funds held for the Owner, including security deposits, and submit to the Owner any financial statements required by the Owner. After the Principal Parties have accounted to each other with respect to all matters outstanding as of the date of termination, the Owner will furnish the Agent security in form and principal amount satisfactory to the Agent against any obligations or liabilities the Agent may properly have incurred on behalf of the Owner hereunder. The Agent, upon termination, shall promptly, but not later than twenty (20) days after the effective date of termination, surrender possession of all the Owner's books, statements and records, and related materials belonging to the Owner that are in the Agent's possession, custody or control to the Board or newly designated agent, if any, and otherwise cooperate in good faith in the smooth transition to the newly designated agent, if any. The Agent shall not be entitled to any compensation or reimbursement of cost for activities related to the turnover of records with the exception of any shipping or delivery expenses.

XXVI. **Default.** In the event of default of any sum due under this Agreement:

a. By the Owner, the Agent shall be entitled to recover, in addition to the unpaid sums, interest on the unpaid balance at the rate of 6% per annum from the date of default plus the Agent's costs of collection, including reasonable attorney's fees.

b. By the Agent, including those described in Paragraph 27(c) below, the Owner shall be entitled to recover, in addition to the unpaid sums, interest on the unpaid balance at the rate of 6% per annum from the date of default plus the Owner's costs of collection, including reasonable attorney's fees.

c. In the event that late payment fees, government-issued citations, or any other charges are improperly incurred to the Owner as a result of the Agent's failure to execute its duties under this Agreement, the Agent shall pay for and reimburse all such sums to the Owner.

XXVII. **Hold Harmless.** The Owner shall indemnify the Agent against all costs, expenses, attorney's fees, suits, and damages of any nature whatsoever from or in connection with its handling of the property or the performance or exercise of any of the duties or powers of the Agent hereunder, unless due to the negligence or willful misconduct of the Agent. The Owner agrees to save the Agent harmless from all fines, judgements, claims, demands, and actions of any kind, and from liability for injuries or death suffered by any employee or contractor engaged by the Agent for the benefit of the Owner, and as well, from any and all liability for injury or death to any person whomsoever, provided, however, the preceding clause shall not apply in cases of the Agent's negligence or willful misconduct. The Agent shall indemnify the Owner against all costs, expenses, attorney's fees, suits, and damages of any nature whatsoever from or in connection with any loss, damage liability, cost, or expense (including reasonable attorney's fees) that the Owner may incur or sustain as a result of the negligence or intentional misconduct of the Agent.

XXVIII. **Related Parties.** It is understood by the parties that Jeffrey Charles Facilities Management, LLC is an affiliated company with a principal of Jeffrey Charles and Associates, Inc.

XXIX. **Interpretive Provisions.**

a. The Agreement constitutes the entire agreement between the Owner and the Agent with respect to the management operation of the Project, and no change will be valid unless made by supplemental written agreement executed by the Principal Parties.

b. This Agreement has been executed in several counterparts, each of which shall constitute a complete original Agreement which may be introduced in evidence or used for any other purpose without production of any of the other counterparts.

c. Where context requires, words in the singular should be substituted for the plural and vice versa, and words in the masculine should be substituted for any gender.

IN WITNESS WHEREOF, the parties to this Agreement by their duly authorized officers have executed this Agreement on the date first above written.

WITNESS:

DocuSigned by:
Jamie K. Blair
F5269ADBAD844D0...

**OWNER:** Naylor Gardens Cooperative Housing Association

DocuSigned by:
C7C7DD095E3B4B2...
David Muir, President

DocuSigned by:
Thy Harrison
9925DD260C0C465...
Thy Harrison, Treasurer

WITNESS:

**AGENT:** Jeffrey Charles & Associates, Inc.

Jeffrey C. Turner, President