eFiled
11/20/2025
Superior Court
of the District of Columbia

**IN THE SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA**
**Civil Division**

| | |
|---|---|
| **NAYLOR GARDENS COOPERATIVE HOUSING ASSOCIATION**<br>2725 30th Street SE<br>Washington, DC 20020<br><br>Plaintiff,<br><br>v.<br><br>**JEFFREY CHARLES & ASSOCIATES, INC.**<br>6422 Grovedale Drive, Suite 201C<br>Alexandria, VA 22310<br><br>Serve on: Christine Leake,<br>Registered Agent<br>210 R Street NW, Suite 102<br>Washington, DC 20001,<br><br>Defendant. | Civil Action No. 2025-CAB-007704 |

## COMPLAINT

COMES NOW Plaintiff, NAYLOR GARDENS COOPERATIVE HOUSING ASSOCIATION ("NGCHA" or "Plaintiff"), formerly known as Veterans Cooperative Housing Association, and presents this Complaint against JEFFREY CHARLES & ASSOCIATES, INC. ("JCA" or "Defendant"), and alleges as follows:

## PARTIES

1. Plaintiff, NGCHA, is a non-profit housing cooperative association established pursuant to and under the District of Columbia Cooperative Association Act,

**EXHIBIT B**

Title 29, Chapter 11 of the Code of Laws of the District of Columbia with a registered office at 2725 30th Street, S.E., Washington, DC 20020.

2. NGCHA owns land, buildings, and other improvements consisting of 56 buildings spanning 58 parcels across 35.31 acres with a total of 796 dwelling units, which are comprised of units that are owned by NGCHA or its members/shareholders (collectively referred to as the "Property"). The Property's units are occupied by members, tenants who lease their unit directly from NGCHA, or sublessees who sublease one of NGCHA's member-owned units.

3. Defendant, JCA, is a Virginia corporation and property management company authorized to conduct business in the District of Columbia.

## JURISDICTION

4. This Court has jurisdiction over this matter and these parties pursuant to D.C. Code Ann. §§ 11-921 and 13-423.

## FACTUAL BACKGROUND

5. On or about June 1, 2023, NGCHA and JCA entered into a Management Agreement (the "Agreement"), wherein NGCHA appointed JCA as the exclusive agent for the management of the Property and set forth the terms and conditions of such management for a term originally intended to end on May 31, 2026.

6. A true and accurate copy of the Agreement is attached hereto as **Exhibit 1**.

7. Pursuant to Section II of the Agreement, NGCHA and JCA incorporated the parties' Management Plan (the "Plan") as part of the Agreement. The Plan set forth

certain policies and procedures that JCA was to follow in the Property's management, wherein JCA promised to perform property management and related services in connection with the Property, in exchange for management fees and other consideration.

8. A true and accurate copy of the Plan is attached hereto as **Exhibit 2**.

9. In exchange for the services specified in the Agreement, NGCHA agreed to pay to JCA a "management fee" equal to 3.5% of gross receipts from the previous month including any subleasing fee paid by members. *See* **Exhibit 1**, Section XXIV of the Agreement.

10. During its ultimately truncated tenure as property manager, JCA withdrew its payments in full from NGCHA's operating account.

11. The Agreement was terminated effective September 30, 2024, at which time JCA ceased acting as NGCHA's property manager.

12. During and after JCA's tenure as property manager, NGCHA discovered that JCA had, in numerous respects, breached its obligations under the Agreement and its duties with respect to the Property, its residents, and NGCHA, as stated herein.

**A. JCA's Failures Relating to Turning Over, Marketing, Selling, and Leasing the Property's Vacant Units**

13. As recognized in the Plan, JCA's "On-site Project Manager, under the guidance and direction of [JCA], ha[d] the complete responsibility for the daily administration of property operations, which include resident placement and vacating . . . ." *See* **Exhibit 2**, Plan at 1.

14. Accordingly, it was JCA's responsibility to "offer for sale" and to "sell memberships in the Cooperative." *See* **Exhibit 1**, Agreement, Section V.

15. The Agreement further provided that JCA "shall be responsible for all leasing operations" related to the leasing of units which are subleased to third parties by the members of NGCHA named in the Proprietary Lease, as well as the leasing of units which are owned by NGCHA itself and subleased to third parties. *See* **Exhibit 1** at Section V(h).

16. To encourage the prompt turnover and sale and/or leasing of the Property's vacant units after a resident vacated a unit on the Property, JCA was required to arrange "for the unit to be prepared for a new occupant within a three-day period" and that "inspections will be scheduled when a resident vacates a leased unit." *See* **Exhibit 2**, Plan at 25.

17. To support the sale and/or leasing of the Property's vacant units, JCA was responsible for carrying out the "marketing activities prescribed in the Management Plan." *See* **Exhibit 1**, Agreement, Section IV.

18. The Plan recognized that "[m]arketing is the activity taken by Management to inform the general public of the property's existence, availability for residency at the property, and the requirements by which an applicant may become a member and take occupancy of a leased unit." *See* **Exhibit 2**, Plan at 16.

19. The Plan recognized that newsprint advertisement, radio or television ads, and "other community resources" would be used in marketing the Property, and that JCA would monitor and record the responses to any such advertising. *See id.*

20. JCA's site manager was also required to "undertake contact with local housing and housing referral agencies which might generate moderate income housing applicants for residency." *See id.*

21. As manager of the Property, JCA materially breached the Agreement by failing to timely inspect, turn over, and/or lease or sell vacant units.

22. JCA also materially breached the Agreement by failing to timely or adequately market available units to the general public.

23. More specifically, a May 2023 vacancy report prepared by JCA's predecessor management company indicated that at least fifteen (15) units were "rent ready" and awaiting inspection and turnover by JCA.

24. However, JCA did not inspect these units until November 20, 2023—more than five (5) months after the Agreement's effective date and the start of JCA's tenure as property manager—causing a rental income loss of at least $129,578 for these units.

25. In order to monitor the Property's vacancies and rental income, JCA's onsite manager was obligated to "prepare and forward to the managing agent monthly closing reports on the rent roll system for accounts receivable activity and vacancy status." *See* **Exhibit 2**, Plan at 56.

26. In a December 2023 report prepared by JCA, it was revealed that an additional forty-five (45) units had become vacant, totaling sixty (60) vacant units.

27. JCA largely continued to fail to timely inspect or turnover the newly vacant units within the required three-day period under the Agreement, resulting in an estimated additional rental income loss in excess of $151,800.

28. JCA's consistent failure to fulfill its obligations under the Agreement and Plan both increased and prolonged the Property's vacancies, crippled NGCHA's cash flow, and prevented otherwise lawful rent increases, causing NGCHA to incur damages.

29. For the few units that JCA did ultimately turn over, it failed to do so in a manner consistent with JCA's obligations under the Agreement and as a financial fiduciary of NGCHA.

30. As property manager, JCA was required to "obtain contracts, materials, supplies, utilities, and services on the most advantageous terms to the Project, and is authorized to solicit bids, either formal or informal, for items that can be obtained from more than one source." *See* **Exhibit 1** at Section XV.

31. Further, Section VIII(e) of the Agreement prescribed that "the prior approval of the Owner will be required for any expenditure which exceeds Five Thousand Dollars ($5,000) in any one instance for labor, materials or otherwise in connection with the maintenance and repair" of the Property. *See* **Exhibit 1** at Section VIII(e).

32. Additionally, "written cost estimates (i.e., bids) from at least three (3) contractors or suppliers for any work item which the Owner or the Agent estimates will cost $5,000 or more and for any contract or ongoing supply or service agreement arrangement which is estimated to exceed $5,000 per year" were to be solicited and documented. *See* **Exhibit 1** at Section XV.

33. JCA failed to obtain the requisite approvals.

34. For example, with respect to work performed relating to the belated turnover of vacant units, it was discovered that a contractor (apparently hired by JCA in a manner inconsistent with the Agreement) performed repairs for nine (9) of the sixty (60) remaining vacant units for a total cost of $52,300, or an average of $5,811 per unit.

35. A comparison of costs for the same scope of work from other contractors estimated that such repairs for the turnover work would total $21,930, which would have resulted in a savings of approximately $32,570.

36. JCA's failure to perform the needed repairs and turnover of these units in a timely and cost-effective manner, and in accordance with the Agreement, caused NGCHA to incur additional damages.

**B. JCA's Failures in Obtaining Necessary Government Licenses and Permits and Complying with Other Governmental Requirements**

37. Section XXII of the Agreement provided that JCA was further responsible for "[a]pplying for, obtaining, and maintaining all licensees [sic] and permits required of the Owner or Agent in connection with the operation and management of the Project" and using "best efforts necessary to comply with all governmental requirements and to discharge any lien, encumbrance, or charge on or with respect to the Property." *See* **Exhibit 1** at Section XXII(a)-(b).

38. During its tenure as property manager, JCA assured NGCHA and its members that deadlines to renew licenses and to seek approval for rent increases from the District of Columbia would be met.

39. However, JCA failed to submit vacancy reports for vacated units to the District of Columbia within the thirty (30) day period required under D.C. Code § 42–3131.06, ultimately disqualifying NGCHA and its members from implementing a 10% rent increase for the affected units, as permitted by D.C. Code § 42–3502.13.

40. The failure to submit vacancy reports permanently set back the rental income that could be collected from those units going forward as a result.

41. With an average rent of approximately $1,100 per unit, NGCHA's inability to raise rent on at least sixty (60) units on the Property resulted in losses exceeding $6,600 per month, $79,200 annually, and approximately $396,000 over a five-year period.

42. JCA also failed to timely renew basic business licenses required for the leasing and/or subleasing of the Property's units, which resulted in NGCHA and its members being legally precluded from implementing scheduled rent increases for the affected subleased units, thereby causing additional losses in rental income.

43. JCA's lapses caused a loss to NGCHA of at least $183,491 in rent increases from August 1, 2023, to September 1, 2024.

44. Projected over a five-year period, the loss of rental income to NGCHA attributed to lapsed licenses totals approximately $917,457 and continues to compound.

45. JCA breached its duties under Section XXII of the Agreement by failing to obtain and maintain required governmental licenses and permits, and/or otherwise complying with all governmental requirements.

46. Moreover, JCA's failures in renewing basic business licenses caused significant delays in NGCHA's ability to enforce tenants' lease agreements and thereby

exacerbated delinquencies in rental payments and prevented the removal of serially non-paying tenants.

47. JCA's breaches materially diminished the value of NGCHA's assets and has caused NGCHA to incur substantial damages.

48. In addition, NGCHA incurred substantial damages in renewing necessary licenses as well as paying other government-imposed citations and penalties, and related attorneys' fees.

49. The Agreement provides that "in the event that late payment fees, government-issued citations, or any other charges are improperly incurred to the Owner as a result of the Agent's failure to execute its duties under this Agreement, the Agent shall pay for and reimburse all such sums to the Owner." *See* **Exhibit 1** at Section XXVI(c).

50. JCA has failed to pay and reimburse NGCHA for these improperly incurred sums incurred as a result of JCA's failure in timely executing its duties under the Agreement.

**C. <u>JCA's Failures In Collection and Management of NGCHA's Funds</u>**

51. The Agreement recognized that "Membership Fees" were the "security deposit, or any other fees funds collected by [JCA] not including Carrying Charges." *See* **Exhibit 1** at Section I(l).

52. The Agreement required JCA to "collect, deposit, and disburse Membership Fees, if required, in accordance with the terms of each Member's Proprietary Lease and the Governing Documents," and mandated that "Membership Fees and other funds collected by the Agent will be deposited by the Agent in an interest-bearing

account for the benefit of the Cooperative separate from all other accounts and funds. . . ." *See* **Exhibit 1** at Section V(g).

53. Membership Fees were to be held in a separate account known as the "Naylor Gardens Cooperative Housing Association Membership Trust/Security Deposit Account" (hereinafter, the "Trust Account"). *See* **Exhibit 1** at Section I(d).

54. "Carrying Charges" were defined as the "monthly assessment[s] paid to the Cooperative by each Member of the Cooperative for use in meeting the Cooperative's financial needs and obligations" and are recognized to include "late fees and other amount amounts receivable on the Owner's account in connection with the management and operation" of the Property. *See* **Exhibit 1** at Section I(e), (m).

55. Carrying Charges were to be held separately from all other funds in a designated Operating Account. *See* **Exhibit 1** at Section I(m).

56. Under the Agreement, JCA was responsible for collecting all Carrying Charges when due and depositing them in the Operating Account. *See* **Exhibit 1** at Section VI.

57. The Agreement also required that "by the tenth (10th) day of each month, and no later than the fifteenth (15th) day of each month, the Agent will furnish to the Owner with a statement of receipts and disbursements during the previous month, and with a schedule of accounts receivable and payable, copies of contractor and vendor receipts, and reconciled bank statements for the Owner's Operating Account as of the end of the previous month." *See* **Exhibit 1** at Section XIII(g).

58. Among its collection duties, JCA was responsible for collecting and holding security deposits for new tenants of the Property and depositing them into the Trust Account.

59. On or about July 21, 2023, JCA deposited only $269,682.47 into the Trust Account it maintained at John Marshall Bank for this purpose.

60. However, NGCHA's April 2024 financial statements revealed a security deposit and accrued interest liability of $542,487, resulting in an escrow shortfall of $272,805.

61. Despite multiple requests by NGCHA, JCA has failed to provide any documentation explaining these discrepancies and to make available all books and records for inspection.

62. JCA was also responsible for collecting rent and other fees, including past due rent and late fees.

63. At the time of JCA's termination as property manager, JCA failed to provide tenant ledgers, rent rolls, and other documents that would provide NGCHA and its subsequent property manager, EJF Real Estate Services, Inc. ("EJF"), information regarding the status of tenant accounts at that time.

64. Because JCA failed to provide these records that they were required to maintain, EJF was required to reconstruct NGCHA's books and accounts in order to carry out its property management services, which caused NGCHA to incur additional costs not less than $14,025.

65. After expending additional resources to investigate and compile information regarding all member and tenant accounts, NGCHA discovered that the balance of outstanding rent, fees, and other amounts owed to NGCHA by its members and tenants at the time of JCA's termination totaled approximately $1.1 million, which included an estimated 95 tenants who owed 3 months or more of back rent.

66. JCA's failures in collecting and/or enforcing these past due amounts on members' and tenants' accounts caused NGCHA to incur substantial damages.

**D. JCA'S Failures to Maintain and Perform Repairs to the Property**

67. Under Section VIII of the Agreement, "[t]he Agent will maintain the Project in good repair in accordance with the Management Plan and local codes, and in a condition at all times acceptable to the Owner, including but not limited to cleaning, painting, decorating, plumbing, carpentry, grounds care, and such other maintenance and repair work as may be necessary." *See* **Exhibit 1** at Section VIII.

68. The Agreement further provided that the "Agent will systematically and promptly receive and investigate all service requests from Members, take such action thereon as may be justified, and will keep records of same." *See* **Exhibit 1** at Section VIII(c).

69. During its tenure as property manager, JCA failed to maintain the Property "in good repair and in accordance with the Management Plan and local codes" in numerous instances and failed to promptly address emergency and other substantial service requests submitted by residents.

70. Between June 2023 and September 2024, NGCHA received citations, violation notices, and fines from the D.C. Department of Buildings, Occupational Safety and Health Administration, and other agencies due to JCA's failure to maintain the Property, as required by law.

71. Between June 2023 and September 2024, certain tenants of the Property submitted complaints to JCA regarding needed maintenance and repairs to their respective apartments which JCA failed to address, including those deemed "emergency requests" like no hot water, no heat, and other issues which were to be addressed as soon as possible. *See* **Exhibit 2**, Plan at 30-31.

72. As a result of JCA's failures in maintaining and performing necessary repairs to the Property, numerous complaints were submitted to the District of Columbia, which resulted in the assessment of infractions, fines, and other penalties against NGCHA and/or caused NGCHA to improperly incur improper charges and amounts which are subject to reimbursement from JCA pursuant to Section XXVI(c) of the Agreement.

### E. JCA's Failure to Maintain Records and Comply with Its Obligations Before and After Termination of the Agreement

73. With respect to JCA's general responsibilities in maintaining and providing records to NGCHA when requested, the Agreement provided, "[t]he Agent will furnish such information (including but not limited to occupancy reports, Resident information, government licenses, balance sheet, income statement, general ledger, aging income report, and trial balance) as may be requested by the Owner [NGCHA] from time to time

with respect to the financial, physical, or operational condition of the Project [Property]." **Exhibit 1** at Section XIII(d).

74. Furthermore, the Agreement provided that "with respect to each fiscal year ending during the term of this agreement, the Agent will have an annual financial report prepared by a certified public accountant or other person acceptable to the Owner, based upon the preparer's examination of the books and records of the Owner and the Agent." **Exhibit 1** at Section XIII(b).

75. The Agreement also required JCA to "prepare and submit in a timely fashion, reports as required by any other institution or auditor." **Exhibit 1** at Section XIII(e).

76. Despite its representations to the contrary, JCA failed to comply with its obligations to cooperate with and provide necessary documents to NGCHA's accountants and/or auditors during and after its tenure as property manager, which has prevented NGCHA's accountant from completing financial audits for the 2023 and 2024 fiscal years, which remain outstanding.

77. Upon its termination as property manager in September of 2024, JCA was required to "[t]ransfer all funds held for the Owner, including security deposits, and submit to the Owner any financial statements required by the Owner." *See* **Exhibit 1** at Section XXV(c).

78. During the transition from JCA to NGCHA's new property manager, EJF, JCA delayed the transfer of funds.

79. At the time of JCA's termination in September 2024, over $500,000 remained in accounts at Sandy Spring Bank, which were controlled solely by JCA, and $211,966.51 in the security escrow account at John Marshall Bank.

80. JCA failed to timely transfer these funds or provide required financial documents, in violation of the Agreement, and delayed the delivery of NGHCA's funds until November of 2024.

81. This failure disrupted NGCHA's ability to meet financial obligations and forced it to draw on reserve funds, causing significant operational instability.

82. Not later than twenty (20) days after the effective date of termination, JCA was also required to "surrender possession of all the Owner's books, statements and records, and related materials belonging to the Owner that are in the Agent's possession, custody or control to the Board or newly designated agent, if any, and otherwise cooperate in good faith in the smooth transition to the newly designated agent, if any." *See* **Exhibit 1** at Section XXV(c).

83. NGCHA also requested its books and records from JCA, and a final accounting after the Agreement was terminated.

84. Despite repeated requests, JCA failed and refused to provide a final and complete accounting, failed to deliver NGCHA's books and records, and failed to grant EJF or NGCHA control of the bank accounts that held NGCHA's funds, including online access.

85. As a result, EJF was required to perform additional services to restore access and reconstruct financial records, resulting in unnecessary costs incurred by NGCHA.

86. The Agreement entitles NGCHA to "recover, in addition to the unpaid sums, interest on the unpaid balance at the rate of 6% per annum from the date of default plus the Owner's costs of collection, including reasonable attorney's fees." **Exhibit 1** at Section XXVI(b)).

87. In or about June of 2025, NGCHA requested reimbursement for the damages and costs caused by JCA, a reconciliation report of all security deposit and interest transactions which occurred during JCA's tenure as property manager, and written explanations and supporting documentation for the financial discrepancies identified herein.

88. JCA did not comply with NGCHA's request.

**COUNT I – BREACH OF CONTRACT**

89. NGCHA refers to and incorporates by reference the foregoing paragraphs.

90. NGCHA and JCA were parties to the Agreement for the Property.

91. The Agreement was valid and binding as to all the parties thereto.

92. The Agreement required that JCA manage the Property in a professional manner.

93. Pursuant to the Agreement, JCA was required to but ultimately failed to adhere to its obligations, including but not limited to the following: (a) failing to timely inspect, repair, turn over, and market newly vacant units; (b) failing to perform repairs and maintenance on the Property in a timely and cost-effective manner; (c) failing to timely submit vacancy reports and renew basic business licenses to the District of Columbia; (d) failing to account for and/or causing a shortfall in tenants' security

deposits held in trust; (f) failing to timely collect and/or enforce past due rent; (g) failing to perform needed repairs and maintenance on the Property; and (h) failing to maintain and abide by its recordkeeping and disclosure obligations under the Agreement.

94. As a result of JCA's breaches of the Agreement, NGCHA has suffered damages in the amount of at least Three Million Dollars ($3,000,000) with the actual amount to be determined at trial.

**COUNT II – BREACH OF FIDUCIARY DUTY**

95. NGCHA refers to and incorporates by reference the foregoing paragraphs.

96. Pursuant to D.C. Code Section 47-2853.195 (Fiduciary duties of a property manager): "(a) A licensee engaged to manage real estate shall: (1) Perform in accordance with the terms of the property management agreement; (2) Exercise ordinary care; (3) Disclose in a timely manner to the owner material facts of which the licensee has actual knowledge concerning the property; (4) Maintain confidentiality of all personal and financial information received from the client during the brokerage relationship and any other information that the client requests during the brokerage relationship be maintained confidential unless otherwise provided by law or the owner consents in writing to the release of such information; [and] (5) Account for, in a timely manner, all money and property received in which the owner has or may have an interest . . ."

97. In its capacity as the property manager for the Property, JCA owed NGCHA and its interested persons a fiduciary duty, including but not limited to, a duty of good faith, full disclosure and loyalty.

98. JCA breached its fiduciary duties in the services they rendered as the property manager for the Property.

99. JCA breached its fiduciary duties to NGCHA by, among other things: (a) failing to perform in accordance with the terms of the Agreement; (b) failing to timely transfer and account for NGCHA's operational and trust funds to EJF and/or NGCHA; (c) failing to produce all financial documents relating to NGCHA for the full period of its tenure as property manager, including, but not limited to, all bank account statements, ledgers, vendor contracts, vendor invoices, rent rolls, reconciliations, and all documents relating to NGCHA's members' accounts; (d) failing to timely submit vacancy reports and renew basic business licenses; (e) failing to timely inspect, repair, turn over, and market newly vacant units; (f) failing to collect and/or enforce past due rent; and (g) failing to perform maintain the Property in a manner compliant with District of Columbia law.

100. As a result of JCA's breaches of the fiduciary duties it owed to NGCHA, NGCHA has been damaged by a sum to be determined at trial, but no less than Three Million Dollars ($3,000,000). In addition, NGCHA is entitled to an award of attorneys' fees and costs necessary in bringing the instant lawsuit.

## COUNT III – NEGLIGENCE

101. NGCHA refers to and incorporates by reference the foregoing paragraphs.

102. JCA owed a duty of care to NGCHA, as well as NGCHA's members and tenants, in carrying out its services as the property manager for the Property.

103. As set forth herein, JCA engaged in negligent acts and omissions that resulted in a breach of these duties.

104. JCA knew or should have known that its actions and omissions set forth herein would cause substantial damages to NGCHA.

105. As a direct and proximate result of JCA's negligence, NGCHA has incurred damages and is entitled to: (a) NGCHA's costs and expenses to remedy the failures and omissions of JCA during its tenure as property manager; (b) the amount of rental income lost as a result of its failures and delays in inspecting, repairing, turning over, and marketing newly vacant units; (c) the amount of past and future rental income lost and costs associated with JCA's failures and/or delays in submitting vacancy reports and renewing basic business licenses to the District of Columbia; (d) failing to account for tenants' security deposits held in trust; (f) failing to collect and/or enforce past due rent; and (g) failing to perform needed repairs and maintenance on the Property.

106. JCA's negligent acts and omissions directly and proximately caused substantial damages to NGCHA, in an amount to be determined at trial, but no less than Three Million Dollars ($3,000,000).

