**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NAYLOR GARDENS COOPERATIVE HOUSING ASSOCIATION,<br><br>Plaintiff,<br><br>v.<br><br>JEFFREY CHARLES & ASSOCIATES, INC.,<br><br>Defendants. | Case No. 26-cv-244-MJS |

**MEMORANDUM OPINION AND ORDER**

A few years back, Naylor Gardens Cooperative Housing Association ("NGCHA") entered into a property-management agreement with Jeffrey Charles & Associates ("JCA"). Under that arrangement, JCA agreed to provide NGCHA with a wide range of property-management services for NGCHA's full property portfolio—comprising some 56 residential buildings with around 800 total dwelling units—in exchange for a management fee. But as it turns out, their deal would be short-lived. After about a year, NGCHA terminated the relationship based on JCA's alleged mismanagement. And not long after, NGCHA filed this case against JCA, asserting claims for breach of contract, various tort claims, and more. The matter is now before the Court on JCA's motion for partial dismissal of Count V only: NGCHA's statutory claim under the D.C. Consumer Protection Procedures Act ("CPPA"). JCA argues that NGCHA fails to plausibly allege the requisite "consumer" relationship to implicate the CPPA. NGCHA insists otherwise. Agreeing with JCA, the Court **GRANTS** the motion and **DISMISSES** Count V of the complaint.

**FACTUAL AND PROCEDURAL BACKGROUND**

The Court draws the following facts, accepted as true, from the complaint. *Casey v. McDonald's Corp.*, 880 F.3d 564, 567 (D.C. Cir. 2018). Plus, because the complaint refers to and attaches as exhibits NGCHA's management agreement and management plan with JCA, the Court may properly consider those materials, too. *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1133 (D.C. Cir. 2015) ("A district court may consider a document that a complaint specifically references without converting the motion into one for summary judgment.") (citations omitted).

NGCHA is a nonprofit housing cooperative association that owns 56 residential buildings, with a total of 796 dwelling units, in Washington, D.C. (ECF No. 1-1 ("Compl.") ¶¶ 1–2.) NGCHA's property units are owned by NGCHA or its members and are occupied by residents that fall within one of several groups: "[NGCHA] members, tenants who lease their unit directly from NGCHA, or sublessees who sublease one of NGCHA's member-owned units." (*Id.* ¶ 2.)

Effective June 2023, NGCHA entered into a property-management agreement with JCA. (Compl. ¶ 5.) JCA agreed to serve as the exclusive agent for the management of NGCHA's full property portfolio for a three-year term in exchange for a percentage-based management fee, calculated as "3.5% of gross receipts from the previous month." (*Id.* ¶¶ 5, 7, 9.) JCA's responsibilities to NGCHA were wide-ranging. As the complaint recites, they included turning over, marketing, selling, and leasing any vacant units across NGCHA's properties (*id.* ¶¶ 13–20); obtaining and renewing any necessary government licenses and permits and complying with applicable governmental requirements; (*id.* ¶¶ 37–40, 42); collecting, managing, depositing, and disbursing membership fees, carrying charges, tenant security deposits, and rent payments (*id.* ¶¶ 51–58); maintaining and performing repairs across the properties (*id.* ¶¶ 67–68); and more. These responsibilities, among others, were spelled out in a detailed eleven-page management agreement

between NGCHA and JCA, which itself incorporated a lengthy "management plan" prepared by JCA for NGCHA's Board of Directors. (*See* Compl. ¶¶ 5–8; Compl. Exs. 1 & 2.)

According to the complaint, JCA failed to properly carry out these responsibilities in a number of ways. As to JCA's role in inspecting and turning over vacant units, for example, NGCHA alleges that "a May 2023 vacancy report prepared by JCA's predecessor management company indicated that at least fifteen (15) units were 'rent ready' and awaiting inspection and turnover" at the time JCA stepped into the property-manager role, but JCA failed to inspect the units for more than five months. (Compl. ¶ 23–24.) Further, NGCHA alleges there was a substantial increase in vacancies by December 2023, "totaling sixty (60) vacant units," with "JCA largely continu[ing] to fail to timely inspect or turnover the newly vacant units" and thus causing substantial rental income loss. (*Id.* ¶¶ 26–27.) As to those units JCA did turn over, NGCHA faults various aspects of JCA's process in doing so, including its alleged failure to secure approvals for certain expenditures. Citing one example, NGCHA alleges that JCA paid more than $52,000 to a contractor to perform repairs in nine vacant units, even though, according to NGCHA, comparable contractors would have completed the same work at less than half that price. (*Id.* ¶¶ 29–35.)