**COUNT IV – ACCOUNTING**

107. NGCHA refers to and incorporates by reference the foregoing paragraphs.

108. Pursuant to D.C. Code Section 47-2853.195 (Fiduciary duties of a property manager): "(a) A licensee engaged to manage real estate shall: (1) Perform in accordance with the terms of the property management agreement; (2) Exercise ordinary care; (3)

Disclose in a timely manner to the owner material facts of which the licensee has actual knowledge concerning the property; (4) Maintain confidentiality of all personal and financial information received from the client during the brokerage relationship and any other information that the client requests during the brokerage relationship be maintained confidential unless otherwise provided by law or the owner consents in writing to the release of such information; [and] (5) Account for, in a timely manner, all money and property received in which the owner has or may have an interest . . ."

109. In its capacity as the property manager for NGCHA, JCA was required to produce upon demand: (i) financial documents necessary for NGCHA to complete audits for tax year 2023 and 2024; (ii) a complete reconciliation report of all security deposit and interest transactions from June 1, 2023, through September 2024; and (iii) written documentation explaining the financial discrepancies identified herein, including any audit trail or supporting transfer documentation; (iv) all bank account statements, ledgers, vendor contracts, vendor invoices, rent rolls, reconciliations, (v) all documents related to NGCHA members' accounts and assessments, and (vi) related records.

110. NGCHA is entitled to an Order compelling an accounting of all the foregoing books, records, accounts, filings, statements and contracts of JCA related to any property management services provided to the Property and/or NGCHA, and entering such other and further relief as the Court deems proper.

**COUNT V – VIOLATION OF DISTRICT OF COLUMBIA CONSUMER PROTECTION AND PROCEDURES ACT**

111. NGCHA refers to and incorporates by reference the foregoing paragraphs.

112. NGCHA is a "consumer" within the meaning of D.C. Code § 28-3901(a)(2).

113. JCA is a "merchant" within the meaning of D.C. Code § 28-3901(a)(3).

114. The property management services performed by JCA represent "goods and services" within the meaning of D.C. Code § 28-3901(a)(7).

115. JCA committed unlawful trade practices in violation of D.C. Code § 28-3904 by:

a. Maliciously, intentionally and willfully misrepresenting the quality of the property management services to be performed;

b. Maliciously, intentionally and willfully failing to disclose defects in the property management services performed;

c. Maliciously, intentionally and willfully concealing defects in the property management services performed;

d. Maliciously, intentionally and willfully failing to disclose: (i) financial documents necessary for NGCHA to complete audits for tax year 2023 and 2024; (ii) a complete reconciliation report of all security deposit and interest transactions from June 1, 2023, through September 2024; and (iii) written documentation explaining the financial discrepancies identified herein, including any audit trail or supporting transfer documentation;

e. Misleading NGCHA into believing that JCA would assist NGCHA in transferring the property management services to EJF, including, but not limited to, transferring NGCHA's accounts, books, and records of JCA to EJF.

116. As a direct and proximate result of the violations of the D.C. Consumer Protection Procedures Act by JCA, NGCHA has incurred damages and is entitled to: (1) NGCHA's costs and expenses to remedy the various defects and deficiencies in the property management services performed; (2) NGCHA's expenses incurred in investigating the existence of the deficiencies and defects in the property management services performed; (3) a credit for any monies not expended by JCA by failing to either initially perform its work in accordance with the property management agreement and in not remediating any faulty work as required by property management agreement; (4) NGCHA's increased expenses incurred in transferring property management services to EJF without necessary accounts, books, and records of JCA; and (5) NGCHA's costs and attorneys' fees.

117. In addition to compensatory financial damages, NGCHA is entitled to disgorgement of the funds paid to JCA, treble damages, reasonable attorney's fees, and punitive damages pursuant to D.C. Code § 28-3905.

**COUNT VI – TORTIOUS INTERFERENCE WITH NGCHA'S CONTRACTUAL RELATIONS WITH ITS SUBLEASING MEMBERS**

118. NGCHA refers to and incorporates by reference the foregoing paragraphs.

119. JCA was aware of the agreements in place between NGCHA and its members subleasing their respective units to third-party tenants (the "Subleasing Members").

120. JCA intentionally and wrongfully interfered with the agreements between NGCHA and its Subleasing Members by: (a) failing to collect rent from subleasing tenants

in apartments owned by NGCHA's members, (b) failing to enforce subleases when those tenants failed to pay rent, and (c) failing to timely pay members their share of the rents collected on their subleased apartments.

121. The conduct of JCA was perpetrated with the intentional and improper purpose of interfering with the contractual relationships between NGCHA and its Subleasing Members, for the benefit of JCA.

122. JCA has caused NGCHA to suffer damages as a result of JCA's conduct by failing to collect and/or enforce rent from the Subleasing Members' sublessees and failing to pay or timely pay the Subleasing Members their share of their respective sublessees' rents.

**COUNT VII -- TORTIOUS INTERFERENCE WITH NGCHA'S CONTRACTUAL RELATIONS WITH EJF**

123. NGCHA refers to and incorporates by reference the foregoing paragraphs.

124. JCA was aware of the management agreement between NGCHA and EJF following the termination of the Agreement.

125. JCA intentionally and wrongfully interfered with the property management agreement between NGCHA and EJF by: (a) failing to timely transfer all of NGCHA's operational, trust, and reserve funds to EJF, and (b) failing to produce all financial documents related to NGCHA for the full period that JCA was the managing agent, including, but not limited to, all bank account statements, ledgers, vendor contracts, vendor invoices, rent rolls, reconciliations, all documents related to NGCHA members' accounts and assessments, and related records.

126. JCA used improper means of interfering with the management agreement between NGCHA and EJF, including, but not limited to, breaching their fiduciary duties to NGCHA and misleading NGCHA into believing that JCA would assist NGCHA in transferring property management services to EJF, including, but not limited to, transferring NGCHA's accounts, books, and records held by JCA to EJF.

127. The conduct of JCA was perpetrated with the intentional and improper purpose of interfering with the contractual relationship between NGCHA and EJF, for the benefit of JCA.

128. JCA has caused, and unless restrained, will continue to cause NGCHA immediate irreparable harm from which NGCHA has no adequate remedy at law in addition to causing damages to NGCHA.

129. NGCHA is entitled to injunctive relief restraining such conduct, an award of compensatory damages, punitive damages, attorneys' fees and any other relief deemed just and appropriate by this Court.

**PRAYER FOR RELIEF**

WHEREFORE, NGCHA seeks judgment against JCA, and requests that the Court grant NGCHA the following relief:

A. Compensatory damages in an amount to be proven at trial of not less than Three Million Dollars ($3,000,000);

B. Treble damages pursuant to D.C. Code Section 28-3905 against JCA;

C. Punitive damages against JCA in an amount to be proven at trial of not less than Five Hundred Thousand Dollars ($500,000);

D. An Order compelling an accounting of the books, records, accounts, filings, statements and contracts of JCA related to any property management services provided to the Property and/or NGCHA;

E. An Order compelling the return of all property held by JCA which rightfully belongs to NGCHA;

F. Costs, attorney's fees, pre- and post-judgment interest; and

G. Such other and further relief as the Court deems proper.

**JURY DEMAND**

Plaintiff demands a trial by jury as to all issues triable by jury in this matter.

Respectfully submitted,

JACKSON & CAMPBELL, P.C.

*/s/ Caroline Y. Lee-Ghosal*

Caroline Y. Lee-Ghosal (D.C. Bar No. 1697129)
Selena A. Motley (D.C. Bar No. 241978)
2300 N Street, N.W. Suite 300
Washington, D.C. 20037
Phone: (202) 457-1600
Facsimile: (202) 457-1678
Email: cleeghosal@JacksCamp.com
Email: smotley@JacksCamp.com

*Counsel for Plaintiff Naylor Gardens Cooperative Housing Association*

EXHIBIT
1

# MANAGEMENT AGREEMENT

BETWEEN:

NAYLOR GARDENS COOPERATIVE HOUSING ASSOCIATION

AND:

AGENT

JEFFREY CHARLES & ASSOCIATES, INC.

BEGINNING: JUNE 1ST, 2023

ENDING: MAY 31ST, 2026

# MANAGEMENT AGREEMENT

This Management Agreement ("Agreement") is made June 1st, 2023, between ***Naylor Gardens Cooperative Housing Association*** ("Cooperative") and ***Jeffrey Charles and Associates, Inc.*** ("Agent").

1. **Appointment and Acceptance.** The Board of Directors ("Board") of the Cooperative appoints the Agent as exclusive agent for the management of the property described in Paragraph 2 of this Agreement, and the Agent accepts the appointment, subject to the terms and conditions set forth in this Agreement and the Supplemental Management Plan.

2. **Description of Project.** The property ("Project") to be managed by the Agent under this Agreement is a housing development consisting of land, buildings, and other improvements which make up:

**Naylor Gardens Cooperative Housing Association**

Location: 2725 30th Street, SE
City: Washington State: District of Columbia, 20020
No. of dwelling units: 796

I. **Definitions.** As used in this Agreement and the Management Plan:

a. "Agent" shall be Jeffrey Charles & Associates, Inc.
b. "Agreement" shall be the Management Agreement between the Cooperative and the Agent.
c. "Board" shall be the board of directors of the Cooperative.
d. "Naylor Gardens Cooperative Housing Association Membership Trust/Security Deposit Account." Shall be the interest-bearing account for the benefit of the Cooperative in which the Membership Fees will be deposited.
e. "Carrying Charge" shall be the monthly assessment paid to the Cooperative by each Member of the Cooperative for us in meeting the Cooperative's financial needs and obligations.
f. "Certificate of Incorporation" shall be the Cooperative Articles of Incorporation, filed with the District of Columbia, as may be amended from time to time by the Membership of the Cooperative.
g. "Cooperative" shall be the Naylor Gardens Cooperative Housing Association.
h. "General Operating Reserves" shall be the interest-bearing account for the benefit of the Cooperative that shall hold the amount to be saved as an operating reserve.
i. "Governing Documents" shall be the Articles of Incorporation, By-Laws, House Rules and Regulations of the Cooperative, and Member's ownership documents including Proprietary Leases and Stock Certificates. In the event of any conflict between the provisions of this Agreement and any provision of the Governing Documents, the provisions of this Governing Documents shall control.
j. "Management Plan" shall be the supplemental document to this Agreement and is a comprehensive and detailed description of the policies and procedures to be followed in the management of the Project.
k. "Member/Membership" shall be any person, trust or other legal entity, or any combination thereof who holds a Stock Certificate or certificate of stock and proprietary lease evidencing ownership in the Cooperative.

l. "Membership Fee" shall be the security deposit, or any other fees funds collected by the Agent not including Carrying Charges.
m. "Operating Account" shall be the account holding all Carrying Charges, including any late fees and other amounts receivable on the Owner's account in connection with the management and operation of the Project. The account shall be named "Naylor Gardens Cooperative Housing Association Operation Account."
n. "Owner" shall be the Members and Residents of the Cooperative who are governed by the Board of Directors.
o. "Principal Parties" means the Owner and the Agent.
p. "Project" shall be the property of Naylor Gardens Cooperative Housing Association.
q. "Property Manager" shall be the Agent's employee assigned to manage the Property.
r. "Proprietary Lease" shall refer to the contract between the Cooperative and the Member signed at the time the Stock Certificate is issued. The Occupancy Agreement, along with the Bylaws and the House Rules, list the rights and responsibilities of Members of the Cooperative as well as the obligations of the Cooperative to the Members.
s. "Residents" shall be any person who is either a Member or who holds a legal lease.
t. "Stock Certificate" shall be the document memorializing the sale of a proportionate share of the Cooperative to an individual. Each Stock Certificate shall list the proportionate share of the Cooperative it represents and shall correspond to a single dwelling unit in the Cooperative.

II. **Management Plan.** The Management plan is attached which provides a comprehensive and detailed description of the policies and procedures to be followed in the management of the Project. In many of its provisions, this Agreement will briefly define the nature of the Agent's obligations, with the intention that reference be made to the Management Plan for more detailed policies and procedures.

  a. Accordingly, the Owner and the Agent will comply with all applicable provisions of the Management Plan, unless certain provisions are waived with the prior written consent of the Board, regardless of whether specific reference is made thereto in any particular provision of this Agreement. The Management Plan will be incorporated as a part of this Agreement, and copies will be provided to the parties hereto.

III. **Basic Information.** As soon as possible, the Owner will furnish the Agent with a complete set of plans and specifications with copies of all guaranties and warranties pertinent to construction, fixtures, and equipment. With the aid of this information and through inspection by competent personnel, the Agent will thoroughly familiarize itself with the character, location, construction, layout, plan, and operation of the Project, and especially the electrical, heating, plumbing, air-conditioning and ventilation systems, the elevators, and all other mechanical equipment.

IV. **Marketing.** The Agent will carry out the marketing activities prescribed in the Management Plan. Subject to the Owner's prior approval, advertising expenses will be paid out of the Project Operating Account as Project Expenses.

V. **Membership.** The Agent will offer for sale and will sell memberships in the Cooperative, which was established as a market rate cooperative and not as a limited equity cooperative. Incidental thereto, the following provisions will apply:

  a. The Agent will follow the Membership selection policy described in the Management Plan and the Governing Documents of the Cooperative.
  b. The Agent will show the premises to prospective residents.
  c. The Agent will take and process applications for membership, including the administration of a background check. Applications will be subject to Board acceptance or denial. If an application is rejected, the applicant will be told the reason for rejection, and the rejected application, with reason for rejection, will

be kept on file for three (3) years. A current list of prospective Members will be maintained.

d. The Agent will complete all the provided Proprietary Leases and will execute the same in the Cooperative's name, identified thereon as agent for the Owner upon receipt of consent to do so by the Board. The terms of all agreements will comply with the pertinent provisions of the Governing Documents of the Cooperative, and any government agency regulations. Proprietary Leases will be in a form approved by the Owner, but Occupancy Agreements need not to be submitted for the approval of the Owner.

e. The Owner will furnish the Agent with schedules of Carrying Charges as from time to time approved by the Board, showing Carrying Charges for dwelling units and other charges for facilities and services. In no event will such Carrying Charges and other charges be exceeded.

f. The Agent will counsel all prospective Members regarding eligibility for dwelling units that are less than fair market Carrying Charges and will prepare and verify eligibility certifications and recertification in accordance with the Cooperative's Governing Documents.

g. The Agent will collect, deposit, and disburse Membership Fees, if required, in accordance with the terms of each Member's Proprietary Lease and the Governing Documents. Membership Fees and other funds collected by the Agent will be deposited by the Agent in an interest-bearing account for the benefit of the Cooperative separate from all other accounts and funds, with a bank or other financial institution whose deposits are insured by an agency of the United States Government. This account will be carried the Corporation's name and designated of record as "Naylor Gardens Cooperative Housing Association Membership Trust/Security Deposit Account." All instruments should be made payable to "Naylor Gardens Cooperative Housing Association."

h. The Agent acknowledges that there are three categories of units within the Cooperative. The first category includes units occupied by the members named in the Proprietary Lease. The second category includes units which are subleased to third parties by the members named in the Proprietary Lease. The third category includes units which are owned by the Owner and subleased to third parties. The Agent shall be responsible for all leasing operations related to the second and third categories, as more thoroughly described in the Management Plan.

VI. **Collection of Carrying Charges and Other Receipts.** The Agent will collect when due all Carrying Charges, including any late fees and other amounts receivable on the Owner's account in connection with the management and operation of the Project. Such receipts (except for Members' Membership fees/security deposits, which will be handled as specified in Paragraph 8(9) above) will be deposited in an account, separate from all other accounts and funds, with a bank whose deposits are insured by the Federal Deposit Insurance Corporation. This account will be carried in the Owner's name and designated or record as "Naylor Gardens Cooperative Housing Association Operating Account."

VII. **Enforcement of Governing Documents.** The Agent will secure full compliance by each Member with the terms of his or her Proprietary Lease and all other Governing Documents. Voluntary compliance will be emphasized, and the Agent, utilizing the services of the Property Manager will counsel Members and make referrals as appropriate to the community agencies in cases of financial hardship or under other circumstances deemed appropriate by the Agent and the Owner, to the end that involuntary termination of tenancies may be avoided to the maximum extent consistent with sound management of the Project. Nevertheless, and subject to the pertinent procedures prescribed in the Management Plan, the Agent may lawfully terminate any occupancy when, in the Board's judgement and the Board's request, sufficient cause (including but not

limited to nonpayment of Carrying Charges) for such termination occurs under the terms of the Members' Proprietary Lease. For this purpose, the Agent is authorized to consult with legal counsel to be designated by the Owner, to bring actions for eviction and to execute notices to vacate and judicial pleading incident to such actions; provided, however, the Agent keeps the Owner informed of such actions and follows such instructions as the Owner may prescribe for the conduct of any such action. Subject to the Owner's approval, attorney fees and other necessary costs incurred in connection with such actions will be paid out of the Project's Operating Account as Project expenses.

VIII. **Maintenance and Repair.** The Agent will maintain the Project in good repair in accordance with the Management Plan and local codes, and in a condition at all times acceptable to the Owner, including but not limited to cleaning, painting, decorating, plumbing, carpentry, grounds care, and such other maintenance and repair work as may be necessary.

Incidental thereto, the following provisions will apply:

a. Special attention will be given to preventative maintenance and, to the greatest extent feasible, the services of regular maintenance employees will be used.
b. Subject to the Owner's prior written approval, the Agent will contract with qualified independent contractors for the maintenance and repair of heating systems and for ordinary repairs beyond the capability of regular maintenance employees.
c. The Agent will systematically and promptly receive and investigate all service requests from Members, take such action thereon as may be justified, and will keep records of same. Emergency requests will be received and serviced on a twenty-four (24) hour basis. Complaints of a serious nature will be reported to the Owner after investigation.
d. The Agent is authorized to purchase all materials, equipment, tools, appliances, supplies, and services necessary for proper maintenance and repair. This expenditure shall be limited to the amount specified in the annual budget.
e. Notwithstanding any of the foregoing provisions, the prior approval of the Owner will be required for any expenditure which exceeds Five Thousand Dollars ($5,000) in any one instance for labor, materials or otherwise in connection with the maintenance and repair of the Project, except for recurring expenses within the limits of the operating budget or emergency repairs involving manifest danger to persons or property or required to avoid suspension of any necessary service to the Project. In the latter event, the Agent will inform the Owner of the facts as promptly as possible. In the event the Agent makes an expenditure exceeding such amount to perform an emergency repair, the Agent shall provide the Owner with a written explanation of the emergency, the repairs made, and the total cost, within twenty-found (24) hours of making this expenditure.

IX. **Utilities and Services.** In accordance with the Management Plan and the operating budget, the Agent will make arrangements for water, electricity, gas, fuel oil, sewage and trash disposal, vermin extermination, decorating, laundry facilities, and telephone services. Subject to the Owner's prior approval, the Agent will make such contracts as necessary to secure such utilities and services.

X. **Employees.** The Management Plan prescribes the number, qualifications, and duties of the personnel to be regularly employed in the management of the Project, including a Property Manager, maintenance, bookkeeping, clerical, and other managerial employees. All such personnel will be employees of the Agent, and will be hired, paid, supervised, and discharged by the Agent with the approval of the Board, subject to the following conditions:

a. As more particularly described in the Management Plan, the On-Site Property Manager will have duties of the type usually associated with that position. He/She will be directly responsible for the Agent's Property Manager for the coordination of activities in the interest of good overall management.

b. The compensation (including fringe benefits) of the On-Site Property Manager and the maintenance employees will be as approved by the Board of Directors.

c. The Owner will pay for compensation (including fringe benefits) payable to the on-site management and maintenance employees, as prescribed in the Management Plan, and for all local, state, and Federal taxes and assessments (including but not limited to Social Security taxes, unemployment insurance and workman's compensation insurance) incident to the employment of such personnel. Such compensation will be paid out of the Project Operating Account and will be treated as Project Expenses.

d. Compensation (including fringe benefits) payable to the on-site staff, such as the Property Manager, and all bookkeeping, clerical, and other managerial personnel, plus all local, state, and Federal taxes and assessments incident to the employment of such personnel will be borne solely by the Project and will not be paid out of the Agent's fee.

e. The Agent will establish and follow an employment policy that affords Residents maximum opportunities for employment in the management and operation of the Project and, to the extent consistent with that consideration, employment opportunities to lower-income persons in the area.

f. The Agent is an independent contractor. In no event shall the Agent (or its employees) be considered employees of the Owner. However, with regard to any type of communication with the Owner's legal counsel or the Board of Directors, officers, committee members, employees and agents, the Agent and its employees shall be deemed the functional equivalent of officers and employees of the Owner for purposes of the attorney/client privilege and any and all other legal protections afforded to the Owner.

XI. **Disbursements From Owner's Operating Account.**

a. From the funds collected and deposited by the Agent in the Owner's Operating Account pursuant to Paragraph 9 above, the Agent will make the following disbursements promptly when payable:

1. Compensation payable to the employees specified in Paragraph 13(C) above, and for the taxes and assessments payable to local, state, and Federal governments in connection with the employment of such personnel.
2. All sums otherwise due and payable by the Owner as expenses of the Project authorized to be incurred by the Agent under the terms of this Agreement, including compensation payable to the Agent, pursuant to Paragraph 25 below, for its service hereunder.
3. All recurring or budgeted items.

b. In the event the balance in the Owner's Operating Account is at any time insufficient to pay disbursements due and payable under Paragraph 14(a) above, the Agent will promptly inform the Owner of that fact and the Owner will then remit to the Agent sufficient funds to cover the deficiency. The Agent will make all earliest and best efforts to advise the Owner of a reasonably foreseeable risk of Owner's Operating Account holding insufficient funds to pay said disbursements. In no event will the Agent be required to use its own funds to pay such disbursements.

XII. **Budgets.** Annual operating budgets for the Project will be as approved by the Owner. Except as permitted under Paragraph 11(e) above, annual disbursements for each type of operating expense itemized in the budget will not exceed the amount authorized by the approved budget. The Agent will prepare and submit recommended operating budgets for approval for each fiscal year beginning during the term of this Agreement, to the Owner at least one hundred-twenty (120) days before the beginning of the fiscal year so that the budget may be approved sixty (60) days before the beginning of the fiscal year. The Owner will promptly inform the Agent of any changes

incorporated in the approved budget, and the Agent will keep the Owner informed of any anticipated deviation from the receipts or disbursements stated in the approved budget.

XIII. **Records and Reports.** In addition to any requirements specified in the Management Plan or in other provisions of this Agreement, the Agent will have the following responsibilities with respect to records and reports:

a. The Agent will establish and maintain a comprehensive system of records, books, and accounts in a manner conforming to the directives of the Board. All records, books, and accounts will be subject to examination at reasonable hours by any Member of the Board and any other authorized representative of the Owner. All such records will remain the property of the Owner and shall be returned to the Owner within twenty (20) days of termination of this Agreement.

b. With respect to each fiscal year ending during the term of this agreement, the Agent will have an annual financial report prepared by a certified public accountant or other person acceptable to the Owner, based upon the preparer's examination of the books and records of the Owner and the Agent, provided that the Board has given prior written consent. The report will be prepared in accordance with the directives of the Owner, and will be certified by the preparer, and will be submitted to the Board withing thirty (30) days after the end of the fiscal year. Compensation for the preparer's services will be paid out of the Owner's Operating Account as an expense of the Project.

c. The Agent will prepare a monthly report comparing actual and budgeted figures for receipts and disbursements and will submit each such report to the Owner by the fifteenth (15th) of the following month.

d. The Agent will furnish such information (including but not limited to occupancy reports, Resident information, government licenses, balance sheet, income statement, general ledger, aging income report, and trial balance) as may be requested by the Owner from time to time with respect to the financial, physical, or operational condition of the Project.

e. The Agent will prepare and submit in a timely fashion, reports as required by any other institution or auditor.

f. By the fifteenth (15th) day of each month, the Agent will furnish the Owner with an itemized list of all delinquent accounts, as of the eleventh (11th) day of the same month.

g. By the tenth (10th) day of each month, and no later than the fifteenth (15th) day of each month, the Agent will furnish to the Owner with a statement of receipts and disbursements during the previous month, and with a schedule of accounts receivable and payable, copies of contractor and vendor receipts, and reconciled bank statements for the Owner's Operating Account as of the end of the previous month.

h. Upon reasonable advance written notice to the Agent, the Agent will grant access to the Owner or its representatives (including but not limited to its legal representation, consultants, and accountants) to enter any part of the Project to inspect the Project, extract information from all books and records, and/or any other purpose the Owner deems necessary, provided the request is for a reasonable time.

i. The Agent shall respond substantively to any inquiry by the Owner with respect to any report described herein within two (2) business days of receipt.