More, NGCHA complains that JCA did not submit timely "vacancy reports" on behalf of NGCHA to the D.C. government, thus "disqualifying NGCHA and its members from implementing a 10% rent increase for the affected units[.]" (Compl. ¶ 39.) Relatedly, NGCHA alleges that JCA "failed to timely renew basic business licenses for the leasing and/or subleasing of the Property's units," precluding rent increases and causing "additional losses in rental income." (*Id.* ¶ 42.) JCA's failure to renew those licenses, NGCHA alleges, "caused significant delays in NGCHA's ability to enforce tenants' lease agreements and thereby exacerbated delinquencies in rental payments and prevented the removal of serially non-paying tenants." (*Id.* ¶ 46.)

More still, NGCHA claims that JCA failed to properly collect security deposits and rent payments from NGCHA property tenants, including past due rent and late fees. (Compl. ¶¶ 58–65.) As NGCHA tells it, "the balance of outstanding rent, fees, and other amounts owed to NGCHA by its members and tenants at the time of JCA's termination totaled approximately $1.1 million, which included an estimated 95 tenants who owed 3 months or more of back rent." (*Id.* ¶ 65.) As another example, NGCHA alleges that JCA failed to adequately maintain and repair the property as it was required to do. In turn, "NGCHA received citations, violation notices, and fines" from various agencies due to JCA's failure to appropriately maintain the property, and tenants repeatedly submitted complaints "regarding needed maintenance and repairs to their respective apartments which JCA failed to address, including those deemed 'emergency requests.'" (*Id.* ¶¶ 70–71.)

Reportedly because of these problems and others like them, NGCHA terminated its management agreement with JCA effective September 2024. (*See* Compl. ¶¶ 11–12, 63, 65, 74.)

NGCHA proceeded to file suit against JCA in the D.C. Superior Court in November 2025, following which JCA timely removed the case to U.S. District Court in January 2026. (ECF No. 1.) Through its complaint, NGCHA asserts seven claims for relief against JCA: breach of contract (Count I); (2) breach of fiduciary duty (Count II); negligence (Count III); accounting (Count IV); violation of the CPPA (Count V); and two counts of tortious interference with contractual relations (Counts VI and VII). Relevant here, JCA moved to dismiss the CPPA claim in Count V only, concurrently filing an answer to the rest of NGCHA's complaint.

In June 2026, the matter was referred to the undersigned for all purposes with the parties' consent. (ECF No. 24; Min. Order, June 3, 2026.) JCA's motion is fully briefed and ripe for decision. (*See* ECF No. 7 ("Mot."); ECF No. 10 ("Opp'n"); ECF No. 13 ("Reply").)

## LEGAL STANDARD

On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court asks whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[F]acial plausibility" means the complaint's facts must allow for a "reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Under Rule 12(b)(6), a court must construe the complaint "in favor of the plaintiff" and afford the plaintiff "the benefit of all inferences that can be derived from the facts alleged." *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979)). But a court need not accept as true "legal conclusions couched as factual allegations[,]" *Nurriddin v. Bolde*n, 818 F.3d 751, 756 (D.C. Cir. 2016) (citation omitted), nor will mere "recitals of the [legal] elements of a cause of action … suffice" to forestall a motion to dismiss, *L. Xia v. Tillerson*, 865 F.3d 643, 650 (D.C. Cir. 2017) (quoting *Iqbal*, 556 U.S. at 678).

## ANALYSIS

JCA seeks dismissal of the CPPA claim in Count V only. And JCA seeks dismissal on a relatively narrow and discrete basis, arguing that NGCHA fails to plausibly allege a predicate "consumer" relationship with JCA, as necessary to support a viable claim under the CPPA. According to JCA, the complaint shows that JCA's property-management arrangement with NGCHA was a "commercial and business relationship," not one between a merchant and consumer, thus placing it beyond the CPPA's reach. (Mot. at 1.) NGCHA sees it differently. Disputing that the case involves "a commercial transaction between two business entities," NGCHA contends that because JCA was "hired to manage people's homes," that means "the primary purpose" of JCA's engagement was a consumer purpose: *i.e.*, "to serve the personal,

household, and family needs of [NGCHA's] member-residents[.]" (Opp'n at 1–2.) On review, and considering the well-pled allegations in NGCHA's complaint, JCA's position carries the day.