XIV. **Fidelity Bond.** The Agent will furnish, at its own expense, a fidelity bond in an amount which is at least equal to the gross potential income for three months and is conditioned to protect the Owner and the Consenting Parties against misappropriation of Project funds by the Agent and its employees. The fidelity bond will designate the Owner as a named insured. The other terms and conditions of the bond, and the surety thereon, will be subject to the approval of the Owner and the Consenting Parties. In the event that any employee, principal owner, director, officer and/or

agent of the Agent is adjudged to having embezzled or otherwise converted funds or other property of the Owner, then Agent agrees to assign to the Owner that portion of the proceeds received by the Agent from its fidelity bond provider as a result of said embezzlement.

XV. **Bids, Discounts, Rebates, etc.** The Agent will obtain contracts, materials, supplies, utilities, and services on the most advantageous terms to the Project, and is authorized to solicit bids, either formal or informal, for items that can be obtained from more than one source. The Agent will secure and credit to the Owner all discounts, rebates, or commissions obtainable with respect to purchases, service contracts, and all other transactions on the Owner's behalf. The Owner and Agent agree that all goods and services purchased from individuals or companies having an identity-of-interest with the Agent or Owner shall be purchased at costs not in excess of those that would be incurred in making arms-length purchases on the open market.

The Board and/or its representatives and the Agent shall solicit written cost estimates (i.e., bids) from at least three (3) contractors or suppliers for any work item which the Owner or the Agent estimates will cost $5,000 or more and for any contract or ongoing supply or service agreement arrangement which is estimated to exceed $5,000 per year. Each person or entity from which a bid is solicited must be properly licensed by the United States, and the District of Columbia, to the extent that the statutes, ordinances, or regulations of any governmental unit or agency require licensure of persons or entities engaging in the business of providing services or supplying the goods that are the subject of the bid. The Agent shall be responsible for obtaining proof of such licensure, which it shall submit to the Owner upon reasonable demand. The Agent agrees to accept the bid which represents the lowest price taking into consideration the bidder's reputation for quality of workmanship or materials and timely performance, and the time frame within which the service of goods are needed. For any contract or ongoing supply or service arrangement obtainable from more than one source and estimated to cost less than $5,000, the Agent shall solicit verbal or written cost estimates, as necessary to assure that the Owner is obtaining services, supplies, and purchases at the lowest possible cost. The Agent must make a written record of any verbal estimate obtained. Copies of all required bids and documentation of all verbal cost comparisons made by the Agent shall be made part of the Owner's records and shall be retained for three (3) years from the date the work was completed. This documentation shall be subject to inspection by the Secretary or his/her designee, and the Owner. The Agent agrees to submit such documentation upon request. The Agent further agrees to disclose to the Owner any financial interest that the Agent may have related to the proposed contractor at the time of the bid submission.

The Agent further agrees that bids will be obtained from, or contracts entered into with suppliers who agree to furnish a reasonable warranty, in writing, of the goods supplied. As to bids or contracts for the provision of services in excess of $5,000, the contractor from whom the bid is sought must give, in writing, a written warranty as to the materials and workmanship for a period of time deemed reasonable by the Board. Furthermore, the contractor must provide evidence of sufficient worker's compensation and liability insurance, and acknowledge in writing that acceptance of the bid is contingent upon the contractor obtaining a performance bond for the completion of the Project, a payment bond ensuring payment of all subcontractors, and that periodic payments under the contract are conditioned upon obtaining from all contractors and subcontractors, and any other party with mechanics lien or materialman's lien rights, executed waivers of those rights. These conditions may only be waived by a vote of the Board of Directors, or in the event of the necessity of emergency repairs as described in Paragraph 11(e) of this contract.

XVI. **Meetings.** The Agent will attend at least eleven (11) Board meetings and one (1) Membership meeting during each year that this agreement is in effect. The Board may request the Agent to attend additional meetings.

XVII. **Social Services Program.** If the Board determines it is applicable, the Agent will be responsible to the Owner for carrying out the social services program described in the Management Plan.

XVIII. **Member-Management Relations.** If the Board determines it is applicable, the Agent will encourage and assist residents of the Project in forming and maintaining representative organizations to promote their common interests and will maintain good-faith communication with such organizations to the end that problems affecting the Project and its residents may be avoided or solved on the basis of mutual self-interest.

XIX. **On-Site Management Facilities.** Subject to the further agreement of the Owner and Agent as to more specific terms and prior written consent of the Board, the Agent will be allowed to maintain a management office within the Project, to be shared with the Board, and the Owner will make no rental charge for the same.

XX. **Insurance.** Owner agrees to procure and maintain, or at the request and expense of the Owner, Agent will procure and maintain, at all times during the term hereof such fire, extended coverage, public liability, workers' compensation, umbrella liability, business interruption and other policies in amounts as are commercially reasonable for like facilities, insuring both Owner and Agent as primary insured for tort liability and insuring Owner as primary insured for property liability. The owner agrees to provide Agent with, where appropriate, copies of certificates of insurance naming the Agent as an additional insured. Owner further agrees that the Agent may terminate this Agreement if, at any time during the term of this Agreement, Owner cancels or refuses to renew or obtain insurance for the Project in the amounts and with the types of coverage as set forth herein, and replacement insurance is not obtained by the Owner within fifteen (15) days after the written request of the Agent.

XXI. **Other Insurance.** Agent represents that it currently maintains and shall maintain, with financially sound and reputable companies, insurance on all of its properties in at least such amounts and against at least such risks as are usually and reasonably insured against by entities of similar size engaged in the same or similar business. Such insurance shall include the following coverage: 1) Commercial General Liability, 2) Workers Compensation, 3) Commercial Automobile Liability, 4) Commercial Umbrella Liability, and 5) Errors and Omissions Liability. Agent agrees that it will not unreasonably reduce the amounts or coverage of such insurance from the amounts or coverage currently in place and that it will increase such amounts and provides additional insurance against such risks such that its insurance in place, from time to time, shall be consistent with the foregoing representation.

XXII. **Compliance with Governmental Orders.** The Agent will take such actions as may be necessary to comply promptly with any and all governmental orders or other requirements affecting the Project, whether imposed by Federal, State, County, or Municipal authority, subject, however, to the limitation stated in Paragraph 11(e) with respect to repairs. Nevertheless, the Agent shall take no such action so long as the Owner is contesting, or the Owner in writing of all notices of such orders or other requirements, within seventy-two (72) hours from the time of their receipt. Agent's responsibilities under this Paragraph will include, but not be limited to:

a. Applying for, obtaining, and maintaining all licensees and permits required of the Owner or Agent in connection with the operation and management of the Project. The Owner will cooperate with the Agent to execute and deliver all applications and any other documents necessary to maintain compliance.
b. Make all best efforts necessary to comply with all governmental requirements and to discharge any lien, encumbrance, or charge on or with respect to the Property. Comply with the homestead deduction requirements of OTR and the requirements of OPM Compliance.
c. Notify Owner of the need to retain legal counsel for the Property for the purpose of instituting any and all legal actions or proceedings reasonably necessary to collect charges, insurance proceeds, condemnation awards, rent or other income to the Project, to

abate or reduce any taxes upon the property, or to dispossess guests, tenants, or other persons, or to cancel or terminate any lease or license for default.

XXIII. **Nondiscrimination.** In the performance of its obligations under this Agreement, the Agent will comply with the provisions of any Federal, state, or local law prohibiting discrimination in housing on the grounds of race, color, sex, creed or national origin, handicap, or familial status including Title VI of the Civil Rights Act of 1964 (Public Law 88-352, 78 Stat. 241), all requirements imposed by or pursuant to the Regulations of the Secretary (24 CFR, Subtitle A, Part 1) issued pursuant to that title; regulations issued pursuant to Executive Order 11063, and Title VIII of the 1968 Civil Rights Act and any subsequent amendment to any of the above stated statutes, ordinances, and regulations.

XXIV. **Agent's Compensation.** The Agent will be compensated for its services under this Agreement by monthly fees, to be paid out of the Project Operating Account and treated as Project expenses. Such fees will be payable on the first (1st) day of each month, in advance, for the term of this Agreement or any renewal term thereof. Each such monthly fee will be in an amount equal to 3.5% of gross receipts of previous month, per month as of same date of this Agreement, which shall include any subleasing fee paid by members. No further charge shall be made by the Agent for the services provided in this Agreement without the consent of the Board. The Agent will propose and get advanced written approval from the Board for any project management fees for contracts over $200,000. Said project management fees shall be determined based on the size, cost, and complexity of the project but shall not exceed [to be determined]. Contracts under $200,000 shall not be subject to any additional project management fees.

XXV. **Term of Agreement.** This Agreement shall be in effect for a period of three (3) years, beginning on **June 1st, 2023,** and ending on **May 31st, 2026,** under the following conditions:

a. This Agreement may be terminated by the Owner or the Agent with or without cause at any time, provided at least ninety (90) days advance notice thereof is given, this Agreement will automatically renew itself for successive one-month terms unless either party notifies the other to the contrary in writing thirty (30) days prior to the expiration date or any renewal term thereof.
b. In the event of a material default by either the Owner or the Agent under this Agreement, the Agreement is terminated as of the date the termination notice is received.
c. Upon termination, the Agent will transfer all funds held for the Owner, including security deposits, and submit to the Owner any financial statements required by the Owner. After the Principal Parties have accounted to each other with respect to all matters outstanding as of the date of termination, the Owner will furnish the Agent security in form and principal amount satisfactory to the Agent against any obligations or liabilities the Agent may properly have incurred on behalf of the Owner hereunder. The Agent, upon termination, shall promptly, but not later than twenty (20) days after the effective date of termination, surrender possession of all the Owner's books, statements and records, and related materials belonging to the Owner that are in the Agent's possession, custody or control to the Board or newly designated agent, if any, and otherwise cooperate in good faith in the smooth transition to the newly designated agent, if any. The Agent shall not be entitled to any compensation or reimbursement of cost for activities related to the turnover of records with the exception of any shipping or delivery expenses.

XXVI. **Default.** In the event of default of any sum due under this Agreement:

a. By the Owner, the Agent shall be entitled to recover, in addition to the unpaid sums, interest on the unpaid balance at the rate of 6% per annum from the date of default plus the Agent's costs of collection, including reasonable attorney's fees.
b. By the Agent, including those described in Paragraph 27(c) below, the Owner shall be entitled to recover, in addition to the unpaid sums, interest on the unpaid balance at the rate of 6% per annum from the date of default plus the Owner's costs of collection, including reasonable attorney's fees.

c. In the event that late payment fees, government-issued citations, or any other charges are improperly incurred to the Owner as a result of the Agent's failure to execute its duties under this Agreement, the Agent shall pay for and reimburse all such sums to the Owner.

XXVII. **Hold Harmless.** The Owner shall indemnify the Agent against all costs, expenses, attorney's fees, suits, and damages of any nature whatsoever from or in connection with its handling of the property or the performance or exercise of any of the duties or powers of the Agent hereunder, unless due to the negligence or willful misconduct of the Agent. The Owner agrees to save the Agent harmless from all fines, judgements, claims, demands, and actions of any kind, and from liability for injuries or death suffered by any employee or contractor engaged by the Agent for the benefit of the Owner, and as well, from any and all liability for injury or death to any person whomsoever, provided, however, the preceding clause shall not apply in cases of the Agent's negligence or willful misconduct. The Agent shall indemnify the Owner against all costs, expenses, attorney's fees, suits, and damages of any nature whatsoever from or in connection with any loss, damage liability, cost, or expense (including reasonable attorney's fees) that the Owner may incur or sustain as a result of the negligence or intentional misconduct of the Agent.

XXVIII. **Related Parties.** It is understood by the parties that Jeffrey Charles Facilities Management, LLC is an affiliated company with a principal of Jeffrey Charles and Associates, Inc.

XXIX. **Interpretive Provisions.**

a. The Agreement constitutes the entire agreement between the Owner and the Agent with respect to the management operation of the Project, and no change will be valid unless made by supplemental written agreement executed by the Principal Parties.

b. This Agreement has been executed in several counterparts, each of which shall constitute a complete original Agreement which may be introduced in evidence or used for any other purpose without production of any of the other counterparts.

c. Where context requires, words in the singular should be substituted for the plural and vice versa, and words in the masculine should be substituted for any gender.

IN WITNESS WHEREOF, the parties to this Agreement by their duly authorized officers have executed this Agreement on the date first above written.

WITNESS:

DocuSigned by:
Jamie K. Blair
F5269ADBAD844D0...

**OWNER:** Naylor Gardens Cooperative Housing Association

DocuSigned by:
C7C7DD095E3B4B2...
David Muir, President

DocuSigned by:
Thy Harrison
9925DD260C0C465...
Thy Harrison, Treasurer

WITNESS:

**AGENT:** Jeffrey Charles & Associates, Inc.

Jeffrey C. Turner, President

EXHIBIT
2

# PROPERTY MANAGEMENT PLAN

## NAYLOR GARDENS



**Prepared For :**

Board of Directors

**Jeffrey Charles and Associates**
6422 Grovedale Drive,
Suite 201C
Alexandria, VA 22310

The owner accepts the ultimate responsibility for ensuring that the Property is maintained in accordance with its stated policies and objectives expressed within the Articles of Incorporation, By-Laws and other organizational documents.

In discharging this responsibility, the owner has contracted with Jeffrey Charles & Associates, Inc., (the "Agent") for the daily operation and administration of the property. The owner accepts the responsibility for providing broad policy guidelines governing the management of the Property's physical, financial and social administration aspects to Jeffrey Charles & Associates, Inc., and as the Agent, Jeffrey Charles & Associates, Inc., within these established policy guidelines will implement the Owner's policy. The Owner and Agent will consult periodically to revise or to establish new policies as dictated by the needs of the property and enunciate the agreed-upon policy objectives with respect to compliance with the regulatory Agreement; Mortgage Loan requirements; federal and local laws; standards of community maintenance services specified by the Lease Agreement; and sound financial objectives. The Owner and Agent will closely monitor the operations of the Property and Owner will receive all written correspondence and financial statements on behalf of Owner from Agent regarding such operations.

Although the Owner intends to stay in close contact with the daily operations, the role of the Owner will remain that of a Policy Center and overseer of operations to ensure that policies are being implemented. Within the bounds of agreed-upon policy, the On-site Project Manager, under the guidance and direction of the Agent, has the complete responsibility for the daily administration of property operations, which include resident placement and vacating, implementing procedures for maintenance and collecting property revenues.

Decisions regarding personnel policy and conditions of employment will be made by the Owner through an approved personnel policy, operating budget and other personnel management aspects. The Agent will hire all personnel associated with the operation of the Property and they will be considered employees Agent. The cost of the site manager and maintenance personnel will be reimbursed to the agent including payroll taxes, benefits and group hospitalization. A primary element of personnel management for the Property will be that all personnel have a high degree of integrity, able to communicate effectively with others' capable of exercising individual initiative and experience in their respective area of property management. The Site manager will be experienced and trained in tax credit compliance.

The Agent, within the basic qualifications and job skills required of the Property positions, will consider and employ in an affirmative manner, women and minorities for positions. Property staffing requirements and responsibilities for on-site personnel are to be established and maintained in compliance with Owner's approved Operating Budget and Plan for the Property. The Agent will cause to be hired sufficient personnel to assure efficient daily operations of the Property and long-term maintenance of Owner's property and equipment.

All on-site personnel will be required to act only within the scope of their position description and will receive compensation for their services to the Property pursuant to the Management Agreement and approved Operating Budget.

Advertising for residents will commence whenever a waiting list has been reduced to a level such that anticipated dwelling unit turnovers for a one-year period exceed the number of prospective residents of record.

Applicants will be provided with Owner approved marketing materials which shall include a description of the community's amenities and services, unit amenities and a schedule of housing charges established at that time for the Property.

All media and written material, i.e., advertisements, stationary, brochures, shall have incorporated a statement that the property supports and adheres to Fair Housing requirements. The Agent shall adhere to and comply with all requirements having to do with Fair Housing regulations in the operation of the property. In addition, all marketing materials and procedures will comply with local, state and Federal Fair Housing procedures and regulations, Affirmative Fair Housing and Marketing Plans and Owner's Policy regarding consideration of applicants as Subscribers. The Agent will be responsible for rendering approval of all residents. The Agent will be responsible for evaluating applicant's statements requesting occupancy.

The Agent, prior to executing a lease Agreement with an approved tenant on behalf of the corporation will inspect the unit to be leased in the company of the new tenant. The inspection will be documented by the Project Manager and the new tenant by the completion of an inspection form signed by both persons as to the condition of the leased unit.

The initial orientation of each new occupant will begin at the time an application is filed with the Management Office for residency or upon notice of an impending vacancy for which a resident is to be selected from a Waiting List. The initial orientation will provide for the applicant receiving:

A. Explanation and introduction on the property;
B. Management's obligations to the residents;
C. Resident's obligations to management;
D. Review of the Owner's Rules & Regulations;
E. Examination of the Lease Agreement;
F. Care of the leased premises.

Upon the date of placement, the Agent will provide an interview session to include:

1. A tour of the facilities, laundry areas, and other common area elements likely to be utilized by the new resident;

2. New Resident packages that include transportation maps and area convenience information for the resident.

3. Explanation of the maintenance procedures and forms of record having to do with maintenance repairs.

4. Introduction to a resident in close proximity to the new resident.

5. Provision of other Management Office material, office hours, emergency service numbers, etc.

Compliance with applicable Equal Opportunity requirements will be furthered by the continuing affirmation of the Agent's policies that they intend to fully comply with laws pertaining to Equal Opportunity. This affirmation includes that the Agent will not discriminate against any employee because of race, color, religion, sex, handicap or national origin in the consideration of recommendations to the Owner for promotions, demotions or transfer, layoff or termination, the implementation of pay rates and other forms of compensation, or in providing training. This affirmation will be communicated to all employees of the Property verbally in staff meetings and in writing to notify all employees that such compliance will continue to be a matter of policy for the Agent and Owner.

All employment application material will explain likewise that the Agent and Owner will not discriminate in considering the application for employment because of race, color, religion, sex, handicap or national origin, whether in recruitment, advertisement, interviews from recruitment activities or in consideration of employment.

The process of determining resident eligibility will be in accordance with a demonstrated and verified background check as to whether the applicant can meet the terms of the Property's Admissions Policy, and if required, the lease Agreement and Rules and Regulations. The Project Manager, under the guidance of the Agent, will draw from the approved listing of residents a household for placement whenever the occupant has given notice to vacate. All applicants, whether approved, rejected or on the Waiting List as a Subscriber, will be reviewed periodically by the Agent's property management staff to ensure that all policy requirements and procedures are being adhered to by the on-site property staff.

All qualified applicants selected for resident status will be so notified by letter issued by the on-site staff. The letter will request that the applicant notify the Management Office of their continued interest in becoming a resident of the Property and ultimate placement into occupancy. Each applicant so responding affirmatively will have their record updated and turned-over by the Project Manager to the Agent for continued evaluation of the applicant's ability to become a resident.

Each approved resident, after attending required Owner interviews will be requested to inspect the unit anticipated to be leased by the corporation. If the condition of the unit meets the lease requirements and maintenance policy standards, the subscriber will be requested to enter into a Lease Agreement for the unit and to become a resident by paying a security deposit and applicable rents.

At least annually, on-site staff will review with all residents their lease obligations that pertain to the condition and maintenance of the property and leased unit. On an on-going and individual basis, the Agent will counsel and, if necessary, obtain assistance from community-based social services programs to assist residents that have been identified as requiring such assistance to meet the leasing terms and conditions.

Maintenance and repair will be accomplished as part of three (3) distinct types of maintenance activities as described below:

A. Scheduled Maintenance

1. Installed Equipment.

Scheduled maintenance and repair of installed equipment will be accomplished by the property maintenance staff, where possible. If the equipment item is under warranty, the supplier/service firm holding the warranty will be requested to service the equipment item. Work undertaken by the maintenance staff will be in accordance with the manufacturer's recommendations and requirements provided by equipment manuals. Scheduled maintenance largely will entail cleaning or replacing minor equipment parts with an emphasis on preventive maintenance. A unit and property equipment and inventory record will be established and maintained on-site.

2. Custodial Services.

Maintenance for interior common areas will be governed by regular service schedules for the cleaning of laundry rooms, hallway/walkways, etc., on a regular basis.

3. Trash Removal.

The schedule for the collection of trash and other unit solid waste products will be based upon the collection schedule negotiated with the refuse contractor. Common area trash removal items will be collected by the maintenance staff and disposed of in a similar manner. The cleaning of units from turnover shall provide for trash removal through the county's program whenever possible. When such service is not available or the items require special collection at additional cost, the Maintenance mechanic, upon consultation with the Project Manger, shall arrange for such removal.

4. Grounds Maintenance.

a. Custodial

Grounds will be swept and litter collected on a regularly scheduled basis, no less than three (3) times per week. Grounds will be inspected daily to ensure that no hazardous conditions arise and property maintenance staff will immediately rectify any deficient condition that may be found from such inspections.

b. Plant and Lawn Care

A schedule for the maintenance of all plantings in the common area will be established in accordance with the characteristics of each specific plant. Lawns will be cut on the basis of an approved schedule meeting budgeted objectives of the Owner, but no less than once per week during the growing season. To the extent possible, weeding will be done by the property maintenance staff and fertilization, pruning and other specialized landscape maintenance will be done by an approved landscape maintenance company.

c. Snow Removal

The maintenance staff shall clear all walkways of snow and spread sand and other ice-melt materials to reduce the opportunity for falls and injuries which could increase the liability of the Owner.

d. Extermination

Extermination services will be contracted out to an approved extermination firm. The service shall provide for monthly service application of pesticide treatment of common areas and selected trouble spots within units.

e. Repairs

The repairs to unit equipment items will be made by maintenance staff within a 48-hour period after receipt of the Work Order request from the resident. The resident may telephone the Management Office for such requests or come by the Management Office to complete the service request order. Regardless of the mode filed, the Management Office will file the request on the maintenance record of pending work to be completed, and the Work Order delivered to the Maintenance mechanic to evaluate and arrange for its completion.

B. Non-routine Maintenance

The Agent's property management staff, together with the on-site property staff, will inspect, at least annually, all major facilities and building systems to ensure that they continue to meet their designed usefulness, remaining life-expectancy and functional criteria. Whenever non-routine maintenance is required, the Maintenance mechanic, Site Manager and Agent's Property Manager will consult to undertake repairs, service or replacement in accordance with the approval Operating Budget, and procurement requirements imposed upon the Agent through the Management Agreement.