The CPPA "affords a panoply of strong remedies" to those "victimized by unlawful trade practices," and its protections "apply to a wide range of practices and transactions." *Ford v. Chartone, Inc.*, 908 A.2d 72, 80–81 (D.C. 2006) (first quoting *Dist. Cablevision Ltd. P'ship v. Bassin*, 828 A.2d 714, 717 (D.C. 2003); then citing *DeBerry v. First Gov't Mortg. & Invs. Corp.*, 743 A.2d 699, 700–01 (D.C. 1999)). But the statute's reach is not without bounds. One important limitation, as the D.C. Court of Appeals has long emphasized, is that CPPA "was designed to police trade practices arising only out of *consumer-merchant relationships* and does not apply to *commercial dealings* outside the consumer sphere." *Id.* at 81 (emphases added); *see also Price v. Indep. Fed. Sav. Bank*, 110 A.3d 567, 573–75 (D.C. 2015); *Sundberg v. TTR Realty, LLC*, 109 A.3d 1123, 1129 (D.C. 2015); *Snowder v. District of Columbia*, 949 A.2d 590, 599 (D.C. 2008); *Bassin*, 828 A.2d at 717; *Howard v. Riggs Nat'l Bank*, 432 A.2d 701, 709 (D.C. 1981).

Put simply, "the CPPA protects only consumers." *Shaw v. Marriott Int'l, Inc.*, 605 F.3d 1039, 1043 (D.C. Cir. 2010) (citations omitted). And within the meaning of the CPPA, a "consumer" is one "who receives or demands goods or services that are primarily for personal, household, or family use." *Id.* Conversely, "the statute does not reach transactions intended primarily to promote business or professional interests." *Id.*; *see also Ruiz v. Millennium Square Residential Ass'n*, 2022 WL 296200, at *4 (D.D.C. Feb. 1, 2022) ("The CPPA penalizes the use of unfair or deceptive trade practices, but only when those practices form part of a consumer-merchant relationship."); *Yudzon v. Sage Title Grp., LLC*, 2020 WL 2615579, at *5 (D.D.C. May 22, 2020) ("[T]he CPPA does not protect businesses engaged in commercial activity[.]" (citation

omitted)); *Bakeir v. Cap. City Mortg. Corp.*, 926 F. Supp. 2d 320, 333 (D.D.C. 2013) ("[The CPPA] does not apply to transactions of a commercial nature[.]" (citation omitted)).

The parties agree on these governing principles. They agree that the CPPA only applies to consumer-merchant relationships, not commercial transactions. And they agree that the dividing line between those alternatives hinges on the primary purpose of the parties' dealings: whether the goods or services at the center of the transaction were primarily for "personal, household, or family use" or whether they were "intended primarily to promote business or professional interests." *Shaw*, 605 F.3d at 1043 (citing D.C. Code § 28-3901(a)(2)). The parties disagree, though, on how those principles map onto NGCHA's claim. A fair reading of the complaint reveals a straightforward answer: NGCHA's agreement with JCA was a commercial transaction intended primarily to promote NGCHA's business interests, not a consumer transaction under the CPPA.

Start with the overall nature of the arrangement, as alleged by NGCHA and as reflected in the management agreement and management plan attached to the complaint. NGCHA hired JCA to manage the entirety of the NGCHA's properties, totaling 56 separate buildings that collectively included 796 separate dwelling units, for a period of three years—at least based on the negotiated term before NGCHA terminated JCA's services in September 2024. (Compl. ¶¶ 2, 5.) In exchange, NGCHA agreed to pay "JCA a 'management fee' equal to 3.5% of gross receipts from the previous month[.]" (*Id.* ¶ 9.) The parties memorialized their respective obligations, including JCA's varied and wide-ranging responsibilities as NGCHA's property manager, in a detailed 11-page management agreement, which itself incorporated a lengthy 60-some-page management plan that JCA prepared for NGCHA. (Compl. ¶¶ 5–8; Compl. Exs. 1 & 2) These overall facets of the relationship—the scope and breadth of JCA's role as property manager, JCA's associated compensation in the form of a percentage cut of NGCHA's "gross receipts," and the specificity

and detail with which the parties memorialized their ongoing arrangement—all point decidedly more in the direction of a commercial relationship than a consumer one.