C. Regular Inspection and Inspection Reports

Regular inspection of all units will be done formally on at least an annual basis. An inspection form will be used to assist in identifying maintenance problems, which if not corrected, may cause a problem of a larger magnitude. The Maintenance staff shall inspect the property's common areas on a daily basis to ensure that all exits and passageways are clear and appropriately lit for use in an emergency and that proper signage is maintained for the property.

Inspections will be scheduled when a resident vacates a leased unit or a complaint is filed about a condition of a unit or other issue suggests that an inspection should be performed. Whenever the property maintenance staff is requested for Work Order servicing inside the unit, it will be the Agent's policy that all plumbing fixtures and faucets be inspected for correct operation and water conservancy and that smoke detectors are checked for proper operation. The completed Work Order shall be marked by the maintenance staff person carrying-out the maintenance work that such an inspection was made and that corrective work is required, where found to be required. Problems noted in housekeeping or insect or pest infestation will be turned over to the Site Manager for corrective action. Upon completion of the Work Order, the resident shall be requested to sign the Work Order stating that the work was done and the time consumed. The Site Manager shall utilize the Work Order as a starting point for the interim inspection suggested by the maintenance staff, should serious deficiencies be found by the staff.

Policies and procedures regarding the collection of monthly rents and other assessments will be clearly communicated to all residents during the orientation to the Property. A reminder on these policies and procedures will be sent to any resident whose housing payment is delinquent. The procedures for collection shall be applied uniformly.

If the resident vacates the premises, Agent, subject to the terms and conditions of the Lease and area, will seek reimbursement for any unpaid charges or other amount owed under the Agreement/Lease. The monthly housing charges will be due in accordance with the Lease Agreement provisions. Residents will have the responsibility to make their payment to the Management Office on or before the first day of the month during normal business hours by check or money order. A mail slot also will be available to collect payments during non-business hours at the Management Office.

The following procedures illustrate the type of action which shall be taken with regard to delinquent charges and assessments:

1. Ten (10) business days after the due date, a "Late Notice" will be sent to the delinquent resident's unit by the Site Manager.

2. If after fifteen (15) business days from the due date, payment has not been received, the Site Manager, if no other arrangements have been made to bring the account current, shall turn the account over to the Property Manager for evaluation.

3. Should the Property Manager find that all efforts have been made to collect upon the delinquent funds by the Site Manager; the account will be turned over to legal counsel for collection in the legal system.

4. If the resident becomes delinquent within a consecutive four (4) month period, the Agent will consider the resident to be a chronic delinquent case and shall take action on the condition through counseling with the resident. In addition, a formal notice will be provided to the resident stating that further delinquencies may be considered sufficient justification to consider the resident in default under the Lease Agreement.

5. Further delinquent conditions occurring after such counseling shall be brought to the attention of the Owner recommending termination of the Occupancy and the Lease Agreement.

Management intends to promote an open atmosphere which will provide that residents may approach the on-site Manager to discuss their housing, maintenance or other needs. To the extent possible, the Site Manager will assist the resident by offering advice or suggestions as to appropriate counseling assistance or other community resources available to the resident. The Site Manager and Agent's property management staff will periodically visit community agencies that may be of assistance in the operation of the Property and to familiarize themselves with the guidelines for services or other program requirements. A property notebook shall be maintained for resident inspection and use in locating assistance through community resources.

In so far as is practical, the Site Manager will attempt to coordinate recreational activities and special program activities for the property with the Owner. This will insure that any activity will be benefited by the widest range of residents. Management staff shall promote and attempt to work through the Agent and Owner to maintain open lines of communications to all residents and to eliminate as much as possible miscommunication and rumors about activities and/or actions.

The Residents will provide the main source of feedback on the quality of Agent's services. Informal evaluations and surveys of residents will be utilized as necessary to evaluate the performance of Management and the Owner's achievement of agreed-upon goals and objectives for the operations of the Property.

To facilitate resident access to Management, it shall be the policy that the Management Office will conduct office hours, Monday-Friday from the hours of 9:00 am until 1:00 pm. A telephone system shall be operational on a 24-hour basis for receiving emergency maintenance request telephone calls. In addition, on-site staff will be given access to contact Agent's property management staff to respond to an emergency or to resolve a problem in operations.

All resident grievances must be in writing and directed to the Site Manager who will attempt to adjudicate the problem with the resident. In the event that the Site Manager requires assistance, he/she will discuss the issue(s) with Agent's property management staff in order to arrive at a conclusion of the issue(s). A monthly record of all resident grievances will be maintained at the property by the Site Manager.

The Agent shall ensure that all on-site personnel are fair and respectful when dealing with residents. Consistent with that policy, the property staff, especially the Site Manager, will be encouraged to listen to all residents and applicants and to try and understand their point of view.

In the instance where the resident or applicant desires to file a personal grievance action as a result of actions (real or perceived) taken on the part of the Property's staff against the individual, the individual will be directed to place the grievance into writing directed to the attention of the Agent's Property Manager assigned to the property. The property manager shall render a decision on the matter in writing within ten (10) days with a copy provided to the Owner. The Site Manager shall be advised of such grievance filing at the time of filing and will be consulted upon, if necessary, for additional information on the matter.

The Maintenance Mechanic will have the primary responsibility for seeing that security measures are in-place, such as locks on units and common-area doors are in working order; dangerous or restricted areas are adequately locked and secured; and, hazardous conditions are corrected or removed.

Police and Fire Department telephone numbers will be maintained at the Management Office as well as stickers obtained for residents to place near or at telephone locations in their unit. The initial orientation program for new residents will attempt to alert the resident to safety issues on the property as well as to elicit their cooperation in keeping the property area safe. Periodically, the Agent will consult with the Fire Department and other safety agencies regarding the actions which management may need to take to ensure the safety of the property and its residents.

Management will cooperate with the police department's office in the area and consult with the area's officials as to the continued monitoring of the property to reduce the opportunity for crime upon the corporation's residents.

The Agent will utilize automated data processing systems and procedures and will maintain a comprehensive system of reports and accounts in conformance with generally accepted accounting principles. The Agent will provide monthly financial reports to the Owner to enable a comprehensive picture of the financial and physical condition of the Property to be drawn.

A. Receipts

Receipts will be issued by a computer process and provided for all collections, regardless of source. The original will be issued to the resident making the payment with copies provided to the Agent by the Site Manager. At the end of the month, collection receipts are to be in balance with collection deposits.

B. Income Deposits

All income collected shall be deposited in the Owner's Operating Account held in a federally insured bank. Daily deposits will be made for all collections. Cash will not be accepted by the Agent or the Management Office.

C. Petty Cash

A Petty Cash Fund established by the Owner will be maintained by the Site Manager for the payment of small purchases. When not in-use, this fund will be kept in a locked cash box separate and apart from other collected receipts. This fund will be replenished, when required, by the Owner. The fund will be audited randomly and periodically by the Agent's property management staff.

D. Expenditures

All property expenditures not covered by the Petty Cash Fund will be made by purchase order/cash voucher procedural system generated by an on-site computer program system. Each invoice issued by the vendor in response to a Purchase Order, supplier or service provider shall be reviewed and approved by the Site Manager and Agent's property management staff. The Site Manager and the Agent's Property Manager shall review the expenditure contemplated first at the Purchase Order stage for cost, budgeting, and account analysis and again at the check voucher stage for adherence to the Purchase Order issued. A copy of all invoices issued for payment will be retained on-site in the Management Office Vendor File System. Where required, copies of all proposals and bids obtained to justify the price received for goods and services will be retained on-site for audit and review.

E. Files

All resident and unit files will be maintained by the Site Manager. All unit maintenance data files will be maintained in the Management Office. The Agent shall retain copies of integral parts of this record by computerized storage processes. The Agent shall maintain copies of all correspondence of an administrative nature as well as copies of any financial reports for future audit and review.

The following policy statement is adopted by the owner to govern the manner in which applicants applying for resident status are to be admitted to the Property and to set forth the criteria that Management must utilize in housing residents on the property. The procedures set forth in the Policy Statement are to ensure that all applicants and residents are treated and dealt with fairly and that the leased units remain in compliance with the property's Regulatory Agreement, tax credit compliance, mortgage criteria and other contractual obligations imposed upon the operation of the property.

The Policy Statement and procedures are open for inspection to all applicants and residents should a circumstance arise in which a Management action is questioned. The Policy Statement and procedures were developed to comply with all Federal, state and local Fair Housing legislation which the owner and agent support.

Marketing

Marketing is the activity taken by Management to inform the general public of the property's existence, availability for residency at the property, and the requirements by which an applicant may become a member and take occupancy of a leased unit. The Site Manager is to review periodically all applications, processing materials and all Fair Housing requirements and guidelines.

The Site Manager shall maintain a Marketing Record file which contains a copy of all newsprint advertisement, listing of radio or television ad placed, and other community resources utilized in marketing the property. The record should also include the response count to each ad.

Management, in implementing, the Marketing Program, shall be guided by the organizational documents of the Corporation, e.g., Affirmative Fair Marketing Plans, Corporation's Bylaws, etc. Primary aspects of the Marketing Program undertaken by Management should be directed toward that sector of the public with moderate income and a need for housing opportunity. The Site Manager shall undertake contact with local housing and housing referral agencies which might generate moderate income housing applicants for residency.

Distribution of Application

All interested persons are to be provided with the following material:

A. Property Brochure - informs the persons of the purposes of the property, federal and local requirements which may have bearing upon the treatment of the application, and a description of the property.

B. Application Package - consists of the presentation folder and contents provided by the Agent, including the most current newsletter.

C. The Applicant - enables Management to decide, based upon the applicant's written statements whether:

   1. The applicant has the ability to pay the corporation's established charge for the unit;

   2. The applicant is interested in a permanent living situation rather than that classified as temporary (hotel, boarding) in nature or rent housing only;

   3. The applicant's household can be served by the available unit size.

Equal Opportunity and Fair Housing Compliance

Management shall discontinue providing applications for any portion of the Waiting List whenever the number of applicants exceeds a one (1) year estimate of future vacancies likely to arise. Whenever a portion of the Waiting List; e.g., 1-bedroom applicants, etc., is closed, management will maintain a written listing in order of date of those potential applicants who request that whenever the Waiting List section is re-opened that they be sent an application.

Application Processing

This section sets for the Policy and basic steps which are to be taken in obtaining and verifying information from applicants for purposes of: (1) determining whether applicant meets the selection criteria; (2) determining monthly carrying charges; and, (3) determining unit size for occupancy.

A. Waiting Lists

1. Management shall maintain a pool of applicants categorized into those who are current residents (Transfer Waiting List) and those who are new to the property (Applicant Waiting List) and who have indicated an interest in remaining as or becoming a member. Within the pool of applicants, all applicants shall be organized into bedroom size required for occupancy.

2. The pool of applicants shall be kept current by requesting in writing that each applicant inform Management at least annually of their continued interest in becoming a resident. Notations of dates of contact and applicant response shall be retained in the applicant's file record.

B. Applicant Register

1. The Site Manager shall maintain an official Register of Applicants in a bound book form. The Register's pages shall provide for the recording in chronological sequence of all applicants who have filed a completed Application for occupancy as a member of the cooperative.

2. All entries shall be written in ink and provide for the following:

   a. Date completed application filed
   b. Application number
   c. Applicant name
   d. Status (Transfer/New) applicant
   e. Disposition column to indicate rejection, inactive or other actions taken on application.

C. Application

1. All persons desiring occupancy as a resident on the property and who are not already a resident involved in the transfer activity are required to complete, in full, an application for occupancy.

2. The completed application shall be submitted to the Management Office. The application shall be date stamped upon receipt by the Site Manager indicating the date the completed application was received.

3. Incomplete applications received by Management are to be immediately returned to the applicant with a cover letter identifying the application deficiencies which must be corrected before the application can be accepted as complete. Applicants are to be informed in the cover letter that they have no standing as an Approved Applicant unless and until a completed application is filed. A copy of the cover letter is to be retained by Management for future reference and review.

D. Application Procedures

1. The Application and any supporting documents constitution the basic record of the applicant. The application and related documents are to be retained in the applicant's sequentially numbered file record form all other occupancy records.

2. If, after reviewing the Application, the Site Manager determines that the applicant is not eligible for occupancy due to housing experience, deficiencies or size of unit need, the applicant is to be informed in writing by the Site Manager as to the reasons for the determination and the applicant's application and Applicant Register marked "ineligible." The Notice of Ineligibility must provide for the applicant to have a 14-day period from the date of the letter in which to respond or to request a meeting in writing to discuss the determination with management.

3. All entries made by Management upon the application and Applicant Register are to be made in ink. Corrections or changes are to be made only by lining out the original entry and entering the correct data. Changes are to be explained or supported in writing, initialed and dated by the Site Manager.

4. All Applications withdrawn by the applicant shall be marked "inactive" and removed from the pool of applicants. In closing the file record, evidence of such withdrawal shall be placed into the record for future audit and review. The Applicant Register shall be marked "inactive" and dated where the word "inactive" appears.

5. All applications received and not otherwise disposed of an "ineligible" or "inactive" are to be considered "active" applicants.

E. Application Review

1. The Site Manager shall evaluate all "active" applicants based upon the following criteria when the applicant's application reaches a point in the pool of applicants that they become likely to be housed within the next six (6) months. The application shall be reviewed by the Site Manager with the applicant to assure that information provided by the applicant is responsive to evaluation in-light of the criteria:
   a. Applicant meets HUD financial requirements, i.e., Income Limits and housing allowances and deductions in effect at the time of the review, etc.,

and corporation By-Law requirements and tax credit compliance.

b. Family household size as compared to possible unit size available for occupancy on the property exists;

c. Favorable credit report and test of ability to pay for the housing cost;

d. Demonstrated ability to pay a monthly housing charge;

e. Favorable comments from previous landlords or mortgagees who were in a position to offer insight into applicants:

(1) Willingness to make monthly payments on-time;
(2) Ability to comply with standard leasing terms and conditions;
(3) Willingness to carry-out standard leasing obligations;
(4) History of detrimental conduct which could pose a problem to the property or other residents.

2. In general, Management staff, in evaluating the application may determine an applicant "ineligible" whenever a negative response is required on items 1 (a) and (b). Whenever two (2) or more informational items are negative among items 1 (c) through (e) above, the application may be termed "rejected". Whenever only two (2) items 1 (c) through (d) appear to be likely to form the basis for rejection, the Management Agent shall review and make a written recommendation to the Site Manager as to whether the applicant should continue to be processed as a possible subscriber for the corporation or be "rejected" as a possible subscriber.

3. Applicants for resident status who are determined to be ineligible or are rejected are to be notified in writing by the Site Manager of the determination and the reasons for the determination. The applicant Notice of Ineligibility or rejection also must provide for a 14 day period from the date of the letter in which the applicant may respond in writing or to request a meeting to discuss the Notice.

4. Applicants determined to be "eligible" and who have the potential for being a resident are to have the application stamped "eligible" and the transmittal survey sheet of the applicant turned over to the Agent for review and recommendation for approval. If, upon review and recommendation a determination is made for resident approval and the Agent grants such approval, the Site Manager shall notify the applicant in writing of their pending approval and inform them as to the period of time that may transpire before occupancy can be expected as well as the obligation to participate in the corporation's Orientation Program. Such estimates of possible occupancy dates given are to be based upon the amount of the residents already in process, length of applicable Waiting List, and unit turnover rates.

Application Fee

Application information and property brochures and date sheets provided the general public shall clearly indicate that there is an application fee charged for the filing of an application for residency.

Approved Applicant Status

All applicants who are approved for resident status shall be required to participate in a formal Orientation Program developed by Management and the Owner. Upon the successful completion of the orientation session, the application shall be marked and noted of participation. Upon the payment of the applicable Security deposit and rent, the applicant, will become a resident of the housing corporation.

Application Rejection

If the applicant fails to attend an Orientation Program session, the Site Manager shall notify the anticipated subscriber of the default and/or non-compliance within five (5) days of the occurrence. The Site Manager shall include in the notification to the applicant that they have ten (10) days within which to notify Management of their continued interest in becoming a resident and to arrange for compliance with their orientation obligation on training.

If the Site Manager is unsuccessful in achieving compliance, the Site Manager shall provide to the Management Agent a recommendation for cancellation of the applicant Subscription Agreement.

Selection of Applicants

When Management becomes aware of an impending unit vacancy, the Site Manager shall select the next approved member transfer case, or if none, the next subscriber by date who meets the following criteria:

A. Unit size needed by the resident/subscriber as described in the Occupancy Standards that is to be available;
B. Has met or can accumulate within 30 days the funds required to be deposited with Management;
C. Is able to take occupancy within 30 days of the projected date of vacancy.

In the event of a vacancy for which two (2) residents are to be considered, having housing preferences, needs and ability to pay monthly housing charges due, the lowest application number (earlier application date) will be offered occupancy first. A transferring resident may reject or refuse to promptly enter into resident status and execute a Lease Agreement and still be entitled to the next opening for resident status and occupancy. If the transferring resident rejects an offer for a justified reason such as hospitalization, inaccessibility to employment location, or inability to meet the fee required, the resident shall retain their position on the applicable Waiting List and the offer shall be counted as one of two (2) offers to which the resident is entitled.

If the resident rejects a second offer, the Site Manager may consider the application to be at the end of the current and applicable list of Waiting Applicants.

Occupancy Standards

To avoid overcrowding and to prevent the under-utilization of space, units are to be assigned to residents in accordance with the occupancy standards below. The minimum standards may be waived by the Site Manager when necessary to make temporary use of the available units.

| Unit Size | Number in Household |
|---|---|
| 1 | 1-2 |
| 2 | 2-4 |
| 3 | 4-6 |

Units are to be assigned to resident households so as to not require the use of the living room areas for sleeping purposes of the authorized household members.

All persons who require separate bedrooms or other residential requirements which the corporation can accommodate on a verified basis, e.g., Doctor's orders, handicapped status, etc., will have a unit assigned based upon the above requirements.

Transfers

The transfer of a resident household to another unit of lesser or larger amount of space, is not subject to the Applicant selection criteria. However, a resident may only be transferred by the Site Manager upon the Agent's approval.

Transfer List

The Site Manager shall maintain a Member Transfer List which shall be composed of all member resident households, ranked by date of the verified determination of need to transfer. As suitable units become available, the Site Manager shall draw from the Transfer List the next member resident meeting the unit size, location and/or amenities offered.

Before the actual transfer may take place, the transferring member must be current in their monthly rent and/or have deposited with Management, the estimated cost of rehabilitating the occupied unit, normal wear and tear excepted. The estimate shall be based upon the Frequent Charge Schedule and/or contractors' quotes able to supply the repair material or perform the work required. Any difference attributable to higher actual costs are to be paid by the transferring member within thirty (30) days of transfer completion.

Occupancy Agreement

A Occupancy Agreement for members is to be entered into between Management and the resident household. The Agreement is to be kept current and reflect the current monthly rent. Changes to the monthly rent, or terms and conditions are to be made by a written Addendum signed by both Management and the member head of household and any other adult resident. The Agreement is to be executed PRIOR to a perspective resident receiving the keys to the unit.

The initial and subsequent leasing terms of the Lease Agreement for residents shall be for the same term as initially entered. Subsequent period extensions are to be granted by Management only as long as the resident household remains in compliance with the terms and conditions cited in the Agreement.

Agreement Administration

Occupancy Agreement and Addendum are to be executed only by the Management Agent in original form and dated. The member household's head, spouse or co-head, and/or other adult household member, if applicable, is/are required to execute the document for the household. Changes in the Lease Agreement content are NOT permitted except when approved by the Owner and HUD and issued by the Management Agent.

The responsible adult individual(s) of the member household is/are required to execute the Agreement in quadruplicate prior to actual occupancy and Addendum in quadruplicate thereafter. The original and one (1) copy shall be retained in the resident's official property file record, one (1) copy provided to the resident.

If, through any cause the sole signer of the Occupancy Agreement ceases to be a resident of the household, the Agreement is to be voided and a new Agreement of the same type executed with the remaining but new adult head-of-household.

If a resident transfers between units, the existing Occupancy Agreement is to be voided and a new Occupancy Agreement executed for the new unit location.

Agreement Termination

Authorized Occupancy Agreements provided to residents by Management provide for the legal termination of the Agreement and hence residency, should such action be required. In the instance where a resident has disregarded the individual and private counseling by the Site and Property Manager or other designated party in resolving an Agreement violation; or, if the circumstances warrant due to actual physical abuse of resident/employees or other serious incident such as the commission of felony actions associated with drug distribution, serious destruction of personal property-owned equipment, the Site Manager shall, after consultation with and receiving clearance from the Management Agent:

A. Inform the resident head-of-household in writing and in a private and officially documented conference that unless the Agreement provision(s) cease or is corrected,

the resident may be requested to move from the property.

B. Request, on a second occurrence of the event(s), that the Management Agent provide to the resident head-of-household, a written notice advising the resident that the continuing actions discussed during an earlier conference may result in the termination of the Agreement by the corporation.

Note: Copies of the conference record, initial notice and Management Agent's notice are to remain in the resident's property file should legal action be required at a later date.

C. Should the Agreement violations continue and/or the issues involve conditions of bodily harm or injury, the Site Manager shall forward to the Management Agent a copy of all relevant memoranda, report(s). Warning Notices and a copy of the resident's Lease Agreement.

D. The Management Agent shall consult with the Site Manager before legal action is taken to ascertain whether all reasonable and required actions short of termination of the Agreement by the Agent have been taken.

Termination Responsibilities

It is important to note that the responsibility to document the instance(s) of Agreement violations brought to Management's attention, counseling or obtaining community supportive services or assistance to resolve the problem remains with the Site Manager -- the party closest to the resident problem. The responsibility to cause termination of the Lease Agreement rests directly with the Management Agent. None of the above individuals or entities has the legal authority to terminate occupancy. Only the Agent is empowered to terminate occupancy. Further, only the Prince Georges County Court or other appropriate judicial process can cause an eviction from the premises. If a resident should refuse to vacate the leased premises after receiving a Notice of Lease Agreement Termination the attorney will be requested to proceed in obtaining, for Management and the corporation, possession of the unit.

If termination of the Lease Agreement is based upon the death of the sole resident occupant, Management shall be guided by the Prince Georges County Landlord-Tenant Act, as amended, or other applicable statutes.

Notice of Termination

All Notices of Termination issued for reasons other than the non-payment of monthly housing charges, shall be served as follows:

A. One (1) copy delivered "first class" mail to the resident's mailing address. Note: Management staff shall not accept such mail on behalf of the resident.

B. One (1) copy "hand-delivered" by the Site Manager to an adult member of the household. The delivery shall be made in the presence of another staff person as a Witness.

C. One (1) copy shall be retained in the resident's property file record notated with the

date, time and signature of the property staff persons who witnessed and served the hand-delivered Notice to the unit.

Legal Action

Should legal action be authorized by the Owner, the Management Agent and Site Manager shall cooperate fully with all legal order issued. Original documents should be removed from the property's file record unless the attorney requires the original record for court submittal. The confidentiality of the termination action and/or eviction action shall be respected and not discussed with other residents or non-property staff.

Record Control

Resident records are not to be removed from the Management office unless authorized for legal and/or audit actions. It is the Site Manager's responsibility to safeguard all resident and applicant data, personnel/personal data and other official documents. Resident, applicant, personnel and all financial informational files are to remain in a secure and lockable file cabinet with limited authority being delegated by the Site Manager to other persons to handle file documents. All records are to be maintained in an orderly and auditable state at all times.