The alleged management failings that underpin NGCHA's claims only strengthen that conclusion. NGCHA alleges that JCA failed to promptly and appropriately turn over, inspect, market, and re-lease vacant units across NGCHA's properties, resulting in lost rental income for NGCHA and its members. (Compl. ¶¶ 21–36.) NGCHA alleges that JCA failed to properly satisfy various D.C. licensing requirements on behalf of NGCHA—requirements that were reportedly necessary for NGCHA and its members to implement scheduled rent increases and enforce lease agreements—resulting in lost rental income and other damages. (*Id.* ¶¶ 38–50.) NGCHA alleges that JCA failed to properly collect security deposits and rent payments from tenants in NGCHA's properties, including past-due rent and late fees, ultimately causing the balance of outstanding rent owed to NGCHA and its members to balloon by the time of JCA's termination as property manager. (*Id.* ¶¶ 58–66.) And NGCHA alleges that JCA failed to appropriately maintain and perform repairs to its properties. (*Id.* ¶¶ 69–72.) As these allegations show, JCA's responsibilities were intended primarily to promote NGCHA's business and financial interests in marketing and leasing its property units, collecting income generated from those property units on NGCHA's behalf, and taking steps to ensure that NGCHA and its members could maximize the income generated from those property units. And the economic harms that NGCHA says resulted from JCA's missteps were fundamentally business losses in the form of lost rental income to NGCHA and its members.

Resisting that conclusion, NGCHA says that JCA's role was not "to merely manage an abstract legal entity but to manage the homes, finances, and living conditions of individual people." (Opp'n at 5.) NGCHA lists several categories of what it calls "non-commercial consumer services that [JCA] agreed to provide" to NGCHA's members "to manage their household and household

expenses," such as the collection of membership fees and assessments from members to ensure "their right to remain in their home," the completion of maintenance and repair needs for tenants throughout the properties, and the management of NGCHA's books and records. (*Id.* at 7.) Because these functions benefited the "personal use" of the properties by NGCHA's members and their tenants, NGCHA argues, they demonstrate that the primary purpose of JCA's property-management services was consumer-focused, rather than a business arrangement. (*See id.*)

The Court disagrees. In some scenarios, at least some of these responsibilities can reasonably be characterized as consumer services. Even JCA acknowledges as much. (*See* Reply at 2.) But not in this context, especially given NGCHA's status as a cooperative housing association. A "cooperative" is a relatively distinct ownership structure whereby its members do not themselves own the unit or apartment in which they reside, but rather "hold[] shares of stock in the cooperative corporation that owns the apartment[,]" and then "[t]he corporation leases apartments to its stockholders." *Burgess v. Pelkey*, 738 A.2d 783, 787 n.9 (D.C. 1999) (quoting *Lemp v. Keto*, 678 A.2d 1010, 1018 (D.C. 1996)). NGCHA describes things similarly, explaining that its "members hold shares of stock in the cooperative corporation paired with a proprietary lease that grants them the right to occupy their specific unit." (Opp'n at 4.)

With that framework in mind, the Court largely agrees with JCA that NGCHA is essentially "a business that provides leases to occupants of units" in its properties, some of whom happen to be owners or members of the cooperative. (Reply at 3.) In fact, many occupants of NGCHA's properties—the complaint does not allege any specific breakdown—are not NGCHA members at all, but rather non-member "tenants who lease their unit directly from NGCHA, or sublessees who sublease one of NGCHA's member-owned units." (Compl. ¶ 2.) For those residents, especially, NGCHA was operating even more clearly as a business, as reflected by NGCHA's complaints

about lost rental income due to JCA's alleged failure to turn over and re-lease units promptly, to secure the licenses and approvals necessary for rent increases, and more. But even broadly speaking, NGCHA's engagement of JCA served to pass off many of NGCHA's own business obligations to its members as a housing cooperative, in exchange for providing JCA with a cut of NGCHA's "gross profits." (Compl. ¶ 9.) Frankly, if anything, NGCHA is perhaps better characterized as a "merchant" within the meaning of the CPPA, rather than a "consumer," which further solidifies the Court's determination that NGCHA cannot pursue a claim against JCA under the statute. *Ford*, 908 A.2d at 81 ("[The CPPA] is not intended to supply merchants with a private cause of action against other merchants." (alteration in original) (quoting *Indep. Commc'ns Network, Inc. v. MCI Telecomms. Corp.*, 657 F. Supp. 785, 787 (D.D.C. 1987))). But the Court need not go that far to conclude that NGCHA's claim fails because it is enough to find that its property-management arrangement with JCA was not a consumer transaction under the CPPA.