Resident Record

Resident property file records shall contain all relevant information pertaining to THAT household. Information which involves two (2) or more resident on a single issue, e.d., disputes, referral memo, etc., should be reflected in both resident files records. Notices to all residents and other general communications may be retained in a single file folder for the fiscal year period.

Vacating Actions

Residents are required to notify Management of their Intent to Vacate pursuant to the Lease Agreement terms and conditions based upon the anniversary date of their Agreement. Residents who vacate prior to the expiration of their Notice and/or anniversary date of the Agreement are responsible for the monthly rent until the anniversary date. Where the resident dies in occupancy with no remaining household members, the remaining survivors shall be consulted with on the disposition of personal effects so as not to exceed the thirty (30) day period of time before the unit may be re-occupied.

After the resident has vacated the unit, the Site Manager, shall arrange, when possible, for the unit to be prepared for a new occupant within a three-day period, where proper vacate notice was provided. After the unit has been prepared by maintenance staff, the Site Manager shall re-inspect the unit to ensure that the unit is ready for an inspection by a new resident. The Site Manager shall arrange for a new resident (who was possibly contacted about the contemplated vacancy some 30 days earlier), to inspect the unit (Pre-occupancy Inspection) and arrange for move-in actions.

## RECERTIFICATION SYSTEM

According to HUD Handbook 4350:3, all prospective tenants must be certified prior to moving in to determine whether or not the prospective tenant is income eligible.

After moving in, all tenants are to be recertified on a yearly basis to re-evaluation family size, income, and allowable deductions. Recertification's are to be completed by the tenants' anniversary date. Anniversary dates are set-up at the time of move-in and is usually lease expiration date. (Example: if a member moved in on 7/18/17, their lease expiration date or anniversary date would be 7/17/18, therefore recertification should be completed by 7/17/18, allowing a rent increase or decrease to be effective on 8/1/18. If after the initial term of the lease, the tenant chooses to remain on a month-to-month tenancy, his next recertification would be done on 7/17/19, therefore, his anniversary date would not change).

Since recertification must be completed by the anniversary date, we will begin the process ninety (90) days prior to the anniversary date so as to have enough time to collect, verify and document. In order to keep better control and to assure recertifications will be completed within the software system provided onsite.

# INITIAL RECERTIFICATION NOTICE

The Initial Recertification Notice is sent 90 days prior to the anniversary date to alert the tenant that he must bring in pertinent information to complete his recertification within ten (10) days of its receipt. It also notifies the tenant that his failure to do so may result in his rent being increased.

The Initial Recertification Notice is to be completed in duplicate, with the original going to the tenant and the copy being retained in the project files.

When setting up interviews for recertification, it is wise to avoid any appointments during rent week.

MAINTENANCE PROCEDURES

JANITORIAL

---

The Porter will be responsible for the cleaning of the hallways, stairwells, grounds and other common areas within the complex.

The following is a detailed schedule of the tasks to be performed and the frequency:

| | |
|---|---|
| Policing of the grounds | 2 X Day (Early morning and Late afternoon) |
| Policing of the hallways and laundry rooms and office (emptying trash etc) | 1 X Day |
| Damp Wipe of ledges, sills, walls, radiators, handrails, doors, etc. | 1 X Week |
| Sweep Floors and Steps | 1 X Day |
| Mop floors and steps | 2 X Week |
| Clean entrance windows | 1 X Week |
| Clean corridor windows | 1 X Month |
| Rest Rooms: | |
| Check Soap | 2 X Day |
| Towels | 2 X Day |
| Tissues | 2 X Day |
| Damp Wipe Surfaces | 1 X Day |
| Empty Trash | 1 X Day |
| Spot mop Floor | 1 X Day |
| Dust Light Fixtures | 1 X 3 months |
| Polish metal surfaces | 1 X Month |

The attached daily work report should be completed each day and submitted to the manager.

# DAILY WORK REPORT

| AREA | Broom Swept | Dry Mopped | Damp Mopped | Machine Scrubbed | Waxed | Machine Buffed | Dusted | Vacuumed | Walls | Windows | Woodwork |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |

Indicate job done by "x"

Date: ______________________________

Employees Assigned: ______________________________

______________________________

______________________________

Hours: ______________________________

Total: ______________________________

Foreman

# MAINTENANCE PROCEDURES

## PROCESSING WORK ORDER REQUESTS

---

The procedure for the on-site processing of a work order request is as follows:

1. Identify whether the work order request is for work that is the responsibility of the resident or the Property. The attached "Chart of Maintenance Responsibilities" is a summary for quick reference. If the repair is the responsibility of the Property continue the work order processing.

   If the repair is clearly the responsibility of the resident, explain this to the resident.

   For any areas that are not clearly defined, explain to the resident that it may be their responsibility. However, the Property will send someone to repair the problem and it will be determined afterwards whose responsibility the cost will be. Contact the Property manager for guidance and/or clarification.

2. Identify whether the work order request is an emergency or a non-emergency.

   The following conditions would constitute an emergency request:

   Water Line Breaks
   Gas Line Breaks or Leaks
   No Heat
   No Hot Water
   Sewer Back-up
   Power Failure
   Inoperable Refrigerator

   Any other situation that, left unattended, could cause further damage to the property or could cause personal injury.

3. Once it is determined that the repair is the responsibility of the Property and whether or not it is an emergency, a work order form should be completed. The work order form is a three part form; 2 parts of the completed requests should be given to the appropriate maintenance person or contractor. The last copy should be kept in a pending file.
   A work order request log should also be kept corresponding numerically to the work order request forms. When a request comes in log the request at the same time the work order is written.

   Although the log may appear to be a duplication of the actual work order process, its purpose is to be a ready analysis for the management and Owner on the types of problems, the prioritization and volume of work, as well as the turnaround time for completion of work orders.

   Work orders should be logged in chronologically as **they are** received. Emergency

requests should be addressed first and as soon as possible. Non-emergency requests should be responded to in the order in which they are received.

4. When the work order comes back completed, a copy should be attached to the one in the pending file and the two should be filed in the appropriate unit file. The third copy is for the resident.

   In the event that a work order is returned incomplete or is not completed within 2 business days because either a part must be ordered, a contractor called, or for any other reason notify the resident of its status. Follow up with the responsible party through to resolution.

5. Special Situations

   A. Insurance Claim

   The Property maintains a property and casualty insurance policy which covers certain defined losses. Report any repairs exceeding the $1,000 deductible which result from a sudden, unexpected loss not due to lack of maintenance such as a fire, windstorm, vandalism, or lightning damage to the property manager immediately.

   B. Third Party Negligence

   If a repair is necessitated by the negligence of **someone else** contact the property manager immediately. In general gather as much information as possible including names, dates, times, witnesses and insurance information.

   C. Expenditures over $250

   If an expenditure in excess of $250 is needed to purchase a part or engage a contractor for a repair, please contact the property manager for approval.

# WORK ORDER REQUEST LOG

| WO# | DATE | NAME | ADDRESS | NATURE OF PROBLEM |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

## ASPHALT MAINTENANCE

The primary objective of the asphalt maintenance program is to regularly inspect the parking lot areas to note and correct as early as possible any signs of cracking, or deterioration in the aggregate surface. Minor crack filling and sealing can be performed by the on site maintenance staff.

The areas will be inspected twice per year and crack filling will be performed as necessary.

Every five years the lots will be seal coated to prevent oil, gas and water infiltration.

## GROUNDS

Each fall bids will be solicited from qualified grounds contractors to perform the grounds maintenance program. The contract will be based on the following specifications:

| | |
|---|---|
| Mowing & Trimming | 24 times |
| Debris Removal | 24 times |
| Edging | monthly |
| Pruning | 2 Times (spring & fall) |
| Mulching | once in spring |
| Leaf Raking | Twice in fall |
| Weed Control | 3 times a year |
| Crabgrass Control | 2 times per year |
| Fertilization | 2 times per year |
| Lime | at soil test |
| Aeration & Seeding | Once in the fall |

## LIGHTING

---

Maintenance of the lighting systems is an important aspect of the maintenance program. Lights must be kept operational to every extent possible as lighting is a both a deterrent to crime and an important safety element.

The interior hallway lighting will be inspected daily by the porter during the course of his or her other duties. Any burned out lights will be reported to the manager. The manager will complete a work order in accordance with the work order processing policy.

The exterior lights will be tested and inspected twice per month by the maintenance personnel by covering the photocells and tripping the timers. All burned out bulbs will be replaced during the testing.

An electrician will be contracted to repair any electrical malfunctions.

## HVAC MAINTENANCE

The units will be equipped with individual HVAC units which provide both heat and air conditioning. The on site maintenance **staff** shall perform the following preventative maintenance schedule:

| | |
|---|---|
| March to April | Filter Change<br>Clean evaporator coils<br>Check operation |
| September to October | Filter Change<br>Clean system<br>Check Operation |

Under no circumstances will on-site personnel perform any repair work involving recharging or any use of Freon. Only a licensed contractor or individual who has the proper recapturing equipment may perform such repairs.

## MAINTENANCE PROCEDURES

## ROOFS, GUTTERS & DOWNSPOUTS

---

The following schedule of inspections and routine maintenance should be followed to extend the life of the systems and to prevent any damage to the structures from water infiltration:

| | |
|---|---|
| Inspect & repair flashings | 1 X 3 months |
| Clean roof drain covers | 1 X month |
| Inspect & repair gutters & downspouts | 1 X 3 months |
| Clean gutters | 2 X Year |

## PEST CONTROL

Legislation has regulated the licensing of the professional pest management control services. Control of pests, in most instances, is the preventive control put in place by management. Pest control experts usually divide control into two phases: (a) "clean-up" or "clean-out", during which an outbreak is reduced to a manageable level and (b) contracted or preventive services where, through regular chemical application and sanitation, re-infestation is forestalled. We intend to hire a firm that will be able to operate under our guidelines and have the ability to understand and work with people. This firm will provide monthly service and inspection. In addition they will answer all emergency calls.

One complete treatment will be made to all units and common areas once a year. Residents with problems may call for service once per month.

## FIRE EXTINGUISHERS

1. Inspect once a month.

2. Recharge as needed or every six months.

    a. Before recharging, inspect gaskets, hose, hose connections, nozzle springs, and pressure gauge. Replace defective parts.
    b. Note pressure gauge reading and, during discharge of water, note whether pressure gauge reading responds to fall in contents.
    c. Completely discharge contents.
    d. Remove cap and note if extinguisher shell is clear of foreign matter.
    e. Check condition of hose, nozzle, gaskets, and gauge.
    f. Correct defects at once.
    g. Fill with clear water (or approved antifreeze mixture if located where subject to freezing temperature).
    h. Restore compressed air charge to recommended reading.
    i. Place date and full name on inspection card.

3. Using antifreeze solutions - Where an extinguisher is in an area exposed to freezing temperatures, an antifreeze solution must be used with water. This solution must be approved by the manufacturers of the extinguisher.

## PLUMBING

The unit plumbing components will be inspected annually as part of the unit inspections. All kitchen and bath areas will be checked for plumbing leaks or other problems. Each sink will be inspected to make sure that an aerator is installed.

I. PROCEDURE

The following procedure will be followed for winterization.

A. Roofs

1. Inspect flashing. Make necessary repairs.

B. Exterior & Sidewalks

1. Inspect building exterior for possible cracks in brick, concrete and other masonry work. Caulk and point where necessary.

2. Inspect and repair sidewalks, curbs gratings and ventilators.

3. Inspect and repair snow melting equipment.

4. Check supply of rock salt or calcium chloride.

5. Check tools, such as scrapers, shovels, etc.

6. Bring all outside hoses inside and store them.

7. Cut off all outside water lines and insure same are completely drained.

C. Exterior Doors and Windows

1. Inspect doors and windows, repair locks, replace cracked and broken glass, glaze in the common areas.

2. Check window seals.

D. Building Lobby Areas

1. Check floor mats, runners and stair treads. Repair as necessary.

E. Plumbing

1. Shut off and drain piping to hose bibs, cooling towers, evaporative condensers, air conditioning chilled water coils, exposed water faucets and fountains.

2. Protect automatic sprinkler systems or pipes in unheated areas.
3. Air conditioning units should be inspected and repairs made where necessary.

F. Heating & Air Conditioning

1. Inspect, repair and test heating equipment, including boilers, boiler refractors, piping valves, pumps, vacuum pumps, steam line gaskets, air compressors, thermostats, traps, radiators, expansion joints and automatic controls.

2. Inspect and repair heating equipment in connection with ventilating and air conditioning systems, such as tempering coils and booster coils, controls on fan inlet dampers, bypass dampers, automatic closing dampers on fan system when system is shut down.

3. Clean out convector type radiators in the common areas and units.

G. Miscellaneous

1. In the common areas, inspect and paint wood and metal surfaces.

2. Check exposed fire extinguishers for anti-freeze.

3. Put light oil in motors and other equipment located outside, such as doors.

MAINTENANCE PROCEDURES

PREVENTATIVE MAINTENANCE PROGRAM

---

I. PURPOSE

To establish guidelines for implementing a preventive maintenance program that will be used at the property.

II. BACKGROUND

Unless a well established and planned program is implemented in which the on-site personnel know what has to be done daily, preventive maintenance will not take place.

There are three steps or elements of an effective preventive maintenance program:

1. Identification of all equipment.

2. Equipment records including a master equipment reference card.

3. A system of tasking which preplans for the person who is responsible to complete the work that must be done each week.

In order that we can save duplication of effort and ensure implementation, there must be certain guidelines, forms, and procedures that must be followed. These guidelines are outlined in this instruction.

III. PROCEDURE

A. Equipment Inventory

An inventory will be made of all equipment in the project. Each piece of equipment will be given an equipment number which will run consecutively. Each piece of equipment will be tagged and marked with its assigned number.

B. Master Reference Card

A master reference card will be established on each piece of equipment in the buildings (see Enclosure A). This reference card will be kept in a card file in the maintenance shop, office or the engineer's work area.

A duplicate card could be attached near or on the equipment. If the card is not adequate for any piece of equipment, a regular 5" x 8" lined index card can be attached. For instance, if there are over 13 preventive maintenance steps, the maintenance section of the card could be continued on a blank card. On the larger pieces of equipment this will be true. However, on the majority of the equipment the master reference card enclosed will be adequate.

C. Tasking System

This is the most important part of the program. The maintenance engineer and his superiors must know what he has to do each day, have a record of what he has done, and a way of checking his work. This should be done with a minimum amount of paperwork.

From the master reference cards the maintenance tasks will be separated by daily, weekly, monthly, quarterly and yearly frequencies.

A separate check list will be made up for each one of these frequencies.

The daily check list could be duplicated for 365 days and completed each day and turned in or the engineer can use one for each day. These check lists could also be posted on a wall with a clear plastic cover. When the tasks are performed, the engineer could make the date completed with a grease pencil. This procedure could save paper work.

Another successful system is one in which 52 weekly sheets are printed. The daily tasks are printed on one side with a place for the engineer to initial for each day of the week. On the other side are the weekly tasks as well as the monthly, quarterly and annual tasks that will be assigned for that particular week. Under this system all tasks for the year will be assigned on these 52 sheets and each weekly sheet will be handed in by the engineer with his time for the week.

# FILING SYSTEM

## I. BACKGROUND

The Site maintains an on-site office that includes complete coordinating filing system for Property, governing, and management operations. It is the resident manager's responsibility to ensure that all files are maintained in accordance with the provisions of this instruction.

## II. ORGANIZATION OF FILES

The files are organized by the following categories:

### A. General Files

General files are in alphabetical listing by subject. Enclosure 1 is a list of all files in the general file. As subjects are added or deleted, Enclosure 1 of this instruction will be updated and changed and distributed to the Managing Agent.

### B. Payroll

There will be a separate file drawer for all payroll records of the Property. Each individual employee will have a file folder which will include all information incidental to his or her employment at the property. It will include applications for employment, a record of leave, absence and vacation time, all correspondence pertaining to that particular employee, annual evaluation reports, all requests or correspondence to and from the employee and all payroll change information.

### C. Unit Files

Each and every property unit will have a file in unit address order which will include all correspondence and information pertaining to that unit or occupants which may from time to time occupy that unit. A separate file will be maintained for each resident. It will include settlement sheets, occupancy agreements, and all correspondence to and from that unit owner or occupant or resident.

### D. Paid Invoice File

All paid invoices and any other information pertaining to a vendor of the property will be filed in an individual file folder for each and every vendor in alphabetical order by year.

### E. Management Reports

A binder will be maintained in the file cabinets by year of all management reports submitted to the Owner on a monthly basis.

F. Contracts and Bid Specification Files

Careful and exact bid solicitation and contract negotiations requires adequate history of past contractor performance and bid specifications. Therefore, there should be a separate file category for CONTRACTS.

By category alphabetical (i.e., grounds, trash, etc.) current contracts only in this file with exact contract specifications and the original specification which were requested and any correspondence. Also, the bid analysis with costs. Any information either requested or received, goes in the contract file.

General information in reference to contracts goes in general files.

In addition to the specific contract files, a file will be maintained in the general files called "CONTRACTS". This file will contain a copy of all pending contracts.

G. Financial Reports

The monthly financial reports should be kept by monthly index in the back of the budget book. The monthly cash disbursement journal can be kept in a separate data binder.

H. Property Unit Listing and Alphabetical Listing

Each month a new property unit listing and alphabetical listing should be kept in the data binder.

III. RETENTION

Payroll files, unit files, minutes and Book of Resolutions will be permanent files. General files, invoice files and management reports will be maintained in the office and stored in permanent storage not less than every two years. New file folders will then be made for the general and invoice files.

IV. FILING PROCEDURE

Filing will be maintained on a daily basis. Correspondence may be filed in more than one file. Items will be filed from the latest date outward. In distribution of items that are included in the management report and the minutes, the originals will be filed in the subject file or the appropriate unit files and copies will be included with the minutes or management report in the proper notebook. Correspondence sent by the managing agent from the managing agent's office will have copies filed in the appropriate files on-site.

ENCLOSURE 1

I. General Files

Affirmative Fair Housing Marketing Plan
Air Conditioning
Appliances
Applications Pending Employment
Audit
Auto Registration
Bank Statements
Owner General Information
Budget
Contracts - Bids & Proposals
Contracts-In Force
Correspondence To and From Owner
Correspondence Employee
Correspondence General
Correspondence Resident
Correspondence Vendor
Delinquencies
Directory
Emergency Procedure
Engineer - Consulting
Engineering - General
Extermination - General
Filing System
Financial - Miscellaneous
Floor Plans
Forms - Original
Forms - Blank
HAP Vouchers
HUD Correspondence
Inspection - Property
Insurance Information Employee
Insurance Policies - Property
Insurance Policies - Claims Pending
Insurance Policies - Claims Settled
Laundry
Legal – Pending
Legal – Other
Letters - Form
Maintenance – Unit
Management Reports
Management Reviews
Managing Agent
Maintenance - Unit

Minutes - Staff Meetings
Miscellaneous Correspondence - Annual
Miscellaneous Correspondence - Permanent
Miscellaneous Income
Newsletters
Newspaper Notices and Bulletins
Operation Manual - SEPARATE BINDER
Parking Spaces
Payroll Information
Personnel Policy Manual
Petty Cash
Physical Inspection Reports
Planning Calendar
Planning Sessions
Preventive Maintenance
Property Description
Questionnaire
Roof
Rules & Regulations
Smoke Detectors
Specifications
Storage Bins
Survey Results
Tax Returns
Tax Lists
Taxation
Time Sheets
Unit Information
Utilities
Vendor Correspondence
Voucher Register
Waiting List
Warranties - Office
Warranties - Mechanical
Welcome Package
Workers Compensation

II. <u>Contract File</u>

Boiler Maintenance
Extermination
Grounds
Painting
Roof Contract
Software Lease
Telephone Systems
Trash Removal

III. Personnel Files - Active and Inactive

Application
Insurance Information or Insurance Waiver
Leave or Vacation History
Welcoming Letter
Correspondence
Evaluation
Separation/Termination Form
Pay Increase Form
Resumes/Applications

IV. Payroll

Time Cards Transmittals
Paid invoices file (alphabetical with major vendor having individual files).

V. Unit Files

Lease, delinquency information and General Correspondence

VI. Financial Reports by Month

A. Monthly Close-Out Report
B. Balance Sheet
C. Income Statement
D. Detail Trial Balance
E. Delinquency List

---

1. Petty Cash Accounts

A Petty Cash Account is a set amount of money retained by the on-site office for low cost or emergency purchases, such as office supplies or maintenance items, which are required immediately.

2. Petty Cash Slips

Any disbursements from the petty cash account should be on a Petty Cash Slip. These slips serve as the backup for the petty cash reimbursement request. The invoice for the expenditure should be stapled to the back of the Petty Cash Slip.

NO. ______________________________
DATE ______________________________
RECEIVED BY ______________________________
APPROVED BY ______________________________
DESCRIPTION ______________________________
AMOUNT ______________________________
CHARGE TO ACCOUNT ______________________________

These slips should be used for all petty cash expenses.

Standard Petty Cash Slips can be ordered from any office supply company.

When the reimbursement is done, these slips will be tallied and together with the cash-on-hand will total the starting amount of the Petty Cash Account.

The Petty Cash Slips should be put in an envelope and marked "Petty Cash Slips for Reimbursement dated ____________" and stapled to the Reimbursement Request.

(If the envelope is very bulky it can be held on-site until the Reimbursement Request and the Check Copy is sent to the on-site office for filing. Then it should be attached to the Reimbursement Request and Check Copy and filed.

3. Petty Cash Reimbursement

Petty Cash Reimbursements are check requests, comparable to an invoice, which will reimburse the petty cash fund for monies spent for miscellaneous items and also is a periodic reconciliation of the petty cash account. The reimbursement request amount plus the amount of cash that is in the petty cash fund should total the initial starting amount of the petty cash fund.

Example:

PETTY CASH REIMBURSEMENT REQUEST

MAKE CHECK PAYABLE TO: , Petty Cashier

DATE:

Breakdown of Petty Cash Expenditures (backup attached):

| Account # | Description | Amount |
|---|---|---|
| XXXX-XXXXX | Office Supplies | $35.75 |
| XXXX-XXXXX | Copying | $ 6.00 |
| XXXX-XXXXX | Coffee | $ 5.25 |
| XXXX-XXXXX | Misc. Adm. | $ 3.00 |

TOTAL AMOUNT OF REIMBURSEMENT: $50.00

Petty Cash Reconciliation - from Sept. 5, 1992 to Nov. 4, 1992

| | |
|---|---|
| Cash on Hand | $40.00 dollars<br>.75 change |
| Reimbursement request | $50.00 |
| Total of Petty Cash | $100.00 |

Petty Cashier

Attached are forms to use for the Reimbursements.

---

Care in the purchase functions - buying at the right price buying in the right quantity, and being absolutely certain that what is purchased is delivered in good condition; these are all vital to the effectiveness of the cooperative management.

A. PURCHASE PLANNING

1. Know of the need before the need so that emergency purchases, often costly, will not have to be made.

2. Shop for price and quality. Management has a sacred obligation to owners to continually shop. A frequent error is for a manager to become accustomed to a particular supplier and to rely on that supplier not only for good service, but for the best price. Such reliance, experience has taught, is often not warranted.

3. Interchange information. Discuss quality and price of supplies, equipment and services with other managers and property managers. Such frequent informal exchanges will save owners money.

4. Obtain written proposals and bids. When to do this is a matter frequently of judgment. In any proposed major expenditure it is necessary and guidance as to the Procedure must be obtained from the managing agent.