Finally, even assuming that some facets of JCA's responsibilities could be construed as consumer services, as NGCHA argues—*e.g.*, maintenance and repair activities that JCA was responsible for completing within NGCHA's individual apartments and units—the complaint does not plausibly show that those sorts of services were the *primary* purpose of JCA's engagement as NGCHA's property manager. *See Shaw*, 605 F.3d. at 1043. Instead, the overall allegations are squarely indicative of a commercial business relationship, not a consumer transaction, especially when read alongside the management agreement and management plan that NGCHA attached to the complaint. Plus, as the case law recognizes, the mere fact that a transaction implicates a residential property does not automatically make it a consumer transaction for purposes of the CPPA. *See, e.g.*, *Price*, 440 A.3d at 574–75 (finding that loan transaction on property was not a consumer transaction because the owner did not live at the property but rather leased it to other

individuals and businesses for their use); *Bakeir*, 926 F. Supp. 2d at 333–34 (similar); *Cannon v. Wells Fargo Bank, N.A.*, 926 F. Supp. 2d 152, 172–73 (D.D.C. 2013) (holding that the purchase of an insurance policy on a residential dwelling was not a consumer transaction because the policy was obtained in connection with the operation of a day-care business out of the property). This case presents another example of why that is so.

Because the complaint does not plausibly allege that NGCHA's management contract with JCA was a consumer relationship, NGCHA fails to state a viable claim under the CPPA.[1]

* * *

In the final sentence of its opposition, NGCHA asks the Court to "grant [it] the opportunity to amend, if the Court deems it necessary." (Opp'n at 8.) The Court rejects that invitation. For starters, NGCHA's request is procedurally deficient under D.C. Circuit precedent, which requires a plaintiff wishing to amend to file "a motion for leave to amend [a] complaint and attach[] a proposed amended complaint." *Rollins v. Wackenhut Servs., Inc.*, 703 F.3d 122, 130 (D.C. Cir. 2012) (citing *Belizan v. Hershon,* 434 F.3d 579, 582 (D.C. Cir. 2006)). And "[a] bare request in an opposition to a motion to dismiss—without any indication of the particular grounds on which amendment is sought—does not constitute a motion within the contemplation of Rule 15(a)." *Id.* (quoting *Belizan*, 434 F.3d at 582); *see also U.S. ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1259 (D.C. Cir. 2004) (same). Further, as a substantive matter, NGCHA fails to explain how it believes it could plead additional facts to state a viable CPPA claim here, and the Court fails

[1] As a final point, the Court acknowledges that NGCHA alleges itself to be a "consumer" within the meaning of the CPPA. (Compl. ¶ 112 (citing D.C. Code § 28-3901(a)(2).) But that is precisely the sort of legal conclusion the Court cannot credit at the motion-to-dismiss stage. *See, e.g.*, *Nurriddin v. Bolden*, 818 F.3d 751, 756 (D.C. Cir. 2016). Instead, the Court looks beyond NGCHA's conclusory labels to the fact-based allegations it puts forward. And for the reasons explained, those allegations do not plausibly show the requisite consumer relationship to support a viable claim.

to see any reasonable path by which NGCHA might do so given the various allegations and considerations discussed above. The Court denies NGCHA's fleeting request for leave to amend.

## CONCLUSION AND ORDER

For the reasons explained, the Court **GRANTS** JCA's partial motion to dismiss. (ECF No. 7) and **DISMISSES** Count V of NGCHA's complaint.

**SO ORDERED.**

Dated: September 18, 2026

Matthew J. Sharbaugh

Digitally signed by Matthew J. Sharbaugh
Date: 2026.09.18 12:22:16 -04'00'

MATTHEW J. SHARBAUGH
United States Magistrate Judge