5. Oversupply means weak management. Don't let it happen!

B. MASTER CONTRACTS

1. Responsibility for developing - Managing Agent.

2. Responsibility for approval and execution - Managing Agent.

3. Implementation

   a. Generally, supplies, equipment and services can be obtained cheaper through the use of a Master Contract. Therefore, a good general ground rule is to continually review the possibility of developing additional contracts.

   b. Generally, it is unwise to execute such contracts for more than one year.

   c. Notification to Resident Managers - The Manager must have a copy of each master contract and use it in purchasing activity.

   d. Recommendations - Resident Managers should freely discuss the performance of

contractors, quality of merchandise, price, etc., with the Managing Agent as this is the best source of information for future negotiation or cancellation.

C. PURCHASE ORDERS/REQUISITIONS

1. Control - A log will be maintained in the building manager's office of the purchase number, the person ordering, the date ordered and other pertinent information regarding the order. (See sample B attached).

2. Who may Approve Purchase Orders/Requisitions - The Manager or Managing Agent only.

3. Limitations - The Manager is authorized to approve any Purchase Order/ Requisition up to $250. The Managing Agent must execute any unusual or first time purchase of supplies equipment or service.

   (Exception: The Managing Agent may set a higher or lower limitation depending on size of community, experience of Manager, etc. Such variation must be authorized in writing.)

4. After approval - the first part of the purchase order log is completed. The ordered should give the vendor the PO/R number (this will help identify the invoice when it arrives and also helps catch inaccurate billings.)

5. Delivery of Material - When delivery is made, the manager will obtain an invoice or delivery ticket. This must be compared with the purchase order.

   If accurate the delivered items are then carefully checked to assure complete delivery. The invoice must be promptly forwarded to the main office. (If the Manager, for good reason, cannot personally receive the items, he/she must later check and then sign below the signature of the actual recipient.)

6. Discrepancies between the PO/R and delivery ticket/ invoice - the nature of the discrepancy must be determines. Contact should be made with the supplier and an effort made to obtain the rest of the order, return the unordered portion, etc. The discrepancy and comments concerning it and action taken must be attached to the invoice forwarded to the Managing Agent's office.

7. Emergency repair orders - frequently, a price for such service cannot be obtained, though generally, at least, an estimate can be obtained and noted on the PO/R. In all cases, the service invoice must reflect the time and number of persons doing the work and the manager must follow through with the service company to determine the charges for placement on the invoice. Otherwise, the Manager is in effect endorsing a blank check. Where the company involved refuses this information, the Managing Agent's assistance is to be sought.

8. When Invoices are Received - they should be matched against the pending PO/R log and the second section of the log sheet completed with approved amount, and date authorized.

The invoice is stamped on the front or back if there is not enough room with payment authorization stamp and the invoice number, vendor number, project number, date and signature completed.

When the authorization for payment is completed the invoice is forwarded to managing agent for payment.

9. When Paid Invoices are Returned - When the PAID invoices are returned, the paid column is completed on the log. They are then filed in alphabetical vendor file listing.

JOB DESCRIPTION

Position: On-Site Manager

Supervisor: Property Manager

Date Revised: December 2017

Property: Naylor Gardens

On-Site Manager Duties

I. General Responsibilities: The manager is responsible for the on-site general administrative and physical operations of the property. The manager will supervise and provide direction to the on-site staff, and assure that the management program is properly executed. The manager will be responsible for the effective marketing, operation, and cleanliness of the property, for insuring prompt response to service requests, for the training, and supervision of personnel, and the establishment of excellent resident relations.

II. Specific Responsibilities

1. Conduct a weekly inspection of the buildings and grounds noting deficiencies of operating employees, contractors, and physical appearance of the property as well as deferred maintenance. Prepare a weekly inspection report outlining property condition and issue work orders for routine items which can be completed by staff. Recommendations for corrective measures relative to deferred maintenance items should be forwarded to the property manager for Owner approval.

2. Maintain the petty cash fund.

3. Complete and maintain personnel and payroll records and report payroll hours to the managing agent.

4. Key control is the responsibility of the on-site manager. A key control system should be set up and maintained which will provide for the proper security and accessibility of keys.

5. Develop with the assistance of the managing agent a tickler system for recertification. Process recertification forms, follow-up on them, and compile the requisite information and complete the HUD recertification forms.

6. Promptly answer and take action on incoming telephone calls, correspondences and requests from residents.

7. Maintain property inventory and order supplies.

8. Properly label and file all records and supporting correspondence. Maintain unit files.

9. Report all cases which involve damage or injury to any person or property to the insurance

agent and property manager as soon as practical.

10. Receive and post all resident payments to the rent roll system. Prepare and forward to the managing agent monthly closing reports on the rent roll system for accounts receivable activity and vacancy status.

11. Maintain a work order system, take service requests and dispatch maintenance personnel.

12. Periodically review and evaluate employee performance as outlined in the personnel policy.

13. Coordinate the rehabilitation of units turned over or vacant with the maintenance mechanic to be ready for move-ins.

14. Marketing the property to include greeting prospects, showing units and taking applications for residency. Maintain a weekly traffic log. Follow-up on prospective residents.

15. Prepare a move-in package including occupancy agreement, other forms and orientation materials. Conduct an orientation of each new resident to allow for a smooth entrance into the community.

16. Conduct move-in and move-out inspections.

17. Maintain a clean office to ensure a professional appearance at all times.

18. Perform all other duties necessary to fulfill the general responsibilities or as may from time to time be assigned.

POSITION DESCRIPTION

Position: Maintenance Mechanic

General: The Maintenance Mechanic is directly responsible to the Site Manager for the routine, preventive and designated non-routine maintenance of the property. The incumbent conducts, maintains and reports to the Site Manager on all daily maintenance activities implemented. The incumbent is responsible for the correct and safe operation of all mechanical components of building systems as well as advising the Site Manager when an inspection or preventive maintenance review points out a developmental problem with the system or component.

Functions: The Maintenance Mechanic ensures that the property's operating systems and property-owned equipment items are functioning properly, safely and within designed constraints by monitoring, inspecting and recording actions. This includes but is not limited to:

a. Inspecting, on a daily basis, all major property operating system controls;
b. Performing light electrical repairs as required within the property premises to maintain the continuance of operations, or available and use of property dwelling units:

    (1) Change-out of fixtures and components
    (2) Switch and outlet repairs
    (3) Breaker and fuse box repairs
    (4) Service and maintenance of all public area lighting and emergency lighting fixtures;

c. Performing light plumbing repair work as required to maintain designed water supply and waste disposal systems on the property:

    (1) Replacing fittings, washers and seats, valve stems, etc.
    (2) Cleaning drains and managing a preventive maintenance program of scheduled drain cleaning
    (3) Replacing plumbing fixtures, i.e., sinks, toilets, vanities, etc.

d. Replacing glass and screens and maintaining the security of property interiors by repairing and replacing lock mechanisms, and other security items associated with windows and doors;
e. Repair and replacement of tile and carpeting within property common areas and property dwelling units;
f. Painting of common area elements and dwelling units upon unit turnovers;
g. Preventive maintenance program and schedule on all major building systems and vital **equipment components; and** preventive maintenance programs on building system small components, e.g., belts, fans, motors, filters, etc.;
h. Assist the Site Manager in the identification, inventory and receiving of supplies, equipment and material necessary to implement a sound maintenance program;
i. Assist in the conduction of a comprehensive and periodic maintenance inspection program for the property;
j. Assist the Site Manager in monitoring contract maintenance services for and on the property;
k. Complete work order requests issued for routine and emergency maintenance **work on the property.**
l. Prepare, develop and monitor maintenance reports and actions.

DRUG-FREE WORKPLACE POLICY

---

Jeffrey Charles & Associates, Inc. has a duty to protect its employees from the dangers posed by the unlawful manufacture, distribution, dispensation, possession or use of drugs in the workplace. Therefore, Jeffrey Charles & Associates, Inc. will take all reasonable steps to insure a drug-free workplace by prohibiting all employees from unlawfully manufacturing, distributing, dispensing, possessing or using a controlled substance in a JC&A, Inc., workplace site.

As a condition of employment, each employee must agree to comply with this policy and must agree to notify JC&A, Inc., immediate supervisor, of any criminal drug statute conviction for a violation occurring in the workplace, no later than five (5) days after such conviction.

JCA Inc. will report such convictions to the appropriate agency of the federal government within ten (10) days.

Where appropriate in JC&A, Inc.'s discretion, employees who violate this policy may be required to participate satisfactorily in a drug abuse counseling or rehabilitation program and are subject to discipline up to and including discharge.

# DRUG-FREE HOUSING PLAN

## I. Screen applications thoroughly

A. Follow tenant selection criteria to the letter.
B. Check current and all past landlord references carefully.
C. Obtain criminal history on all applicants.

## II. Take action to deter drug traffic.

A. Keep trash and litter picked up on the grounds at all times.
B. Keep property in good physical condition with no deferred maintenance.
C. Keep fences repaired to prevent unauthorized foot traffic.
D. Ticket and have removed unauthorized vehicles.
E. Implement and enforce auto registration.
F. Provide adequate exterior lighting designed to be vandalism-proof.
G. Advise residents at move-in that rules and regulations will be enforced. Explain Lease, Rules, Addendum for Drug-Free Housing, etc., in detail at the time of move-in.
H. Work with local organizations to provide education for children and adults on drug abuse.
I. Encourage resident participation.

1. Assist in the organization of a Resident Association.
2. Assist in the organization of a Neighborhood Watch Program.
3. Educate residents to help them be aware of drug problems through regular meetings.
4. Encourage residents to keep their children actively involved in positive programs.
5. Encourage resident support to help keep the complex clean and uncluttered.

## III. Educate on-site staff of awareness of paraphernalia, habits, and visitors involved in drug use and distribution.

A. When walking/inspecting exterior of property, be aware of evidence of drugs and paraphernalia.
B. When performing unit inspections, be aware of evidence of drugs and paraphernalia.
C. Be aware of nightly activity and locations.
D. Encourage staff to participate in neighborhood meetings.

## IV. Take action if you suspect drug traffic.

A. Work closely with your local police department.

1. Introduce yourself and let the authorities know you are concerned.
2. Ask the police to do extra patrols.

3. Provide the police with information on calls made to the property.
4. Ask police to provide you with information on calls made to the property.

B. Eliminate escape routes for vehicles and foot traffic.
C. Eliminate look-out posts.
D. Secure laundry rooms and other community space after office hours.
E. Request resident support in reporting suspicious activity.
F. Evict residents who violate their lease.

ACKNOWLEDGEMENT

I acknowledge receipt of the Jeffrey Charles & Associates, Inc. Drug-Free Workplace policy. I understand that compliance with it is a term and condition of my employment and that any violation by me of the policy may result in discipline, up to and including discharge, or a mandatory participation in a counseling or rehabilitation program, at my employer's option. I also understand that I must agree to report any conviction for a violation of a criminal drug statute, involving the workplace, as defined in the policy, within five days of any such conviction, to Jeffrey Charles & Associates immediate supervisor.

DATE:

Employee Name (Print) Employee Signature

# JEFFREY CHARLES AND ASSOCIATES
# AFFIRMATIVE ACTION GUIDELINES AND PLAN

1. Jeffrey Charles and Associates is a responsible member of society. It seeks to comply fully with the equal employment opportunity laws, with Public Law 93-112 relating to the handicapped, and with the Vietnam Era Veterans' Readjustment Act as it relates to employment. Therefore, and in compliance with these laws and with Executive Order 11246, this Affirmative Action Plan sets forth Jeffrey Charles and Associate's Affirmative Action Guidelines and Plan.

2. The following statement of the Owner of Jeffrey Charles and Associates is published for the information and guidance of all concerned:

> It is the intent of Jeffrey Charles and Associates to comply fully with our nation's equal employment opportunity laws and laws relating to the employment of handicapped individuals, disabled veterans, and veterans of the Vietnam Era. All recruiting, hiring, and promotion shall be without regard to race, color, religion, sex, age, or national origin and with due regard to the provisions of P.L. 93-112 and the Vietnam Era Veterans' Readjustment Act. We believe this direction is clearly in our national interest and also in the best business interests of the agency. Moreover, we seek to point the way for others in providing unrestricted and genuine opportunities for minorities of all types, the handicapped, and veterans of the Vietnam Era.

3. The management of Jeffrey Charles and Associates has the responsibility for implementing the Affirmative Action Guidelines and Plan. They will monitor this plan, assist in identifying problems, develop solutions, and prepare audit reports in compliance with this plan. At all times, they strive to improve Jeffrey Charles and Associate's ability to implement to the letter and the spirit the equal opportunity laws.

4. The Executive Vice President/Chief Operating Officer will monitor this plan, conducting continual analysis to ensure compliance. The Executive Vice President/Chief Operating Office will advise the Board routinely of problems and recommend improvements.

5. The Controller/Chief Financial Officer will ensure that Jeffrey Charles and Associates contracts are in compliance with Chapter 60 of the Office of Federal Contract Compliance, Equal Employment Opportunity, and the Department of Labor, with P.L.93-112, as amended, and with other applicable laws regulations relating to Equal Employment Opportunity and affirmative action.

Jeffrey Charles and Associates guidelines ensure equal employment opportunity for and utilization of disabled veterans, veterans of the Vietnam Era, and all other individuals without regard to race, color, religion, sex, age, national origin, or physical or mental handicap. The following

Affirmative Action Guidelines and Plan are adopted to further comply with the requirements of the Office of Federal Contract Compliance, including those specified by Executive Orders 11246 and 11758; Executive Orders 11246 and 11758 require that all primary and secondary government contractors with a contract in excess of specified dollar amounts have written Affirmative Action Guidelines and a Plan. Accordingly, Jeffrey Charles and Associates adopts Affirmative Action Guidelines and a Plan that has six objectives:

- Recruiting - To ensure that recruiting practices are free from bias against women, minorities, the handicapped, disabled veterans, and veterans of the Vietnam Era. Every effort will be made to find qualified candidates from these groups to fill vacancies, especially in positions in which these groups are under represented.

- Hiring - To ensure that current hiring practices do not discriminate against women, minorities, the handicapped, disabled veterans, or veterans of the Vietnam Era.

- Training - To encourage female, minority, handicapped, disabled veteran, and Vietnam Era veteran employees to take advantage of all available training.

- Compensation - To ensure that all performance evaluations and salary adjustments are made without bias.

- Upgrading and Promotions - To ensure that all qualified women, minorities, handicapped, disabled veterans, or veterans of the Vietnam Era are given equal consideration for promotion on the basis of merit, qualifications, and ability.

- Internal Communication of Policy - To correct attitudes or unintentional stereotypes of the roles of minorities, women, the handicapped, disabled veterans, or veterans of the Vietnam Era and to communicate equal opportunity guidelines to all staff.

For purposes of this Plan, these definitions are adopted:

Handicapped individual means any person who (1) has a physical or mental impairment that substantially limits one or more of such person's major life activities, or (2) has a record of such impairment. A handicapped individual is substantially limited if he or she is likely to experience difficulty in securing, retaining, or advancing in employment because of a handicap.

Qualified handicapped individual means a handicapped individual, as defined above, who is capable of performing a particular job, with reasonable accommodation to his or her handicap.

Disabled veteran means a person entitled to disability compensation under laws administered by the Department of Veterans Affairs for disability rated at 30% or more, or a person whose discharge or release from active duty was for a disability incurred or aggravated in the line of duty.

Qualified disabled veteran means a disabled veteran as defined above who is capable of performing a particular job, with reasonable accommodation of his or her disability.

Veteran of the Vietnam Era means a veteran, any part of whose active military, naval, or air service was during the period August 5, 1964, through May 7, 1975, who (1) served on active duty for a period of more than 180 days and was discharged or released from active duty because of a service-connected disability.

The Affirmative Action Guidelines and Plan outline (1) how the Plan will be communicated to all staff, (2) how the policy will communicated to people outside the firm, (3) who is responsible for the Plan, (4) how the Plan will be implemented, (5) what practices and procedures will be employed, and (6) how the Plan will be audited.

1. INTERNAL COMMUNICATION OF EQUAL EMPLOYMENT OPPORTUNITY GUIDELINES

The Equal Employment Opportunity Guidelines of Jeffrey Charles and Associates will be communicated to all employees and prospective employees in these ways:

- Distribution of the guidelines to all current staff, including the management staff responsible for its administration, and inclusion of the guidelines in the Handbook given to all new employees

- Periodic discussions at management and staff meetings

- Publication, where appropriate

- Consistent and continued informal communication of the guidelines to all employees by Jeffrey Charles and Associates management team members

- Special emphasis to all Jeffrey Charles and Associates management personnel of JCA's commitment to equal employment opportunity

2. EXTERNAL DISSEMINATION OF GUIDELINES

- All employment and recruiting sources will be informed that Jeffrey Charles and Associates is an Equal Opportunity Employer.

- All subcontractors and major vendors and suppliers will be notified of Jeffrey Charles and Associates guidelines and will be required to conform.

- An Equal Opportunity clause will be incorporated in employment advertisements.

3. AUTHORITY AND RESPONSIBILITY FOR COMPLIANCE

The Executive vice President/Chief Operating Officer will be responsible for the Affirmative Action Guidelines and Plan. The Executive Vice President/Chief Operating Officer will issue necessary administrative instructions, request appropriate personnel inventories, review progress, and continually review the plan to ensure compliance with Acts of Congress, Executive Orders, contractual commitments, and equal employment opportunity directives.

## 4. AFFIRMATIVE ACTION GUIDELINES AND PLAN IMPLEMENTATION

Implementation of the Jeffrey Charles and Associates guidelines and plan is assigned to all personnel responsible for recruiting. Hiring, training, promoting, evaluating, and assigning personnel. The President/Chief Executive Officer of Jeffrey Charles and Associates has the responsibility for reviewing the Affirmative Action Guidelines and Plan, and for seeing that it is properly implemented and maintained.

### 4.1 Recruiting New Employees

a. Jeffrey Charles and Associates will actively seek our qualified minority, women, handicapped, disabled veteran, and veterans of the Vietnam Era applicants for employment.

b. The designation "EOE" will be used in all employment advertisements.

c. Good faith efforts will be made to recruit and employ minorities, women, the handicapped, disabled veterans, and veterans of the Vietnam era in management level and all other positions.

### 4.2 Employment and Selection

a. Employees will be selected wholly on the basis of ability, experience, training, and other objective factors related to ability.

b. Employment selection criteria will be reviewed to ensure that they do not discriminate against any individual on other than a job-related basis.

c. The program Director of each program will review all positions within the program to determine if there exists a bona-fide occupational qualification for any positions which would affect employee selection based upon race, color, creed, national origin, citizenship, sex, handicap, age, or marital status. In the event that a bona-fide qualification exists, the Program Director will request in writing, authorization from the President/CEO to stipulate such qualification. If a bonafide occupational qualification is authorized the Program Director will modify the job description to so stipulate.

### 4.3 Placement, Training and Advancement

a. Affirmative efforts will be made to place, train and advance women, minorities, handicapped individuals, disabled veterans, and veterans of the Vietnam Era in all departments of Jeffrey Charles and Associates.

b All qualified staff will be considered for all openings, and vacancies will be announced to all employees.

c. Salaries will be established and increased without regard to race, color, religion, sex, age national origin, or physical or mental handicap.

d. Employees will have equal opportunity to participate in all Jeffrey Charles and Associates sponsored and outside training without regard to race, color, religion, sex, age, national origin, or physical or mental handicap.

e. All qualified employees will be given equal consideration for advancement. No job categories are closed, or will be closed, to individuals because they are women, minorities, handicapped, disabled veterans, or veterans of Vietnam Era, unless a Bona-Fide Occupational Exemption has been established.

f. Jeffrey Charles and Associates will periodically review the qualifications and progress of all employees to ensure that the affirmative Action Guidelines and Plan are fully implemented.

5. AFFIRMATIVE ACTION EMPLOYMENT PRACTICES AND PROCEDURES

5.1 Interviewing Prospective Employees

Experience shows that illegal discrimination, intentional or unintentional, may occur easily during the interview process. The chance of illegal discrimination will be reduced if interviewers discuss only subjects related directly to the job. All Jeffrey Charles and Associates staff involved in interviewing prospective employees will be cautioned to avoid personal subjects unless the applicant brings them up. For example, they will be prohibited from asking:

- Whether the applicant is married or intends to marry
- Whether the applicant has children, is expecting a child, or intends to have children
- How children, if any, will be cared for during working hours
- Whether the applicant is a "head of household"
- Whether the applicant is a member of any organization other than professional organizations relevant to the job
- About the applicant's religion
- About the applicant's personal financial situation
- About the applicant's national ancestry

5.2 Evaluating Prospective Employees

Although subjective judgments can never be completely eliminated from the evaluation process, efforts should be made to use objective criteria for employee selection.

Broadly speaking, both the initial screening and subsequent evaluation should be based on job qualifications. Requisite qualifications should be established be fore the screening so that each applicant can be screened against them. Applicants who meet requisite qualifications also should be evaluated against desired, but not necessary, qualifications.

When two or more equally well-qualified candidates are identified, the candidate who furthers the Jeffrey Charles and Associates affirmative Action Guidelines and Plan will be chosen.

6. AUDIT PROCEDURES

To evaluate Jeffrey Charles and Associates Affirmative Action Guidelines and Plan, the director of Human Resources, under the direction of the Executive Vice President/COO, will, each year, analyze the workforce and prepare a report to the Owner indicating the number of persons employed by job classification, by salary level, by race and sex, by physical or mental handicap, and veteran status. Disparities, if found, will be noted and the agency will pursue corrective action with vigor.

**On this ________ day of __________________, 2009**

**Approved by the Owner**

______________________________________________

**Jeffrey Turner, President**

# JCA

Jeffery Charles and Associates, Inc.

## WELCOME

On behalf of Jeffery Charles and Associates Inc. (JCA), we welcome you and wish you every success at JCA.

We believe that each employee contributes directly to JCA's growth and reputation, and hope that you will take great pride in being a member of our team.

You should familiarize yourself with the contents of this Handbook as soon as possible as it will answer many questions that you may have about working at JCA. This Handbook is intended to provide you with a general understanding of our personnel policies. It is **not an employment contract** and is not intended to create contractual obligations of any kind. All employment is offered on an at-will basis. At any time, for any reason, with or without notice, either the employee or JCA can end the employment relationship.

Also, it is important that, as our activities continue to expand or circumstances change, the need may arise to change policies described in this Handbook. Accordingly, JCA reserves the right to revise, supplement, eliminate, or change any policies or provisions of the Handbook at any time as it deems appropriate. We will endeavor to notify employees of such changes as they occur.

## COMPANY EEO POLICY

It is JCA's policy to provide all employees equal opportunity and equal treatment regardless of race, color, religion, gender, national origin, family status, disability, or age. This policy extends to such areas as compensation, benefits, promotions, transfers, and other programs. All of JCA's employees have to work in an environment free of discrimination and harassment.

## PROMOTIONAL PHILOSOPHY

It is the policy of JCA to ensure that all employees are given an equal opportunity for career change or advancement. It is our desire to fill job vacancies from within the company when associates possessing the appropriate skills and qualifications for those positions are available.

## HARASSMENT POLICY

We at JCA strive to provide a good working environment, which includes friendliness, good humor and mutual respect among all employees.

We are committed to providing a work environment that fosters mutual employee respect. In order to ensure such an environment, JCA specifically prohibits any form of illegal harassment by or toward its employees.

If any employee should encounter any illegal harassing behavior directed toward them, he or she should bring it to the attention of the President of JCA. Employees who bring such behavior to JCA's attention can expect protection against retaliation. The complaint will be promptly investigated and confidentiality maintained to the extent possible in the conduct of the investigation. Any employee who violates this harassment policy will be subject to discipline up to and including termination.

**DEFINITION:**

Harassment is offensive conduct relating to an employee's personal identity which has the purpose or effect of:

- Creating an intimidating, hostile, or offensive work environment
- Interfering with an individual's work performance
- Adversely affecting an individual's employment or a career-related action

Some examples of personal identity include age, color, disability, gender, national origin, race and religion.

Harassment occurs in a variety of situations which all share a common element: unwelcome comments or behavior that affects the workplace. Some examples of harassing behavior include:

VERBAL: Innuendos or comments emphasizing the personal identity of an employee; jokes regarding the personal identity of an employee; graphic comments; slurs; unwelcome flirtations or propositions toward an employee.

VISUAL: Derogatory, demeaning or suggestive graffiti, drawings, gestures or objects.

PHYSICAL: Unwelcome touching, impeding or blocking movement, physical interference with normal work or movement, assault.

Harassment does not include an occasional compliment or mutually acceptable conduct.

Contact the CEO or President of JCA if you have any questions.

## CONFIDENTIALITY

It is important that each employee maintain a strict confidentiality with respect to any information about our business or any persons connected with our business, or the persons or affairs of the associations managed by us that you may learn in the course of your work. It is absolutely necessary that, in the event you have any doubts about how to act in any situation that arises, you should not divulge any information about the corporation or its activities. If you are in doubt whether something is confidential, before responding to a question, you should seek guidance from your immediate supervisor.

Gossip about individuals is a particularly serious and dangerous problem and must, at all times, be avoided. For example, if you hear something about another employee, Board member, volunteer or homeowner, whether of a personal or public nature, you should not divulge that information to anyone else, including the person who is the subject of the gossip or the rumor. If, however, the rumor or gossip could, if true, adversely affect the work of JCA, your supervisor should be made aware of same.

## EMPLOYEE CONFLICTS

## CONFLICT OF INTEREST

Employees have an obligation to conduct business within guidelines that prohibit actual or potential conflicts of interest.

Transactions with outside firms must be conducted within a framework established and controlled by the managerial level of our organization. Business dealings with outside firms should not result in unusual gains for those firms, JCA or the employee. Unusual gains refers to bribes, products, bonuses, special fringe benefits, unusual price breaks, gifts, or other windfalls designed ultimately to benefit either the corporation, the employee, or both. One annual holiday gift or a gift with a value not to exceed $50 may be accepted by a JCA employee. More than one

annual gift with a value greater than $50.00 must be reported to JCA. Promotional plans which could be interpreted to involve unusual gain require specific management-level approval.

If an employee has any influence on transactions involving purchases, contracts, or leases, it is imperative that he or she disclose to the President or CEO of JCA as soon as possible the existence of any actual or potential conflicts of interest so that safeguards can be established to protect all parties.

**CORPORATE DOCUMENTATION AND PROCEDURES**

The materials, products, designs, plans, ideas and data of the organization are the property of JCA and should never be given to an outside firm or individual except through normal channels and with appropriate authorization. Any improper transfer of material or disclosure of any information by any employee or ex-employee, even though it may not be apparent that the employee or former employee has personally gained by such action, constitutes unacceptable conduct and may result in disciplinary action up to and including termination and legal action may be instituted.

All forms, documents, contracts, specifications, computer programs, owner or Board member information, manuals, letters, memorandums, policies, proposals, and any other written communication or documentation developed by the Directors or employees of JCA remain the property of JCA and may not be given to any outside person or company without the express written consent of the President or CEO of JCA. All the above-mentioned documentation is copyrighted.

On termination of employment, an employee shall not remove any of the above-mentioned material from the JCA offices. Should it be found that an employee or any other person, including a former employee, has breached this rule, legal action may be instituted.

**EMPLOYMENT CATEGORIES**

**GENERAL**

Each employee is designated as either NON-EXEMPT or EXEMPT from the overtime provisions of the federal and state wage and hour laws. All non-exempt employees must receive written permission from their supervisor prior to the day overtime work is performed. In addition to the above categories, each employee will belong to one other employee category:

**FULL-TIME**

Full-time employees are those who are not in temporary or probationary status and who are regularly scheduled to work the corporation's full-time schedule of 40 hours per week. Generally, full-time employees are eligible for the corporation's full benefit package, subject to the terms, conditions and limitations of each benefit program.

**PART-TIME**

Part-time employees are those who are not in a temporary or probationary status and who are regularly scheduled to work less than 40 hours per week. While they do receive all legally-mandated benefits (such as workers' compensation and Social Security benefits), they are not eligible for any of the company's other benefit programs, except as may be required by applicable law.

**TEMPORARY**

Temporary employees are hired as interim replacement to temporarily supplement the workplace, or to assist in the completion of a specific project. Employment assignments in this category are of a limited duration. Employment beyond any initially stated period does not in any way imply a change in employment status. "Temporary" employees retain that status until notified of a change. While temporary employees receive all legally mandated benefits (such as workers' compensation and Social Security benefits), they are not eligible for any of the company's other benefit programs, except as may by required by applicable law.

**INITIAL EMPLOYMENT BENEFITS**

During the initial 90 days of employment, new employees are eligible only for those benefits which are required by law, such as workers' compensation insurance and Social Security. Thereafter, employees become eligible for any other corporation-provided benefits, subject to the terms and conditions of each benefit program.

**PERSONNEL AND PAY RECORDS**

**ACCESS TO PERSONNEL FILES**

Personnel files are the property of JCA, and access to the information they contain is restricted. Generally, only officials and representatives of the corporation who have a legitimate reason to review information in a file are allowed to do so. The company may, at its discretion, permit an employee to review material in his or her file, but only at JCA's offices and in the presence of the President or Officer of JCA.

**PERSONNEL DATA CHANGES**

Each employee is required to promptly notify management of any changes in personnel data. Personal mailing addresses, telephone numbers, number and names of dependents, individuals to be contacted in the event of an emergency, educational accomplishment, and other such status reports should be accurate and current at all times.

**TIMEKEEPING**

Nonexempt employees are responsible for accurately recording the time they begin and end their work, as well as the beginning and ending time of each meal period. They should also record the beginning and ending time of any split shift or departure from work for personal reasons. Furthermore, all employees must notify the receptionist each time they leave the work area, even before a scheduled break. As mentioned above, overtime work must always receive written approval before it is performed. It is also the employee's responsibility to sign his or her time record to certify the accuracy of all time recorded.

If you work more than 40 hours in any payroll week, you will receive, in addition to your base salary, overtime pay for all hours over 40 at the rate of one-half times your regular rate of pay for that particular payroll week. The regular rate used in computing overtime pay may vary from week to week depending upon the number of hours worked; it will be computed by dividing the base salary by the number of hours worked during the payroll week in question.

**PAYDAYS**

Paydays are every other Friday. If you are not at work when paychecks are distributed, your paycheck will be held for you or mailed to you (if requested). If you wish to have a third party collect your paycheck for you, you will need to provide the Corporate Accountant with written authorization specifying to whom your paycheck may be released.

In the event that a paycheck is lost or stolen, you should notify the Corporate Accountant so that he or she can implement the necessary procedure immediately. Processing time to receive a new check may take as long as one (1) week, and may include a stop payment fee.

**EMPLOYMENT BENEFITS**

**GENERAL**

Eligible employees in this corporation are provided with a wide range of benefits. A number of the programs (Such as Social Security, workers' compensation insurance and unemployment insurance) cover all employees in the manner prescribed by law.

Benefit eligibility is dependent upon a variety of factors, including employee classification, and the President can identify the programs for which you are eligible. Details of many of these programs can be elsewhere in the employee Handbook.

The following benefit programs are available to full-time employees:

Vacation Benefits
Holidays
Leave of Absence—General
Sick Leave
Bereavement Leave
Jury Duty Leave
Medical Insurance
Dental Insurance
401(K) Plan

**MEDICAL INSURANCE**

A medical insurance benefit package is available to full-time employees upon completion of the 90th day of employment. If an employee chooses to participate in this program, JCA contributes the cost of the employee's premium only, and the employee may take coverage for their dependents at their own cost. The nature of insurance and benefits are set forth in booklets provided by the insurance companies and will change from time to time based upon the policy. The insurance booklets are available from the CEO or President. Medical insurance will not become effective until the first of the month following the 90th day of employment.

**DENTAL INSURANCE**

Dental insurance is also offered to full-time employees upon completion of their 90 day period with JCA. If an employee chooses to participate in this program, JCA does not contribute to the employee's premium. The employee is responsible for 100% of their premium, and the employee may take coverage for their dependents at their own cost. The nature of insurance and benefits are set forth in booklets provided by the insurance companies and will change from time to time based upon the policy. The insurance booklets are available from the CEO or President. Dental insurance will not become effective until the first of the month following the 90th day of employment.

**401(K)**

Full-time employees are eligible to participate in the 401(K) plan upon completion of one full year of service with the company, prior to the open enrollment periods, and on attainment of the age of 21 years of age. Employees may contribute, through salary reduction, any amount up to 15% of their gross salary. These contributions are before Federal Income Tax Deductions. Currently, the company matches the employee contributions, up to 2% of salary. This matching contribution may change from time to time. In addition, the company has the right to make discretionary contributions, allocated to all eligible participants based on salary.

The employee's contributions are always one hundred percent (100%) vested. Company contributions vest according to the following schedule:

| Years of Service | Vested Percentage |
|---|---|
| 1 | 20% |
| 2 | 40% |
| 3 | 60% |
| 4 | 80% |
| 5 | 100% |

Vested benefits are normally distributed only following death, disability, retirement or termination or employment, however, the plan also provided for hardship distributions and loans to participants.

## VACATION BENEFITS

Employees are entitled to five (5) working days paid vacation per year. The paid vacation leave request is to be submitted on the "Request for Leave" form to the CEO or President at least 30 days prior to the requested vacation date. If there is no schedule conflict, the request will then be submitted to the team administrator for final approval.

No more than five (5) working days vacation may be taken at any one time, with the exception of an employee traveling overseas. In this event, ten (10) working days may be requested. Such a request is to be made at least sixty (60) days prior to the requested vacation date.

No two (2) members of the same team may take leave at one time. No more than two persons holding similar positions in each department may take leave at the same time.

On receipt of approval of leave, the President will make two (2) copies of the approved "Request for Leave," form and give one (1) copy to the receptionist, the second copy to you (if you require one), and will keep the original for your personnel file.

All requests for leave are dealt with on a "first come, first serve," basis. Please submit your application for leave prior to finalizing your arrangements.

Vacation days are not cumulative and must be taken within the proper time frame, or they will be forfeited. Earned, but unused vacation days are lost at termination.

## BONUS VACATION DAYS

One additional bonus vacation day is granted for each year of completed employment, up to ten (10) years – making a maximum total of ten (10) additional vacation days. These days are not cumulative, nor are they reimbursed if not used.

Three (3) or more consecutive bonus vacation days are to be submitted on the "Request for Leave," form for approval to the President at least thirty (30) days prior to the requested bonus

vacation date. If there is no schedule conflict, the request will then be submitted to the team administrator for final approval.

On receipt of approval of leave, the President will make two (2) copies of the approved "Request For Leave," form and give one (1) copy to the receptionist, the second copy to you (if you require one), and will keep the original for your personnel file.

All requests for leave are dealt with on a "first come, first serve," basis. Please submit your application for leave prior to finalizing your arrangements.

Bonus Vacation days are not cumulative and must be taken within the proper time frame, or they will be forfeited. Earned, but unused bonus vacation days are lost at termination.

**HOLIDAYS**

All regular employees are eligible for paid holidays that fall within Monday-Friday work week, paid at the regular rate of pay for such employee, provided the employee works his/her full scheduled day before and his/her full schedule day after the holiday in question. The following are paid holidays:

| | | |
|---|---|---|
| New Years Day | Martin Luther King's Day | Memorial Day |
| Independence Day | Presidents Day | Labor Day |
| Thanksgiving Day | Columbus Day | Christmas Day |
| Day After Thanksgiving | | |

If an employee's scheduled vacation includes a paid holiday, one additional day may be added to the beginning or end of the employee's scheduled time off.

Regular full-time employees' holiday pay will be paid at straight time rates not to exceed eight (8) hours of pay per day of any holiday.

**LEAVE OF ABSENCES—GENERAL**

Unless stated to the contrary, all leaves of absence are without pay and without break in service. During personal leaves of absence, it may be necessary to fill the employee's job. If there is an opening in the employee's job when the employee is able to return to work, the employee will be reinstated to that job. If the employee's former position has been filled, the employee will be reinstated to any available job for which JCA considers the employee qualified. Subject to applicable law, if there is no available job at the time the employee is able to return to work, the employee will be laid off and will be offered reinstatement to the next available opening for which he or she is considered to be qualified.

JCA will continue to provide insurance benefits to the end of the month following the beginning of the leave of absence. After that time, however, employees must pay the full cost of their insurance benefits. When such a situation occurs, the employee will be given his or her COBRA

notice which outlines specific information for paying the insurance premiums. If an employee desires the insurance coverage to continue, premium payments must be made by the first (1st) of each month. JCA will resume payment of the costs of these benefits when the employee returns to active employment.

## SICK/PERSONAL DAYS

Four hours per month of service will be accumulated for paid sick/personal leave, subject to a maximum of six (6) days leave per year. These days are to be used for illness, family problems, medical/dental appointment, funerals, etc. These days are not cumulative, nor are they reimbursed if not used.

Any absence over six (6) days will be deducted from that pay period or taken from earned vacation days. The smallest portion of a sick/personal day which may be used is one-half (1/2) day or for four (4) hours. It is strongly suggested that medical appointments be scheduled for the beginning or end of the day rather than mid-day.

Employees who are unable to report to work due to an illness or injury should notify the President by 8:15AM if they will not be at work that day. The President should also be contacted each additional day of absence unless the absence is known to be for an extended period of time. Before returning to work from a sick leave absence of two (2) consecutive calendar days or more, an employee may be required to provide a physician's verification that he or she may safely return to work.

When an employee is off sick for more than two (2) consecutive calendar days, a physician's certificate must be produced to entitle the employee to pay. Sick leave benefits will be calculated based on the employee's base pay rate at the time of the absence.

JCA will continue to provide insurance benefits to the end of the month following the beginning of an extended sick leave. After that time, employees must pay the full costs of their insurance benefits. JCA will resume payment of its proportionate share of the costs of these benefits when the employee returns to active employment.

## FAMILY AND MEDICAL LEAVE ACT

JCA will not discriminate against any employee who requests an excused absence for medical disabilities or pursuant to the Family Medical Leave Act. JCA provided a comprehensive program of paid and unpaid leave designed to assist employees during periods when an employee or an employee's family is confronted with serious health conditions or a new child through birth, adoption or foster care. This program is designed to comply with the Family and Medical Leave Act (FMLA). If any provision of these policies conflicts with the FMLA, JCA will comply with the FMLA.

**ELIGIBILITY FOR LEAVE**

The employee is eligible for family and medical leave when the employee has been employed by JCA for a total of twelve (12) months and has worked at least 1250 hours during the previous twelve (12) months.

**CIRCUMSTANCES UNDER WHICH LEAVE IS AVAILABLE**

Family and medical leave is available in four (4) instances:

A. Because of the birth if a child of the employee and in order to care for such child.
B. Because of the placement of a child with employee for adoption of foster care.
C. Because the employee is needed to care for the spouse, child, or parent, of the employee, if such child, spouse or parent has a serious health condition.
D. Because of a serious health condition that makes the employee unable to perform one or more of the essential functions of his/her position. This condition satisfied when the employee receives inpatient care in a hospital or needs continuing treatment from his/her doctor.

Voluntary or cosmetic treatments which are not medically necessary are not serious health conditions, unless inpatient care in a hospital is required or unless complications develop.

Routine physical examinations are not serious health conditions.

**AMOUNT OF LEAVE AVAILABLE**

The employee may take a total of four (4) workweeks of leave each year when the employee presents a qualifying reason. To calculate the amount of leave available, JCA subtracts the number of workweeks of FMLA leave used during the past four (4) months by the employee from the total maximum allowed of four (4). The resulting number is the amount of leave available to the employee at the present time.

Where two (2) JCA employees who are married request leave in order to care for a newborn child, a newly adopted child, a foster child, or a family member with a serious health condition, the couple as a whole may take only twelve (12) workweeks of leave for this purpose.

**SUBSTITUTION OF VACATION & SICK DAYS FOR UNPAID LEAVE**

1. Employees who take FMLA leave for the birth, placement of a child for adoption or foster care, or care for a spouse, child, or parent who has a serious health condition must first use all accrued paid vacation days, paid bonus vacation days, or paid sick/personal days. Employees who take FMLA leave due to a serious health condition of themselves or their child, parent or spouse must first use all accrued vacation, personal, or sick leave. Applicable paid leave days will be substituted in this order: (1) paid sick days, (2) paid

personal days, (3) paid vacation days. Furthermore, when JCA or the employee elects to substitute paid leave for FMLA unpaid leave and JCA's procedural requirements for taking that kind of leave are less stringent than the requirements of the FMLA (i.e., notice or certification requirements), only the less stringent requirements may be imposed. Therefore, an employee who has complied with the less stringent requirements in such cases may not have leave for FMLA purpose denied or delayed on the grounds that the employee has not complied with stricter requirements of the FMLA. However, the requirement that paid vacation and sick time be used during the FMLA leave is inapplicable for employees who are receiving disability or workers' compensation benefits during the leave. If the workers' compensation benefits cease during the leave (i.e. because the employee declines a light duty position) then the substitution provision applicable as of the date those benefits cease.

2. Paid vacation, bonus vacation days and sick/personal days substituted for unpaid FMLA leave count toward the employee's maximum allowable FMLA leave of twelve (12) workweeks per year.

**APPLICATIONS FOR FAMILY AND MEDICAL LEAVE**

1. If the employee will be at work any time before the leave commences, requests for FMLA leave must be made in writing to the President by filling out an FMLA Leave Request Form. If the need for leave is so sudden and unexpected that the employee will not be at work before leave commences, the employee (or employee's spokesperson if the employee is unable to do so personally) must notify the President for the requested period by telephone, telegraph, fax, or by other electronic means.

2. A "FMLA Leave Request" form is available through the President.

3. In the event the leave is foreseeable, the employee must provide JCA with at least thirty (30) days notice of the leave. If thirty (30) days is not feasible, employee should give notice as soon as possible. Whenever possible, the employee should schedule leave to avoid inconvenience for JCA. Failure to provide notice in the manner prescribed by these policies constitutes a minor infraction of JCA's standards of conduct and may result in discipline. If the employee takes paid sick days for something like bronchitis (not an FMLA illness), which then develops into pneumonia, the entire period may be counted as FMLA leave. JCA must notify the employee that leave will be counted as FMLA leave within two (2) business days of being notified of the FMLA qualifying condition.

**MEDICAL CERTIFICATION**

1. Whenever FMLA leave is requested due to a serious health condition, JCA may issue a written request to the employee for medical certification from the health care provider for the afflicted person.

2. The employee shall provide a medical certification from the afflicted person's health care provider within fifteen (15) calendar days of the date JCA requests such certification. Failure to provide Medical Certification within fifteen (15) days of JCA's request constitutes a minor infraction of JCA's standards of conduct and will result in discipline. JCA will issue a second (2nd) oral or written request for medical certification. If the employee fails to provide a medical certification within fifteen (15) days of the second request, the employee shall be denied leave or have such leave revoked and shall thereafter be disciplined in accordance with JCA's absence control policy, which may include disciplinary action up to and including discharge.

3. At the discretion of JCA, leave may be granted contingent upon receipt of the Medical Certification Form.

**HOW LEAVE MAY BE TAKEN**

1. Leave related to caring for a newborn child, an adopted child, or a foster child must be taken in a single continuous block beginning at or after the child's birth or placement in the employee's home and must end within one (1) year of the child's birth or placement in the employee's home.

2. Leave relating to the serious health condition of the employee or a family member may be taken in a block, intermittently, or on a reduced leave schedule. In this respect, a pregnant employee may be considered to have a serious health condition for some purposes.
3. Intermittent and reduced schedule leave must be carefully coordinated with the President, and the employee may be required to reschedule treatments so long as this does not interfere with recovery.

4. JCA may *temporarily* reassign the employee on intermittent or reduced schedule leave to an alternative position for which the employee is qualified that is more compatible with the employee's leave requirements, or JCA may alter the duties of the employee's current position. The alternative position will have equivalent pay and benefits.

**MEDICAL INSURANCE**

While the employee is on medical or family leave, JCA will continue to provide health care insurance in accordance with JCA's normal policies for all persons normally covered by the policy. If the employee currently pays for any portion of his/her group health insurance, the employee must continue to make such payments by check, money order, cashier' check, or cash. If the employee does not return to work following the expiration of FMLA leave, the employee may be required to reimburse JCA for premiums paid by JCA on behalf of the employee depending on the reason for the failure to return. If insurance coverage lapses, JCA must still restore the employee to coverage/benefits equivalent to those that the employee would have had if leave had not taken FMLA. The employee may NOT be required to meet any qualification requirements imposed by the plan (*i.e.* waiting period or passing a physical).

**RESTORATION RIGHTS**

Upon return from FMLA leave, the employee will be restored to the employee's former position or an equivalent position if the former position is no longer available. If the employee is a Key Employee, restoration of the employee's job may be denied if retaining the employee would cause JCA grievous economic injury. If JCA intends to treat the employee as a key employee, JCA must notify the employee of that fact before leave start, or, if time is needed to ascertain whether the employee is in fact a key employee, as soon thereafter as possible. Furthermore, JCA must notify the employee either in person or by certified mail of its intent to deny restoration once that decision is made and of the basis for the employer's finding that substantial and grievous economic injury will result.

**BEREAVEMENT LEAVE**

If an employee wishes to take time off due to the death of an immediate family member, the employee should notify his or her supervisor or the President immediately. Employees may allocate bereavement leave to vacation, bonus vacation or sick leave. Additional paid time off may be granted to allow the employee to attend the funeral and make any necessary arrangements associated with the death.

"Immediate family" is defined as the employee's spouse, parent, child, sibling, the employee's spouse's parent, child or sibling, or the employee's child's spouse; grandparents or grandchildren.

**BACK-UP PERSONNEL**

a. When a Community Manager of any team is on leave, another Community Manager will cover any emergency administrative situation for the team and perform inspections of the properties. The inspection updating is to be done by the substituting Community Manager or by the team Service Specialist.

Prior to requesting leave, the Community Manager must check the "On Call" roster. If the Community Manager is scheduled for "On Call" duty for the period for which leave is being requested, it is the individual Community Manager's responsibility to arrange for another member of the staff to cover the "On Call" duty.

b. When the Service Specialist of any team is on leave, all members of that team will cover the service desk. The other teams' Service Specialist will assist as well.

c. When the Financial Specialist of any team is on leave, the other team Financial Specialist will take care of the essential work only.

**MAINTENANCE OF RECORDS**

Employee Attendance Records are kept in order to monitor the leave/vacation policies. These records are available for inspection by individual employees whose obligation it is to ensure the correctness thereof.

**WORKERS' COMPENSATION IN SURANCE**

The company provides a comprehensive workers compensation insurance program at no cost to employees. Any employee who sustains a work-related injury or illness should inform his or her supervisor and the President immediately. No matter how minor the on-the-job injury may appear, it is important that it be reported immediately. This will enable an eligible employee to qualify for coverage as quickly as possible.

**EMPLOYEE SEPARATION**

**RESIGNATION/TERMINATION**

Resignation is a voluntary act initiated by the employee to terminate employment with JCA: Although advance notice is not required, JCA requests at least two (2) weeks written resignation notice from employees.

Prior to an employee's departure, an exit interview may be scheduled to discuss the reasons for resignation and the effect of the resignation on benefits.

**EMPLOYMENT TERMINATION**

Since employment with this organization is based on mutual consent, JCA has the right to terminate the employee with or without advance notice.

We will generally schedule an exit interview for terminating employees. During the interview, we will brief the exiting employee as to his/her continued benefits, if any, upon leaving our employment.

Employee benefits will be affected by the employment termination. All accrued, vested benefits that are due and payable at termination will be paid according to our policy. Some benefits may be continued at the employee's expense if the employee chooses. The issuing of a final paycheck is subject to the turning in of the JCA property and the performance of other JCA existing departure procedures.

## RETURN OF PROPERTY

Employees are responsible for all property, materials or written information issued to them or in their possession or control. Employees must return all property of JCA which is in their possession or control in the event of termination or employment, resignation, or layoff, immediately. This may include but may not be limited to a building access card, office keys, keys relating to communities managed, personnel handbook, service request manual, procedure manual, cell phone, or pagers. The company may also take all action deemed appropriate to recover or protect its property.

## EMPLOYEE CONDUCT AND WORK RULES

## GENERAL

To assure orderly operations and provide the best possible work environment, JCA expects employees to follow the corporation's rules of conduct. It is not possible to list all the forms of behavior that are considered unacceptable in the workplace, but the following are examples of infractions of rules of conduct that may result in disciplinary action, including suspension or termination of employment.

- Theft or inappropriate removal or possession of JCA property
- Falsification of timekeeping or other JCA records
- Violation of JCA's Substance Abuse Policy
- Possession, distribution, sale, transfer or illegal drugs or anabolic steroids in the workplace, while on duty or while operating JCA owned vehicles or equipment
- Violation of JCA's Harassment Policy
- Fighting or threatening violence in the workplace
- Boisterous or disruptive activity in the workplace
- Negligence or improper conduct leading to damage of JCA property
- Insubordination or other disrespectful misconduct
- Violation of safety or health rules, conflict of interest or non-disclosure statements
- Possession of dangerous or unauthorized materials, such as explosives or firearms in the workplace
- Excessive absenteeism, tardiness, leaving work early or any other absence without notice
- Unauthorized absence from work station during the work day

- Unauthorized disclosure of JCA "secrets," system procedures, etc. or confidential information
- Unsatisfactory performance or conduct
- Unprofessional behavior
- Disrespect to our clients

## SUBSTANCE ABUSE POLICY

Concern about drugs in the workplace as well as our society in general has risen to such a degree that the need for a substance abuse policy has become apparent.

**PURPOSE AND SCOPE OF POLICY:**

The purpose of this policy is to clearly articulate JCA's belief that the abuse of alcohol and prescription drugs and the use of illegal, nonprescription drugs are incompatible with the operation of a business and completely unacceptable behavior on the part of our employees. The purpose in adopting this policy is to foster the health and safety of all our employees and their working environment by elimination of drug and alcohol abuse. The policy also gives a basic description of drug testing measures, the procedures we will implement upon the discovery of substance abuse by employees, and JCA's role in providing assistance to its employees who have fallen victim to substance abuse and who voluntarily seek this care. The scope of this policy extends to each of our employees, and continuation of employment signifies understanding of, and intent to comply with, the terms of this policy.

**DEFINITIONS:**

"Substance" is defined as any drug, including alcoholic beverages, intoxicating inhalants and all other illegal drugs. "Prescription drug" is defined as medication or drugs lawfully prescribed for the employee by a physician, chiropractor or dentist licensed by the State of Texas and for which the employee has in his/her possession a current prescription. All other prescribed drugs and medicine are deemed a substance.

**PROHIBITED CONDUCT:**

We are committed to having a drug free workplace. In that connection, for purposes of this policy, the mere intake of illegal drugs constitutes substance abuse. Possession of any substance defined above while on JCA's property or while on JCA business is likewise prohibited. Reporting to work or attempting to work while under the influence of alcohol is likewise prohibited. The section is not intended to prohibit the moderate consumption of alcohol in connection with JCA business.

**DISCIPLINARY ACTION:**

Any violation of this policy by an employee will result in immediate disciplinary action up to and including discharge. Any person, who refuses to comply with any of the terms of this policy or to fully cooperate with regard to any possible infraction of this policy, will be subject to the same disciplinary action.

**EMPLOYEE DRUG ASSISTANCE PROGRAM:**

We will work with the employees who believe that participation in an alcohol or drug treatment program is necessary. The medical insurance that is provided sets forth the benefits available under such policy. Information concerning substance abuse policies may be commenced by contacting the President.

**TESTING:**

JCA retains the right to request any prospective employee or employee to submit to a substance test when, in JCA's judgment, it is appropriate to do so. Compliance with such request us a condition of employment.

**RIGHT OF ACCESS TO TEST RESULTS AND CONFIDENTIALITY:**

BY signing JCA's copy of this Substance Abuse Policy, the applicant or employee consents to the release of all testing results to JCS's management and further releases and holds harmless both JCA and the testing laboratory from any and all claims or causes of action based on any action taken in connection with such results. Each employee shall have the right to request and receive the results of any substance test. All employee information relating to testing will be protected by JCA as confidential unless otherwise required by law, such is relevant to any legal proceedings, there are overriding public health and safety concerns, or authorized in writing by the employee.

**SEARCHES:**

JCA may authorize the search of an employee, employee's personal property, including desks and work area. No search will be conducted without the employee's consent. However, an employee's consent to a search is required as a condition of employment.

**WEAPONS POLICY**

JCA prohibits employees from possessing weapons on its premises with the sole exception of personnel specifically authorized by the President. A weapon is defined as any device or object capable of causing serious bodily injury or death to another person, including but not limited to handguns, shotguns, rifles, or other firearms, "stun guns", any knives with blades more than

three (3) inches in length. Violations of this policy will result in disciplinary action up to and including termination.

**VIOLENCE POLICY**

Violent acts or verbal or physical threats by employees against the property or person of other employees, customers, vendors, or other individuals associated with JCA will not be tolerated under any circumstances. Violations of this policy will result in disciplinary action up to and including termination.

**EMAIL/INTERNET POLICIES**

When using JCA e-mail, Internet or voice mail, you do not only represent yourself, you are representing JCA and you are doing it in a public medium. This system has been established and is to be used for official company business only. Individuals will have no privacy rights in e-mail or any other data files. Each account is subject to monitoring to determine its compliance with business use. An employee's use of the network is considered consent to the policy and to management's right to review e-mail (or listen to telephone conversations or voice mail). Please fully observe the guidelines and policies identified below and use prudent professional judgment in all such communication situations.

1. The use of JCA e-mail and Internet is for JCA business purposes only, and should be sent or retrieved only if it has a valid business or work-related reason which advances JCA's best interests.
2. E-mail should not be used to solicit, advocate, or participate in non-company or personal interests and cannot be used to solicit or to address others regarding commercial, religious, personal or political causes, or for any other solicitations and/or communications that are not work related.
3. The electronic mail system is not to be used in any way that could be interpreted as disruptive or offensive to others, or in ways that could be harmful to workplace moral or JCA's reputation.
4. All e-mail messages are records of JCA. Employees do not have a personal privacy right in any matter created, received at, or sent from the JCA e-mail system. JCA reserves the right to monitor the e-mail network at any time, and to access, examine and disclose information in an employee's e-mail mailbox at any time, without prior notice, and to further ensure that the system is being used for company purposes only.
5. Employees are reminded that e-mail can be read or intercepted by others, which can include inadvertent disclosure, accidental transmission to third parties, or purposeful retransmission to another employee's internal mailing list.
6. Your written communication via e-mail should be no different than that of a business letter. Despite the impression of informality with e-mail, your grammar, spelling and choice of words will convey both your professionalism and that of JCA. NOTE: studies

reflect that e-mail and Internet communications imply a sense of false privacy thereby causing the user to express him/herself in an inappropriately casual, if not unprofessional, manner. **Never send, write or keep anything you wouldn't want to see on the evening news.**

7. There will be no receiving or sending of foul, offensive, defamatory, pornographic or other inappropriate communication. There will be no display or transmission of sexually explicit images, messages, or cartoons, or any transmission or use of e-mail communications containing ethnic slurs, racial epithets, or anything that may be constructed as harassment or disparagement of others based on their race, national origin, sex, sexual orientation, age, disability, religious, familial status or political beliefs.
8. Employees are required to immediately notify their supervisor or the President if inappropriate material has been e-mailed to them from either a co-worker or an outside source.
9. Some information must be evaluated for its appropriate distribution via e-mail. Personnel concerns, disciplinary matters, confidential material protected by attorney-client privilege, general information or e-mail messages about JCA and/or its proprietary information, client(s) information, should only be disclosed to other authorized JCA employees and/or managerial staff and may not be suitable for e-mail transmission.
10. Employees shall not use e-mail in a manner that engages in copyright infringement.
11. Your e-mail password is the same as your network password unless you change it. Your password should not be shared with anyone else for any reason. However, your password does not imply your privacy on the network or e-mail. Your password can be overwritten.
12. Employees may not use company e-mail, electronic messaging, or web browser systems to download software unless approved in advance and in writing by the supervisor.
13. The unauthorized use of electronic messaging systems for purposes of "snooping" is also a violation of company policy.
14. E-mail and voicemail must be checked daily to ensure a high level of service response. You will have a limited disk quota and will be notified when you have exceeded that quota.
15. Delete unwanted messages immediately since they take up storage. Save messages if desirable, in the required format in the JCA data network.
16. Routinely and frequently virus-scan your e-mail especially when receiving or downloading files from others systems to prevent the spread of a virus. **NEVER** download files from a source you do not know; this is one way networks are virus attacked!
17. **NEVER** open a file that is an "Executable." You can determine an Executable by its extension.EXE> For example: setup.EXE or funny.EXE.

## EMPLOYEE PRIVACY

It is not JCA's policy or intent to meddle into an employee's private affairs. At the same time, JCA's offices, furnishings and office equipment are the property of JCA and are intended for the use of JCA's business. Thus, while JCA permits limited use of JCA's property, within reason and subject to the exercise of good judgment, for personal matters, the ability to do so does not make private anything within the premises of JCA that is JCA property. Accordingly, there should be no expectation of privacy anywhere within the confines of JCA's office premises.

By way of example only, and not of limitation, no employee of JCA should have any expectation of privacy to anything stored in any of the furniture (*i.e* desks, credenzas, etc.) within JCA's offices or within the confines of the offices itself (irrespective of whether the furniture assigned to any employee is under lock and key or not). Similarly, employees should not expect any privacy with respect to information stored in the hard drives of either the computer which serves as the server to the computer network of JCA or on the hard drive of any individual computer within any of the offices. Nor may any individual place any passwords or obstacles to retrieving information stored on the hard drives of any of the computers in the office. The only passwords permitted are those assigned and placed by JCA. Any materials intended to be kept personal and confidential should not be left anywhere in JCA's offices or furniture. Instead, you are encouraged to take such materials home to insure their privacy.

The foregoing is not intended to limit the right or ability of the owners to restrict access to certain information regarding JCA's business. As such, there may be certain areas within the premises of JCA's offices or certain information stored on the hard drives of JCA's computers relating to JCA business to which the owners, in their sole discretion, have determined should have limited access.

Any questions regarding the meaning or application of this policy should be directed to the President.

## TELEPHONE POLICY

Telephone etiquette is an important aspect of customer relations. To assure efficient telephone communications, employees should always use the approved greetings, attitude and speak in a courteous and professional manner. Please confirm information received from the callers, and hang up only after the caller has done so.

The telephone is the life blood of our company. As our switchboard is extremely busy, all employees are requested to keep calls as concise as possible.

Personal telephone calls must be kept to a minimum. In order to assist the receptionist and keep the telephone call flow efficient, the following procedures are required:

1. If possible, please acknowledge the acceptance of a call when the receptionist rings through to your desk. If you are on a call and another call comes in for you, the receptionist will ring through to your desk just to let you know that there is another call waiting for you.
2. Establish a weekly lunch schedule in each team, a copy of which must be given to the receptionist or advise the receptionist five-ten (5-10) minutes prior to the commencement of the lunch hour of the time that you intend to be away from your desk.
3. A sign-out sheet for office absence is at the reception desk. All employees must sign-out prior to leaving the office or taking a lunch break and fill in the anticipated time of return.
4. Advise the receptionist prior to going into a meeting. Also advise the receptionist if any other employees will be in the meeting. Please be sure to let the receptionist know the approximate time the meeting is expected to last.
5. If it is necessary to have you calls "held" for a period of time, please advise the receptionist prior to the necessary time and also advise for how long you will not be available.
6. Community Services Specialists who elect to take advantage of "quiet time" must pre-schedule it in coordination with other Community Service Specialists and must advise the receptionist ahead of time. No two (2) Community Services Specialists may take "quite time" simultaneously.
7. Calls to the 900 exchange are specifically prohibited.
8. Please do not use the Directory Assistance unless it is absolutely necessary. Please refer to the telephone directory.
9. Per the Vacation Policy, each employee is to furnish the receptionist with a copy of their fully approved "Request for Leave" form. Please remind the receptionist the day prior to the commencement of your leave that you will be on vacation. Also advise the receptionist who will be taking your calls during your absence.
10. In the event that the receptionist is out, all of the Community Service Specialists will be required to do "relief reception" on rotation schedule basis. The schedule will be drawn by the President and every effort will be made to schedule each Service Specialist to fit their specific duty schedule. However, if all requests cannot be accommodated, your cooperation is expected.

## SMOKING

In keeping with JCA's intent to provide a safe and healthful environment, smoking is prohibited throughout our facilities. This policy applies equally to all employees, contractors, Board Members, and visitors. No more than any two (2) members of the company may leave the office at the same time for a "smoking break."

Out of consideration and fairness for co-workers, smokers are expected to keep the number of "smoking breaks" to a minimum and to minimize the amount of time each "smoking break."

**MEAL PERIODS**

All full-time regular employees are provided with one (1) meal period of sixty (60) minutes in length each work day. Lunch breaks must be scheduled amongst the individual teams. A minimum of one (1) team member must be on duty during normal business hours. Employees will be relived of all active responsibilities and restrictions during lunch meal periods. Please remember to notify the receptionist before leaving your desk.

**OVERTIME**

When operating requirements or other needs cannot be met during regular working hours, employees will be given the opportunity to volunteer for overtime work assignments. A contract relating to pay for overtime is to be signed by all non-exempt employees. Time off for sick leave, vacations, bonus vacations, holidays, or any leave of absence will not be considered hours worked for purposes of performing overtime calculations.

**HOURS**

Our hours are 9:00 a.m. to 5:00 p.m. Monday through Thursday and 9:00 a.m. to 3:00 p.m. on Friday. Staffing needs and operational demands may necessitate variations in starting and ending times, as well as variations in the total hours that may be schedules each day and week.

**WORKWEEK**

Our work week is 40 hours commencing at noon on Friday and ends at noon on the following Friday.

**SAFETY**

Establishing and maintain a safe work environment is the shared responsibility of JCA and employees from all levels of the organization. We have made every effort to see that the work environment is the safest possible for our employees. Employees are expected to obey the safety rules and to exercise caution in all their work activities. Employees at all levels of the organization are expected to correct unsafe conditions to their supervisor as JCA takes safety seriously.

All accidents that result in injury must be reported to the President, regardless of how insignificant the injury may appear. Inform your supervisor if you have suggestions for improving job safety.

**USE OF EQUIPMENT AND WEHICLES**

When using JCA property, employees are expected to exercise care, perform required maintenance, and follow all operating instructions, safety standards and guidelines. Notify the

President if any equipment, machines, or tools appear to be damaged, defective, or in need of repair. Prompt reporting of damages, defects, and the need for repairs could prevent deterioration of the equipment and possible to injury to employees or others.

Employees are also expected to report to their supervisor, any automobile accidents in which they may be involved (irrespective of fault) and traffic tickets they receive, if the accident occurred or the traffic ticket was received when on JCA business.

**SECURITY INSPECTIONS**

JCA wishes to maintain a work environment that is free of illegal drugs, alcohol, firearms, or other improper materials. To this end, JCA prohibits the control, possession, transfer, sale of use of such materials on its premises. JCA requires the cooperation of all employees in administering this policy.

Desks, lockers, and other storage devices may be provided for the convenience of employees, but remain the sole property of JCA. Accordingly, they, as well as any articles found in them, can be inspected with supervisory approval by any agent or representative of JCA at any time, either with or without prior notice. Similarly, employee vehicles in the parking lot may be subject to inspection from time to time in the presence of the employee.

**NON-APPLICABILITY OF POLICY**

The policies do not apply to Directors who are also Officers and employees and are employed by JCA.

ACKNOWLEDGEMENT FORM REGARDING EMPLOYEE HANDBOOK

I have received a copy of the current JCA Employee Handbook. I understand that revisions to the Handbook may supersede or eliminate one or more existing policies and that JCA will endeavor to communicate any revisions through appropriate notices.

I understand that my employment relationship with JCA is at will and is subject to termination by me or JCA with or without cause or notice; at any time either party believes such action to be appropriate.

I further authorize JCA to withhold from my final check the cost of any item I have not returned prior to leaving the corporation and the full amount of any money which I may owe to JCA, including, but not limited to, costs of re-keying locks or replacing keys. I also authorize JCA to deduct from any of my paychecks the cost of having to place a stop payment order on a check I have lost or had stolen.

I acknowledge that this Handbook is not a contract for employment. I have received, read, understood, and will comply with both the policies contained in this Handbook and any revisions made to these policies.

____________________________________ ____________________

EMPLOYEE'S SIGNATURE DATE

____________________________________

EMPLOYEE'S NAME (TYPED OR PRINTED)

Jeffery Charles and Associates, Inc.

ACKNOLEDGMENT OF RECEIPT OF JCA'S WRITTEN POLICY CONCERNING THE FAMILY AND MEDICAL LEAVE ACT (FMLA)

1. I acknowledge I have received and will read a copy of JCA's written FMLA policy as stated in the JCA Employee Handbook.
2. I understand I must give written notice in accordance with the JCA policy of any request for FMLA leave, unless the onset of my own serious health condition makes it impossible for me to do so.
3. I understand that I may be disciplined if I fail to comply with the terms and conditions of JCA's written policy.

____________________________________ ____________________
EMPLOYEE'S SIGNATURE DATE

____________________________________
EMPLOYEE'S NAME (TYPED OR PRINTED)

# Superior Court of the District of Columbia

CIVIL DIVISION - CIVIL ACTIONS BRANCH

INFORMATION SHEET

Naylor Gardens Cooperative Housing Association
Plaintiff(s)

Case Number: 2025-CAB-007704

vs

Date: November 18, 2025

Jeffrey Charles & Associates, Inc.
Defendant(s)

☐ One of the defendants is being sued in their official capacity.

| | |
|---|---|
| Name: *(Please Print)* Caroline Y. Lee-Ghosal, Esquire | Relationship to Lawsuit |
| Firm Name: Jackson & Campbell, P.C. | ☒ Attorney for Plaintiff<br>☐ Self (Pro Se) |
| Telephone No.: (202) 457-1600 DC Bar No.: 1697129 | ☐ Other: ___ |

TYPE OF CASE: ☐ Non-Jury ☐ 6 Person Jury ☒ 12 Person Jury

Demand: $ ___ Other: Damages of $3,000,000.00+ and accounting

PENDING CASE(S) RELATED TO THE ACTION BEING FILED

Case No.: ___ Judge: ___ Calendar #: ___

Case No.: ___ Judge: ___ Calendar #: ___

NATURE OF SUIT: *(Check One Box Only)*

**CONTRACT**
- ☑ Breach of Contract
- ☐ Breach of Warranty
- ☐ Condo/Homeowner Assn. Fees
- ☐ Contract Enforcement
- ☐ Negotiable Instrument

**COLLECTION/INS. SUB**
- ☐ Debt Collection
- ☐ Insurance Subrogation
- ☐ Motion/Application for Judgment by Confession
- ☐ Motion/Application Regarding Arbitration Award

**EMPLOYMENT DISPUTE**
- ☐ Breach of Contract
- ☐ Discrimination
- ☐ Wage Claim
- ☐ Whistle Blower
- ☐ Wrongful Termination

**REAL PROPERTY**
- ☐ Condo/Homeowner Assn. Foreclosure
- ☐ Declaratory Judgment
- ☐ Drug Related Nuisance Abatement
- ☐ Ejectment
- ☐ Eminent Domain
- ☐ Interpleader
- ☐ Other
- ☐ Quiet Title
- ☐ Specific Performance

☐ **FRIENDLY SUIT**
☐ **HOUSING CODE REGULATIONS**
☐ **QUI TAM**
☐ **STRUCTURED SETTLEMENTS**

**ADMINISTRATIVE PROCEEDINGS**
- ☐ Administrative Search Warrant
- ☐ App. for Entry of Jgt. Defaulted Compensation Benefits
- ☐ Enter Administrative Order as Judgment
- ☐ Libel of Information
- ☐ Master Meter
- ☐ Petition Other
- ☐ Release Mechanics Lien
- ☐ Request for Subpoena

**MALPRACTICE**
- ☐ Medical – Other
- ☐ Wrongful Death

**AGENCY APPEAL**
- ☐ Dangerous Animal Determination
- ☐ DCPS Residency Appeal
- ☐ Merit Personnel Act (OEA)
- ☐ Merit Personnel Act (OHR)
- ☐ Other Agency Appeal

☐ **APPLICATION FOR INTERNATIONAL FOREIGN JUDGMENT**

# Information Sheet, Continued

**CIVIL ASSET FORFEITURE**
- ☐ Currency
- ☐ Other
- ☐ Real Property
- ☐ Vehicle

**NAME CHANGE/VITAL RECORD AMENDMENT**
- ☐ Birth Certificate Amendment
- ☐ Death Certificate Amendment
- ☐ Gender Amendment
- ☐ Name Change

**TORT**
- ☐ Abuse of Process
- ☐ Assault/Battery
- ☐ Conversion
- ☐ False Arrest/Malicious Prosecution
- ☐ Libel/Slander/Defamation
- ☐ Personal Injury
- ☐ Toxic Mass
- ☐ Wrongful Death (Non-Medical Malpractice)

**GENERAL CIVIL**
- ☐ Accounting
- ☐ Deceit (Misrepresentation)
- ☐ Fraud
- ☐ Invasion of Privacy
- ☐ Lead Paint
- ☐ Legal Malpractice
- ☐ Motion/Application Regarding Arbitration Award
- ☐ Other - General Civil
- ☐ Product Liability
- ☐ Request for Liquidation
- ☐ Writ of Replevin
- ☐ Wrongful Eviction

**CIVIL I/COMPLEX CIVIL**
- ☐ Asbestos

**MORTGAGE FORECLOSURE**
- ☐ Non-Residential
- ☐ Residential

**STATUTORY CLAIM**
- ☐ Anti – SLAPP
- ☐ Consumer Protection Act
- ☐ Exploitation of Vulnerable Adult
- ☐ Freedom of Information Act (FOIA)
- ☐ Other

**TAX SALE FORECLOSURE**
- ☐ Tax Sale Annual
- ☐ Tax Sale Bid Off

**VEHICLE**
- ☐ Personal Injury
- ☐ Property Damage

☐ **TRAFFIC ADJUDICATION APPEAL**

☐ **REQUEST FOR FOREIGN JUDGMENT**

Filer/Attorney's Signature

November 20, 2025

Date